UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | No. 1:21-cr-150-TJH |
| | : | |
| v. | : | |
| | : | |
| JAMES DOUGLAS RAHM, JR., | : | |
| | : | |
| Defendant | : | |

### UNITED STATES' RESPONSE TO DEFENDANT'S NOTICE OF INTENT TO RAISE PUBLIC AUTHORITY DEFENSE

Defendant James Douglas Rahm, Jr. seeks to raise a defense of "entrapment by estoppel" at his December trial in this matter. *See* Def't Notice of Public Authority Defense, Dkt. 36. But listening to then-President Trump's speech before the riot on January 6, 2021 certainly cannot be a reasonable defense – let alone an exoneration – of the crimes with which he is charged.

This is not the first time in this District that defendants have argued that high-ranking government officials authorized criminal misconduct. Thirty years ago, the D.C. Circuit considered an asserted defense not unlike that made by Rahm, Jr. In the wake of the Iran-Contra scandal, Oliver North faced criminal prosecution for conduct that North said he had been directed to engage in by the National Security Advisor to President Reagan, allegedly with the President's acquiescence or approval. North was a high-ranking government official indisputably working on behalf of the Administration; his superior, the National Security Advisor, had not only condoned but engaged in similar misconduct; and his superior reported directly to the President. North subpoenaed the then-former President to be a witness at his trial. North also requested that the trial court use this jury instruction at his trial: "If you find that . . . North acted in good faith on a superior's apparent authorization of his action, and that his

reliance was reasonable based on the facts as he perceived them, that is a complete defense . . . ." *United States v. North*, 910 F.2d 843, 879 (D.C. Cir. 1990) (per curiam), *opinion withdrawn and superseded in part on reh'g*, 920 F.2d 940 (D.C. Cir. 1990).

The D.C. Circuit flatly rejected North's claim that he could raise a good-faith defense based on the apparent or implied authorization by his superiors in the Executive Branch:

> North's suggested instruction, quoted above, goes so far as to conjure up the notion of a "Nuremberg" defense, a notion from which our criminal justice system, one based on individual accountability and responsibility, has historically recoiled. In the absence of clear and comprehensible Circuit authority that we must do so, we refuse to hold that following orders, without more, can transform an illegal act into a legal one.

*Id.* at 881. The Court similarly concluded that whether North "was following President Reagan's orders" was "immaterial" to whether North intended to "corruptly" obstruct Congress under 18 U.S.C. § 1505. *Id.* at 884. In so doing, the Court rejected North's "stunning" idea that he could "escape the criminal consequences of his otherwise unlawful acts merely by asserting that his reason for committing the acts was that he was 'following orders.'" *Id.* at 883-84.

Rahm, Jr.'s claim is weaker than North's unsuccessful claim in virtually every respect. He is not—nor ever has been—a government official, let alone a government official engaged in high-level national security work. Instead, he is a member of the public who claims that he went to a rally and heard the former President tell him to "walk down to the Capitol" and "show strength," among other things. Based on that, Rahm, Jr. contends that he is entitled to raise an public authority defense at trial.

This Court should reject Rahm, Jr.'s attempt to deflect responsibility. The narrow affirmative defense he invokes has no application here, and he should be precluded from raising it at trial. Rahm, Jr. cannot show that former President Trump advised him that the criminal

statutes he is alleged to have violated did not apply to his conduct.   And Rahm, Jr. cannot show that it was objectively reasonable for him to rely on the statements of former President Trump as invitations to commit consequence-free criminal acts.

## I.     FACTUAL AND PROCEDURAL BACKGROUND

Rahm, Jr. and his adult son drove from Philadelphia to Washington, D.C. on January 6, 2021.   Once in Washington, D.C., he attended the "Stop the Steal" rally on the National Mall. He then headed to the U.S. Capitol building, joining other rioters on the east side of the Capitol. Rahm, Jr. was part of the larger mob that descended on the Capitol and the restricted grounds that day.   Prior to entering the Capitol, Rahm, Jr. made the following post on Facebook, stating, "They're in there counting the electoral votes we have the building surrounded we're ready to make a breach and take our Capitol back" as depicted below:



Rahm, Jr. entered the Capitol at approximately 2:42 pm through the East Rotunda Doors after they were violently breached by rioters from inside. Rahm, Jr. spent approximately 11 minutes in the Capitol during which time he went through the Rotunda, through Statuary Hall to the Statuary Hall Connector. At this point, the rioters in the Connector were just outside the House of Representatives Chamber and were attempting to breach the Chamber Door to get to lawmakers who were sheltering inside. He turned around and proceeded back whence he came and exited out the East Rotunda Doors at approximately 2:53 pm. Rahm, Jr. recorded videos of himself in the Capitol and posted photographs and comments on social media. One of these

4

videos did not capture the defendant's face but did capture a voice, identified by Individual 1 as Rahm, Jr.'s, saying, inter alia, "We're taking our fucking house back.   Time to find some brass and kick some freakin' ass" and showed the interior of the U.S. Capitol building Rotunda.   Rahm, Jr. later told the FBI that prior to entering the Capitol on January 6, he recalled yelling to the crowd he was in, "I think we stopped the vote!" to which people around him cheered.   As a result of the actions of Rahm, Jr. and hundreds of others, on January 6, 2021, Congress was forced to halt its proceedings and evacuate the House and Senate Chambers.   After the building was secured later that day, Congress reconvened and completed counting, certifying, and declaring the Electoral College vote result.

Rahm, Jr.'s actions at the Capitol were reported to the FBI by Individual 1.   On or around January 8, 2021, Individual 1 visited Rahm, Jr.'s Facebook page and saw multiple posts, to include photographs and videos, of Rahm, Jr.'s time inside the U.S. Capitol on January 6, 2021. Individual 1 returned to Rahm, Jr.'s Facebook page a day or two later and noticed that most of the Facebook posts on that Facebook page concerning the January 6, 2021 U.S. Capitol riot had been deleted. Individual 1 was able to take a screenshot of one Facebook post in which another Facebook user asked Rahm, Jr., "Doug are you okay? Are you safe?" and he responded with the comment, "riot Shields and pepper spray never hurt anyone did they.   Home alive.   History made.   I walked right through Pelosi's office I should have shit on her chair (three laughing emojis)."

Based on this conduct, Rahm, Jr. was charged with Obstruction of an Official Proceeding under 18 U.S.C. § 1512(c)(2) and (2) (Count One); Entering and Remaining in a Restricted Building or Grounds under 18 U.S.C. § 1752(a)(1) (Count Two); Disorderly and Disruptive Conduct in a Restricted Building or Grounds under 18 U.S.C. § 1752(a)(2) (Count Three); Disorderly Conduct in a Capitol Building under 40 U.S.C. § 5104(e)(2)(D) (Count Four); and

Parading, Demonstrating, or Picketing in a Capitol Building under 40 U.S.C. § 5104(e)(2)(G) (Count Five).

On June 13, 2022, Rahm, Jr. filed a "Notice of Public Authority Defense." Dkt. 36.

## II.     ARGUMENT

As a matter of law, the entrapment by estoppel defense cannot apply on these facts. This defense applies only if a defendant was "actively misled . . . about the state of the law defining the offense," and relied on that misleading advice. *United States v. Cox*, 906 F.3d 1170, 1191 (10th Cir. 2018). No such advice was given to Rahm, Jr. on or before January 7. This defense also requires that a defendant's reliance be reasonable. Even if Rahm, Jr. believed that the statutes he is now charged with had been interpreted to permit his conduct, that belief would not be reasonable.

The Court should therefore preclude this defense in advance of trial. "In a variety of procedural contexts, the vast majority of cases have held, as a matter of law, that the defense was unavailable on the facts of the case." *United States v. Conley*, 859 F. Supp. 909, 926 (W.D. Pa. 1994). Accordingly, courts have routinely rejected either jury instructions or requests to put on evidence by defendants whose proffered evidence fails, as a matter of law, to meet the defenses' requirements. *E.g.*, *United States v. Nichols*, 21 F.3d 1016, 1018 (10th Cir. 1994) (affirming denial of motion to appoint psychological expert to testify in support of entrapment-by-estoppel defense); *United States v. Weitzenhoff*, 35 F.3d 1275, 1290 (9th Cir. 1993) (upholding refusal to instruct jury on entrapment-by-estoppel defense); *United States v. Brebner*, 951 F.2d 1017, 1024-27 (9th Cir. 1991) (affirming exclusion of evidence purporting to raise the defense as immaterial as a matter of law); *United States v. Etheridge*, 932 F.2d 318, 320-21 (4th Cir. 1991) (order granting motion in limine precluding evidence upheld).

**A.     No Executive official could empower Rahm, Jr., explicitly or implicitly, to commit the criminal conduct he engaged in on January 6.**

As an initial matter, former President Trump did not have the authority to permit or authorize the criminal conduct engaged in by Rahm, Jr.— obstructing an official proceeding, disorderly conduct, entering and remaining in a restricted area, and parading and demonstrating in a Capitol building—on January 6.  As Chief Judge Howell wrote last year in rejecting the idea of an entrapment-by-estoppel defense for January 6 defendants:

> [A President] cannot, in keeping with his constitutional function and his responsibilities under Article II, lawfully permit actions that directly undermine the Constitution. Thus, a President cannot, within the confines of his constitutional authority, prevent the constitutionally mandated certification of the results of a Presidential Election or encourage others to do so on his behalf, nor can he direct an assault on the coequal Legislative branch of government. Were a President to attempt to condone such conduct, he would act *ultra vires* and thus without the force of his constitutional authority. . . . Put simply, even if former President Trump in fact [explicitly directed the rioters' actions,] his statements would not immunize defendants charged with offenses arising from the January 6 assault on the Capitol from criminal liability.

*United States v. Chrestman*, 525 F. Supp. 3d 14, 32-33 (D.D.C. 2021).

The D.C. Circuit came to the same conclusion in *North*, when addressing Oliver North's contention that President Reagan authorized his obstruction of Congress in that case.  The court made clear that "'[n]either the President nor any of [North's] superiors had the legal authority to order anyone to violate the law,' particularly if such 'orders,' explicit or implicit, represented nothing more than [the President's] desires." *North*, 910 F.2d at 891 n.24.  Fifteen years earlier, the D.C. Circuit did not even entertain the idea that the President can lawfully authorize an individual to obstruct justice or Congress when it would have most obviously applied.  Three former high-ranking officials in the Nixon Administration were convicted of obstruction of justice, conspiracy, and perjury in connection with the Watergate scandal.  *See United States v. Haldeman*, 559 F.2d 31, 51 (D.C. Cir. 1976).  President Nixon had spoken directly and privately

7

with several of the defendants and directed or at least acquiesced in much of their illegal conduct.  *See id.* at 57-59.   Yet neither the district court nor the D.C. Circuit apparently contemplated that Nixon's involvement in the Watergate cover-up could somehow immunize the participants from later prosecution.   *Id.* at 84-88; *United States v. Mitchell*, 385 F. Supp. 1190 (D.D.C. 1974) (district court opinion).   Indeed, the district court (later affirmed on appeal) thought so little of Nixon's importance to his subordinates' trial that it denied a continuance that would have allowed Nixon to testify, on the ground that his testimony was largely immaterial or cumulative to the defendants' case.   *Mitchell*, 385 F. Supp. at 1192-93.

Thus, even if former President Trump explicitly called for Rahm, Jr. to engage in the charged criminal conduct, that could not underlie an entrapment-by-estoppel defense.

> **B.      There is no available entrapment-by-estoppel defense, because Rahm, Jr. cannot point to an interpretation of the statutes he is charged with violating on which he reasonably relied.**

Courts have narrowly confined the entrapment-by-estoppel defense.   The Supreme Court first adopted a due process defense to entrapment by public officials in *Raley v. Ohio*, 360 U.S. 423 (1959).   In *Raley*, the Supreme Court set aside the convictions of three individuals who refused to answer the questions of the Ohio Un-American Activities Commission, in reliance on inaccurate representations by the Commission "that they had a right to rely on the privilege against self-incrimination" under the Ohio Constitution. 360 U.S. at 425.   The Court held that the convictions violated the Fourteenth Amendment's Due Process Clause because they involved "the most indefensible sort of entrapment by the State—convicting a citizen for exercising a privilege which the State clearly had told him was available to him."   *Id.* at 438.   The Court emphasized that the Commission's advice constituted "active misleading" as to the contours of that "vague and undefined" area of law.   *Id.*

A few years later, the Court revisited the subject in *Cox v. Louisiana*, 379 U.S. 559 (1965). *Cox* reversed the conviction of a protester who had led a group of 2,000 in a civil rights march across the street from a courthouse and was later prosecuted for violating an anti-picketing statute prohibiting demonstrations "near" a courthouse. 379 U.S. at 560, 564-65. The statute did not define that term. *Id.* at 560. The protesters had been "affirmatively told" by "the highest police officials of the city, in the presence of the Sheriff and Mayor," that protesting across the street from the courthouse was lawful under that statute. *Id.* at 571. The Court determined that the statute's ambiguous term "near" necessarily "foresees a degree of on-the-spot administrative interpretation by officials charged with responsibility for administering and enforcing it," and thus found that the demonstrators "would justifiably tend to rely on [the police's] administrative interpretation of how 'near' the courthouse a particular demonstration might take place." *Id.* at 568-69. The Court concluded that the local officials' interpretation of "near" was a "limited administrative regulation of traffic" that the protesters reasonably relied on. *Id.* at 569. But it also made clear that a defendant cannot reasonably rely on a law enforcement official's attempt to provide "a waiver of law," which the Court described as "beyond the power of the police." *Id.*

Distilling these cases, recent case law has limited the entrapment-by-estoppel defense to the narrow circumstances in which a defendant reasonably relies on an interpretation of a statute that, if accurate, would render the defendant's conduct non-criminal. "To win an entrapment-by-estoppel claim, a defendant criminally prosecuted for an offense must prove (1) that a government agent actively misled him about the state of the law defining the offense; (2) that the government agent was responsible for interpreting, administering, or enforcing the law defining the offense; (3) that the defendant actually relied on the agent's misleading pronouncement in

9

committing the offense; and (4) that the defendant's reliance was reasonable in light of the identity of the agent, the point of law misrepresented, and the substance of the misrepresentation."  *Cox*, 906 F.3d at 1191; *United States v. Burrows*, 36 F.3d 875, 882 (9th Cir. 1994) ("This defense applies when [1] a government official [2] tells a defendant that certain conduct is legal and the defendant commits what would otherwise be a crime [3] in reasonable reliance on the official's representation." (quoting *United States v. Baptista-Rodriguez*, 17 F.3d 1354, 1368 n.18 (11th Cir. 1994)); *United States v. Neville*, 82 F.3d 750, 761 (7th Cir. 1996) ("[W]e have required that [1] the government official "actively mislead the defendant; and that the defendant's reliance be [2] actual and [3] reasonable in light of the identity of the agent, the point of law represented, and the substance of the misrepresentation.").  Last year, Chief Judge Howell adopted the Tenth Circuit's four-part test in preliminarily rejecting a Capitol riot defendant's claim to a defense similar to Rahm, Jr.'s.  *See Chrestman*, 525 F. Supp. 3d at 33 (adopting *Cox*'s four-part test for entrapment-by-estoppel defense).

Rahm, Jr. cannot make out an entrapment-by-estoppel defense.  No official provided an interpretation of the law covering Rahm, Jr.'s alleged criminal conduct, thereby assuring Rahm, Jr. that his conduct was legal.  Moreover, assuming Rahm, Jr. relied on former President Trump's words to commit obstruction of Congress and other crimes, that reliance was objectively unreasonable.

> **1.  Rahm, Jr. identifies no witness who "actively misled" him by interpreting a law in a manner indicating that his criminal conduct was non-criminal.**

In his speech on January 6, 2021, former President Trump did not purport to interpret the scope of the statutes Rahm, Jr. is charged with violating.  Said another way, former President Trump did not "affirmatively assure[] the defendant that certain conduct [was] legal."  *United*

10

*States v. Howell*, 37 F.3d 1197, 1204 (7th Cir. 1994); *United States v. Troncoso*, 23 F.3d 612, 615 (1st Cir. 1994) (defense fails absent advice from official that conduct "was actually legal"). Former President Trump did not state that the U.S. Capitol grounds were no longer "restricted" under 18 U.S.C. § 1752(a) nor that it would not constitute obstruction to enter the Capitol building under 18 U.S.C. § 1512.   Former President Trump did not purport to reinterpret a specific criminal statute to render Rahm, Jr.'s conduct non-criminal.   He therefore did not "actively mis[lead]" Rahm, Jr. "about the state of the law defining the offense."   *Cox*, 906 F.3d at 1191. Rahm, Jr. has not identified anyone else who might have authority to do so who did so either.   Further, Rahm, Jr. does not identify any comment made by former President Trump that purported to reinterpret any law.   As Chief Judge Howell observed last year, an entrapment-by-estoppel defense by a January 6 rioter:

> would not be premised, as it was in *Raley* [and] *Cox*, . . . on a defendant's confusion about the state of the law and a government official's clarifying, if inaccurate, representations. It would instead rely on the premise that a defendant, though aware that his intended conduct was illegal, acted under the belief President Trump had waived the entire corpus of criminal law as it applied to the mob.

*Chrestman*, 525 F. Supp. 3d at 32; *see also North*, 910 F.2d 843 (noting that "North does not even claim that he relied on *any* 'conclusion or statement of *law*'"); *United States v. Smith*, 940 F.2d 710, 715 (1st Cir. 1991) (rejecting entrapment-by-estoppel defense because federal agent allegedly encouraged defendant to keep firearms to assist with undercover operation, but never was alleged "to have represented that keeping the guns was, in fact, *legal*").

Judge Kollar-Kotelly rejected an entrapment-by-estoppel defense in *United States v. Grider,* holding, "former President Trump's statements did not in any way address the *legality* of the actions he urged his supporters to take. He did not, for example, assure them that marching along Pennsylvania was 'lawful' or that occupying Capitol grounds was 'permissible.'" 21-cr-

11

022-CKK, ECF 116 at 5 (D.D.C. August 1, 2022) (emphasis in original).  Rahm, Jr., like Grider, has not identified any statement by former-President Trump, or any other government official, that assured him the conduct in which he engaged on January 6 was lawful.  The former President's statements regarding marching to the Capitol building and showing strength cannot reasonably be interpreted as "official pronouncement" concerning whether certain conduct violated the criminal laws.

### 2. Any reliance would not be objectively reasonable.

In any event, even if former President Trump's statements could be construed as an unexpressed interpretation of the criminal laws applicable to Rahm, Jr.'s conduct, and even if he relied on that interpretation, Rahm, Jr. cannot show that his reliance was reasonable. "[R]easonable reliance occurs" only "if 'a person sincerely desirous of obeying the law would have accepted the information as true, and would not have been put on notice to make further inquiries.'" *United States v. Lynch*, 903 F.3d 1061, 1077 (9th Cir. 2018) (internal quotation marks omitted); *United States v. Corso*, 20 F.3d 521, 528 (2d Cir. 1994) (adopting "sincerely desirous" standard).  After former President Trump's remarks, Rahm, Jr. posted on Facebook that he was "ready to make a breach."  He entered the Capitol after doors were violently forced open.  He entered the building and proclaimed, "We're taking our fucking house back.  Time to find some brass and kick some freakin' ass."  At some point he was pepper sprayed but boasted about continuing.

Rahm, Jr. could not have reasonably relied on statements by former President Trump to conclude that that conduct was lawful.  As a private citizen, Rahm, Jr. alleges no relationship with former President Trump.

Thus, regardless of former President Trump's intent or the foreseeability of Rahm, Jr.'s and other rioters' reactions to his statements, when Rahm, Jr. engaged in the conduct described above, any reasonable person in his shoes would "[know] he was breaking the law." *Corso*, 20 F.3d at 529. Certainly, one "sincerely desirous of obeying the law" could not have accepted at face value any purported assurance that such conduct was lawful. *Lynch*, 903 F.3d at 1077-78. Rahm, Jr. therefore cannot rely on the defense of entrapment by estoppel. That would be true even if former President Trump explicitly called for violence and mayhem: it is unreasonable, as a matter of law, for anyone to believe that a call for violence rendered their ensuing misconduct lawful.

### III. CONCLUSION

Therefore, this Court should preclude Rahm, Jr. from pursuing an entrapment-by-estoppel defense at trial.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar Number 481052

By:
*/s/ Douglas G. Collyer*
Douglas G. Collyer
Assistant U.S. Attorney (detailed)
N.D.N.Y. Bar No. 519096
14 Durkee Street, Suite 340
Plattsburgh, New York 12901
518-314-7800
Douglas.Collyer@usdoj.gov

*/s/ Sean P. Murphy*
Sean P. Murphy
Assistant U.S. Attorney
D.C. Bar No. 1187821
Torre Chardon, Suite 1201
350 Carlos Chardon Avenue

San Juan, PR 00949
787-221-6077
Sean.Murphy@usdoj.gov

## **CERTIFICATE OF SERVICE**

I hereby certify that on August 24, 2022, I caused a copy of the foregoing motion to be served on counsel of record via electronic filing.

>／s/ Douglas G. Collyer
>Douglas G. Collyer
>Assistant United States Attorney