**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Case No. 21-cr-150-TFH** |
| **JAMES DOUGLAS RAHM, JR.,** | |
| **Defendant.** | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence James Douglas Rahm, Jr. to a sentence of 21 months' incarceration, the high end of the applicable Guidelines range of 15 to 21 months, three years of supervised release, $2,000 in restitution and the mandatory $100 special assessment.

I.    **INTRODUCTION**

James Douglas Rahm, Jr. ("Rahm") participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers and resulted in more than $2.8 million in losses.[1]

Rahm's conduct targeted the police and Members of Congress – and like the conduct of

---

[1] As of October 17, 2022, the approximate losses suffered as a result of the siege at the United States Capitol was $ 2,881,360.20. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police.

every rioter that day, threatened democracy itself.  Rahm, posted on Facebook, "They're in there counting the electoral votes we have the building surrounded we're ready to make a breach and take our Capitol back."  He then entered the Capitol through the East Rotunda Doors after rioters on the inside shoved police out of the way and opened the doors for Rahm and the cohort on the portico.  Once inside, Rahm recorded himself stating, "Time to find some brass and kick some friggin' ass."  Rahm also celebrated halting the certification of the 2020 Electoral College vote count.

The government recommends that the Court sentence Rahm to 21 months' incarceration, which is the high end of the advisory Guidelines' range of 15 to 21 months. A 21-month sentence reflects the gravity of Rahm's conduct, which, while not resulting in lasting physical injury or property damage, nonetheless threatened to cause both – to say nothing of the psychological scars of the many victims of the riot and damage to the institution of democracy.

## II.    FACTUAL BACKGROUND

### A.    Rahm's Role in the January 6, 2021 Attack on the Capitol

As set out more fully in the statement of facts for stipulated trial (*See* ECF No. 57), Rahm participated in the attack on the United States Capitol, an attack that disrupted the peaceful transfer of power after the November 3, 2020 presidential election and caused extensive damage and injury.

Rahm travelled with his adult son[2] from his home in Philadelphia to Washington, D.C. on January 5, 2021 to attend the rally at the Ellipse for then-President Trump the next day.  On the night of January 5, Rahm encountered a group of men he assumed were Proud Boys.  Rahm posted on Facebook that he was "hanging with the Proud Boys" reportedly to impress his Facebook

---

[2] *See United States v. James Douglas Rahm, III,* 21-cr-585.

2

friends.

On January 6, 2021, Rahm and his son were not able to enter the rally at the Ellipse, so he joined the throng marching to the Capitol, making his way to the east side of the Capitol building. At some point prior to his entering the Capitol, Rahm and his son were separated.  There, Rahm took a photo of the Capitol and posted it on Facebook and wrote, "They're in there counting the electoral votes we have the building surrounded we're ready to make a breach and take our Capitol back." *See* Image 1, below.



Image 1

Although the east side of the Capitol was not as chaotic as the west side at this point, police officers are clearly visible in the photograph standing between Rahm and the Capitol and physical barriers were in place as depicted in Image 2, below:



Image 2

After rioters broke through the police line on the east side, Rahm climbed the steps and joined rioters outside the East Rotunda Doors. There, Rahm yelled to the crowd, "I think we stopped the vote" to which people around him cheered.

Rahm also filmed a video wherein he stated, "We broke the door down. We're going in. My eyes hurt like shit from that pepper spray, but we're going in." The East Rotunda Doors had essentially been broken down.  While Rahm and other rioters on the portico and outside the east side of the Capitol demanded entry to the closed and restricted building, police officers barricaded the East Rotunda Doors from within to keep them closed and secured.  However, a mob of rioters already on the inside of the Capitol shoved aside the barricades and as a group, pushed the police officers out of the way.  With police removed, the rioters opened the East Rotunda Doors at

approximately 2:37 p.m. allowing hundreds of rioters to stream in, including Rahm at approximately 2:43 p.m. *See* Image 3, below.



Image 3

Once inside, Rahm walked straight into the Rotunda toward Statuary Hall where he filmed a video in which he loudly and disruptively proclaimed, "We're in. We're taking our fucking house back. We're here. Time to find some brass and kick some friggin' ass." While in the Rotunda, Rahm is seen recording and parading with his flag. *See* Image 4, below.



Image 4

Rahm walked through Statuary Hall to the Statuary Hall Connector. *See* Image 5,

below:



Image 5

In the Statuary Hall Connector, right outside the House of Representatives Chamber, Rahm joined yet another group of rioters outside the House Chamber as they attempted to gain access to the House Chamber where members of Congress were sheltering.   Rioters chanted, "Break it down" in reference to the House Chamber Door.   Rahm turned around and proceeded back whence he came, trespassing through non-public areas of the Capitol.  *See* Image 6, below.



Image 6

Rahm exited the U.S. Capitol at approximately 2:53 p.m. through the East Rotunda Doors having spent approximately 11 minutes inside the Capitol building on January 6. *See* Image 7, below.



Image 7

*Rahm's Social Media Statements About January 6*

Once outside the building, but still within the restricted grounds, Rahm took a "selfie" photograph and posted it on Facebook, celebrating the criminal activity for which he was just responsible, "do not believe the media there were no anarchists no antifa just patriots trying to take our country back. Yes I was there the pepper spray is just wearing off…" *See* Image 8, below.



Image 8

He offered further braggadocious celebration of his criminal exploits online, proclaiming, "riot Shields and pepper spray never hurt anyone did they. Home alive. History made. I walked right through Pelosi's office I should have shit on her chair (3 laughing emojis)":



Rahm also minimized and justified his and other rioters' actions on January 6, stating, "From my experience it was Patriot's (sic) trying to take our house back. Nobody burned anything, nobody broke anything except for a door and the window. All the papers running all over in the offices we're (sic) done for news cameras we destroyed nothing we didn't knock over one piece of paper only the front door. We the people tried to take our house back now they will blame it on

Trump. Disgusting anti-Americans":



**B.     Rahm's Interview with the FBI**

On February 5, 2021, FBI agents interviewed Rahm.  During the voluntary interview, he sought to minimize his involvement in the riot with statements that are contradicted by video evidence. Specifically, Rahm initially denied that he entered the Capitol and claimed that he only

made it to the steps of the building.  After being informed that the FBI had video evidence of him inside the Capitol, Rahm next claimed that he was involuntarily pushed into the Capitol by the large crowd of which he was a part, and that he exited the Capitol the moment he found an exit. This claim is, of course, belied by the video evidence submitted at the stipulated trial, which shows Rahm enter the Capitol of his own free will, as well as Rahm's own video in which he proclaimed while marching through the Rotunda, "We're in. We're taking our fucking house back. We're here. Time to find some brass and kick some friggin' ass."

Rahm also claimed to the FBI that his son had not entered the Capitol building.  In fact, he and his son had separated after arriving at the Capitol and did not find each other again until the end of the day.  The FBI was in possession of video evidence that showed his son inside the Capitol, as well.

Even a month later, Rahm continued in his belief that anyone who stood against what happened on January 6 was "anti-American."  He told the FBI it was unamerican for the government to be on a "manhunt" for people who entered the Capitol on January 6.

Rahm also boasted to the FBI that he was arrested in Arizona for marijuana smuggling in the early 1980's and was freed after bribing the judge by paying him $25,000. Rahm also detailed previously living a lavish lifestyle in the 1980's from being a drug dealer, oftentimes smuggling large quantities drugs into the U.S. from Mexico.  It is noted that despite advising the FBI of this, Rahm did not mention any of this personal history to probation during the PSI interview.

## III.    INDICTMENT AND PLEA AGREEMENTS

On November 10, 2021, the grand jury returned a superseding indictment charging Rahm with Obstruction of an Official Proceeding, in violation of 18 U.S.C. § 1512(c)(2) and (2), and

four misdemeanors, including Entering and Remaining in a Restricted Building or Grounds, Disorderly and Disruptive Conduct in a Restricted Building or Grounds, Disorderly Conduct in a Capitol Building and Parading, Demonstrating or Picketing in a Capitol Building.  ECF No. 26. On October 13, 2022, Rahm proceeded to a trial on stipulated facts and this Court found him guilty of all counts of the superseding indictment.  October 13, 2022 Minute Entry.

## IV.    STATUTORY PENALTIES

As noted by the U.S. Probation Office, Rahm faces up to 20 years of imprisonment, a fine up to $250,000, and a term of supervised release of not more than three years for Count One, Obstruction of an Official Proceeding.

Rahm faces up to 1 year imprisonment, a fine of up to $100,000, and a term of supervised release of not more than one year for Counts Two and Three, Entering and Remaining in a Restricted Building or Grounds and Disorderly and Disruptive Conduct in a Restricted Building or Grounds, respectively.

Rahm faces up to 6 months imprisonment, a fine of up to $5,000, and a term of probation of not more than five years for Counts Four and Five, Disorderly Conduct in a Capitol Building and Parading, Demonstrating, or Picketing in a Capitol Building, respectively.

## V.    THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007). "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark" for determining a defendant's sentence. *Id.* at 49. The United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") are "the product of careful

study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions" and are the "starting point and the initial benchmark" for sentencing. *Id.* at 49.

    **1.  Probation Correctly Calculated the Advisory Guideline Range in this Case.**

Probation's Guidelines analysis, to which the government agrees, follows:

Count One: 18 U.S.C. § 1512(c)(2)

| | | |
|---|---|---|
| U.S.S.G. § 2J1.2(a) | Base Offense Level | 14 |
| U.S.S.G. § 2J1.2(b)(2) | Resulted in Substantial Interference | +3 |
| | **Total** | **17** |
| Acceptance of responsibility (U.S.S.G. §3E1.1) | | -3 |
| **Total Adjusted Offense Level:** | | **14** |

The U.S. Probation Office calculated Rahm's criminal history as category I, which the government does not dispute. PSR ¶ 64.  Accordingly, based on the calculation of Rahm's total adjusted offense level, after acceptance of responsibility, at 14, his Guidelines imprisonment range is 15 to 21 months' imprisonment.

    **2.  Contrary to Rahm's Claim, the certification of the Electoral College vote involved the administration of justice as defined broadly in the Guidelines.**

Rahm "objects to ¶49 of the PSR, which applies U.S.S.G. § 2J1.2(b)(2) for substantial interference with the administration of justice, "specifically, the proceeding before Congress, to wit:  Congress's certification of the Electoral College vote," which adds three levels to his base offense level of 14. His objection is meritless and this Court should apply the three-point enhancement for substantially interfering with the administration of justice, under U.S.S.G. §

14

2J1.2(b)(2).  Rahm's conduct obstructed the "administration of justice," as that term is used in the Guidelines, because it obstructed the certification of the Electoral College vote.  The riot, of which Rahm was a part, resulted in evacuations, vote count delays, officer injuries, and more than $2.8 million in losses.

Section 2J1.2, entitled "Obstruction of Justice," applies to a variety of obstruction offenses, including all offenses under § 1512 and under 11 other statutes found in Chapter 73 of Title 18.  *See* U.S.S.G. § 2J1.2 cmt.; U.S.S.G. Appendix A.  It provides for an eight-level increase if the offense involved causing or threatening injury to a person or damage to property "in order to obstruct the administration of justice."  U.S.S.G. § 2J1.2(b)(1)(B).  It also provides for a three-level increase "if the offense resulted in substantial interference with the administration of justice."  U.S.S.G. § 2J1.2(b)(2).

Section 2J1.2's text, purpose, and commentary all support the conclusion that conduct that obstructs Congress's certification of the Electoral College vote interferes with the "administration of justice" for purposes of the guideline.  Administration of justice, in its broadest sense, refers to the proper administration of law by all three branches of government.  Black's Law Dictionary defines "justice" to include "[t]he fair and proper administration of laws," and it defines "obstruction of justice" as "[i]nterference with the orderly administration of law and justice."  Black's Law Dictionary (11th ed. 2019); *see* Ballentine's Law Dictionary 696 (3d ed. 1969) (defining justice to include "exact conformity to some obligatory law").  When defining "contempt" to include "[c]onduct that defies the authority or dignity of a court *or legislature*," Black's Law Dictionary observes that "such conduct interferes with the administration of justice."  Black's Law Dictionary (11th ed. 2019) (emphasis added).   And courts have defined

15

"administration of justice" to mean "the performance of acts or duties required by law," *Rosner v. United States*, 10 F.2d 675, 676 (2d Cir. 1926) (quotation omitted), or "the performance of acts required by law in the discharge of duties," *United States v. Partin*, 552 F.2d 621, 641 (5th Cir. 1977).

To be sure, the term "administration of justice" is more commonly used in a narrower sense to refer to "interference with the pendency of some sort of judicial proceedings."  *In re Kendall*, 712 F.3d 814, 828 (3d Cir. 2013); *see In re McConnell*, 370 U.S. 230, 234, 236 (1962) (defining the term in the contempt context as relating to "the performance of judicial duty"); *United States v. Aguilar*, 515 U.S. 593 (1995) (stating that the "omnibus clause" of 18 U.S.C. § 1503, which criminalizes obstruction of the "due administration of justice," requires proof of "an intent to influence judicial or grand jury proceedings").  The cases cited by Rahm have interpreted "administration of justice" in the context of § 1503 but not the Guidelines.  It is simply not true that a statutory definition must carry over to the Guidelines.  *DePierre v. United States*, 564 U.S. 70, 87 (2011) (interpreting statutory term differently than same term in the Guidelines, even though sentencing anomalies might result). But there are compelling reasons for concluding that "administration of justice" bears its broader (albeit less common) meaning in U.S.S.G. § 2J1.2.

First, § 2J1.2's context and purpose support the broader reading of "administration of justice" in both (b)(2) and (b)(1)(B).  Section 2J1.2 applies to an array of obstruction statutes, including a number that do *not* involve the "administration of justice" in the narrow sense (i.e., relating to judicial or quasi-judicial proceedings).  *See* U.S.S.G. § 2J1.2 cmt. (listing covered statutes); U.S.S.G. Appendix A (statutory index).  Those offenses include concealing or destroying invoices or papers relating to imported merchandise, 18 U.S.C. §§ 551; obstructing an

investigation under the Workforce Innovation and Opportunity Act, 18 U.S.C. § 665(c); obstruction of proceedings before departments, agencies, and committees, 18 U.S.C. § 1505; obstruction of enforcement of state gambling laws, 18 U.S.C. § 1511; obstruction of official proceedings, 18 U.S.C. 1512; obstruction of a federal audit, 18 U.S.C. § 1516; destruction of documents in agency investigations, 18 U.S.C. § 1519; and interfering with the administration of the Internal Revenue Code, 26 U.S.C. § 7212.  Yet under a narrow interpretation of the guideline, the enhancements under §§ 2J1.2(b)(1)(B) and (b)(2) would not apply to those statutes.  That is good reason to reject such a reading.  *Cf. United States v. Castleman*, 572 U.S. 572 U.S. 157, 167 (2014) (rejecting a reading of 18 U.S.C. § 922(g)(9) that "would have rendered [it] inoperative in many States at the time of its enactment").

Section 2J1.2's background indicates that the Sentencing Commission intended the enhancements to reach the type of violent and dangerous conduct at issue in this case.  The background notes that § 2J1.2 broadly covers crimes "of varying seriousness," including offenses that involve intercepting grand jury deliberations, interfering with an illegal gambling investigation, or obstructing "a civil or administrative proceeding," and that the underlying conduct may "range from a mere threat to an act of extreme violence."  U.S.S.G. § 2J1.2 cmt. Background.  Within that range, the enhancements "reflect the more serious forms of obstruction." *Id.*  The Commission thus crafted the enhancements in § 2J1.2 to cover the most egregious *conduct* in the full knowledge that obstruction-of-justice offenses are not limited solely to interference with judicial proceedings and the fact that the enhancement has often been applied in the context of obstruction of judicial or investigative proceedings does not dictate whether it *also* applies to obstruction of congressional proceedings.

17

Relatedly, limiting subsection (b)(1)(B)'s and (b)(2)'s enhancements to obstruction of judicial proceedings would undermine the purpose of the Guidelines.  "A principal purpose of the Sentencing Guidelines is to promote uniformity in sentencing imposed by different federal courts for similar criminal conduct."  *Hughes v. United States*, 138 S. Ct. 1765, 1774 (2018).  The Guidelines therefore seek to achieve "a strong connection between the sentence imposed and the offender's real conduct."  *United States v. Booker*, 543 U.S. 220, 246 (2005).  The Sentencing Commission quite reasonably determined, for example, that "causing or threatening physical injury to a person, or property damage, in order to obstruct the administration of justice" is more serious than obstruction not involving such injury or threats and should be punished more severely.  U.S.S.G. § 2J1.2(b)(1)(B).  And the seriousness of the threatening or injurious conduct does not depend on whether the obstructed proceeding is judicial, legislative, or executive.  There is no sound basis for assigning a significantly higher offense level to someone who substantially interferes with a court proceeding than someone who substantially interferes with a congressional proceeding.  *See United States v. Rubenacker,* 21-cr-193 (BAH), May 26, 2022 Sentencing Hearing Tr. at 69 ("There is simply no indication in guideline Section 2J1.2 that the [specific offense characteristics] containing the phrase 'administration of justice' were meant to apply to only some of the statutes referenced to this guideline and not to apply to all of the cases involving obstruction of proceedings taking place outside of courts or grand juries; that simply doesn't make sense.")

This is especially true considering that subsections (b)(1)(B) and (b)(2) are not simply two factors among many but are the key sentencing factors in most obstruction cases.  The three other enhancements in § 2J1.2 have limited application.  Subsections (b)(1)(A) and (b)(1)(C) apply only

18

to violations of § 1001 and § 1505 relating to sex or terrorism offenses.  And subsection (b)(3), a comparatively minor two-level increase, applies only where a document was destroyed or altered or the offense was "extensive in scope, planning, or preparation."  U.S.S.G. § 2J1.2(b)(3).  Reading the enhancements in subsection (b)(1)(B) and (b)(2) as applying only to judicial or quasi-judicial proceedings would fail to distinguish between the seriousness of offenders' conduct in a wide variety of obstruction offenses covered by § 2J1.2.  On the other hand, reading the term "administration of justice" more broadly eliminates this gap in the guideline.

Second, Section 2J1.2's commentary provides a broad definition of "administration of justice."  It defines "[s]ubstantial interference with the administration of justice" to include "a premature or improper termination of a felony investigation; an indictment, verdict, or any judicial determination based on perjury, false testimony, or other false evidence; or *the unnecessary expenditure of substantial governmental or court resources*." U.S.S.G. § 2J1.2 cmt. n.1 (emphasis added). This definition includes interference not only with "court" resources, but also with any "governmental" resources, a term that includes congressional resources. Rahm's analogy of severely vandalizing a public playground does not follow since the offense must involve the obstruction of an official proceeding for 2J1.2 to apply.  The Supreme Court has held that "commentary in the Guidelines Manual that interprets or explains a guideline is authoritative unless it violates the Constitution or a federal statute, or is inconsistent with, or a plainly erroneous reading of, that guideline." *Stinson v. United States*, 508 U.S. 36, 38 (1993).  Because this commentary is consistent with the plain text of the Guideline, which uses the broad term "administration of justice," it is authoritative.

The government is not estopped from taking a position on the meaning of "administration of justice" in the Guidelines simply because it argued that "official proceeding" does not require the "administration of justice" as that term has been interpreted in the context of § 1503. As the Supreme Court has made clear, the same term can have different meanings in different contexts. And the government in the litigation over the meaning of "official proceeding" made no representation about the meaning of "administration of justice" in § 2J1.2.

Obstruction of the Electoral College certification vote on January 6, 2021 falls comfortably within the meaning of "administration of justice" as used in § 2J1.2 because it involved Congress's performance of duties required by law.  Specifically, Congress's certification of the Electoral College vote was an official proceeding required by both the Constitution and federal statutes.[3] *See* U.S. Const. art. II, § 1, cl. 3; 3 U.S.C. §§ 15-18.  Application of 2J1.2(b)(1)(B) is therefore appropriate here.

Other courts have appropriately applied the "administration of justice" enhancements in U.S.S.G. § 2J1.2(b)(2) to efforts to obstruct a wide range of proceedings that were not limited to judicial or grand jury proceedings.  *See United States v. Ali*, 864 F.3d 573, 574 (7th Cir. 2017) (upholding the application of § 2J1.2(b)(2) after law enforcement officials expended substantial

---

[3] Chief Judge Howell has articulated a different basis on which to apply the enhancement to obstruction of the Electoral College certification.  *United States v. Rubenacker*, 21-cr-193 (BAH), Sentencing Hearing Tr. at 69.  She pointed out that Black's Law Dictionary defines "administration of justice" to include the "maintenance of right within a political community by means of the physical force of the state," Black's Law Dictionary (11th ed. 2019), and observed that the joint session of Congress used "'the physical force of the state' in the form of law enforcement officers located in and around the Capitol to secure the proceedings." *Rubenacker*, Sentencing Tr. at 75.  This understanding of the guideline is arguably broader than the interpretation advanced by the government because it could apply to any proceeding (or event) at which there was a police presence, rather than being limited to proceedings involving the administration of the law.

resources to recover the defendant's children he kidnapped and transported internationally); *United States v. Atlantic States Cast Iron Pipe Co.*, 627 F. Supp. 2d 180, 205-08 (D.N.J. 2009) (applying § 2J1.2(b)(2) after a defendant interfered with OSHA investigations into a workplace accident); *United States v. Weissman*, 22 F. Supp. 2d 187, 194-98 (S.D.N.Y. 1998) (applying § 2J1.2(b)(2) after a defendant withheld subpoenaed documents from a congressional subcommittee).

The fact that the Sentencing Commission did not amend § 2J1.2 after the passage of the Sarbanes-Oxley Act is of no moment. The guideline already applied to a variety of non-judicial proceedings at the time-including most or all of the statutes cited herein-and the Sentencing Commission correctly understood the guideline to apply to the new offense created under § 1512(c)(2), as well.

It is true that "official proceeding" is not synonymous with "administration of justice." But in the context of Guidelines § 2J1.2, which is labeled "Obstruction of Justice" and is designed to cover all offenses under § 1512 (and many other non-judicial obstruction offenses), the terms "obstruction" or "interference" with the "administration of justice" should be understood to include obstruction of official proceedings.  Several judges on this Court have applied § 2J1.2's "administration of justice" enhancements in cases arising from the Capitol breach on January 6, both in cases where the parties agreed to their application and where the application was contested. *See, e.g.*, *United States v. Wilson*, No. 21-cr-345 (Lamberth, J.); *United States v. Hodgkins*, No. 21-cr-188 (Moss, J.); *United States v. Fairlamb*, No. 21-cr-120 (Lamberth, J.); *United States v. Chansley*, No. 21-cr-003, (Lamberth, J.); *United States v. Matthew Miller*, No. 21-cr-075 (Moss, J.) (uncontested, but independently addressed by the Court); *United States v. Rubenacker*, No. 21-cr-193 (BAH) (contested); *United States v. Guy Reffitt*, No. 21-cr-032 (Friedrich, J.) (contested);

*United States v. Pruitt,* No. 21-cr-23 (Kelly, J.); *United States v. Robertson,* 21-cr-34 (Cooper, J.) (contested).

Accordingly, the three-level upward adjustment for substantial interference under U.S.S.G. § 2J1.2(b)(2) is properly scored.

## VI. SENTENCING FACTORS UNDER 18 U.S.C. § 3553(A)

Under 18 U.S.C. § 3553(a), the factors this Court must consider when imposing a sentence include the nature and circumstances of the offense, § 3553(a)(1); the history and characteristics of the defendant, *id.*; the need for the sentence to reflect the seriousness of the offense and promote respect for the law, § 3553(a)(2)(A); the need for the sentence to afford adequate deterrence, § 3553(a)(2)(B); and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct, § 3553(a)(6). In this case, the Section 3553(a) factors weigh in favor of a term of incarceration.

### A.     Nature and Circumstances of the Offense

The attack on the U.S. Capitol, on January 6, 2021 is a criminal offense unparalleled in American history. It represented a grave threat to our democratic norms; indeed, it was one of the only times in our history when the building was literally occupied by hostile participants. By its very nature, the attack defies comparison to other events.

While each defendant should be sentenced based on his or her individual conduct, each individual who entered the Capitol and assaulted police on January 6 did so under the most extreme of circumstances, to which their conduct directly contributed. As a person entered the Capitol, they would—at a minimum—have crossed through numerous barriers and barricades, heard the throes of a mob, and smelled chemical irritants in the air. Depending on the timing and location of their

approach, in addition to their own acts of violence, they likely would have observed other extensive fighting with police.

While looking at Rahm's individual conduct, this Court should look to a number of critical factors, to include: (1) whether, when, how the defendant entered the Capitol building; (2) whether the defendant encouraged violence; (3) whether the defendant encouraged any acts of property destruction; (4) the defendant's reaction to acts of violence or destruction; (5) whether during or after the riot, the defendant destroyed evidence; (6) the length of the defendant's time inside of the building, and exactly where the defendant traveled; (7) the defendant's statements in person or on social media; (8) whether the defendant cooperated with, or ignored, law enforcement; and (9) whether the defendant otherwise exhibited evidence of remorse or contrition. While these factors are not exhaustive nor dispositive, they help to place each individual defendant on a spectrum as to their fair and just punishment.

Rahm's role in the January 6 attack merits a substantial term of incarceration.  He entered the Capitol with the intent to "kick some friggin' ass," after proceeding through "riot shields and pepper spray."  He repeatedly boasted online about breaking down the doors to the Capitol and pushing through the pain in his eyes from the pepper spray to stop the vote.  Though he now claims to have embellished, he celebrated his conduct in the immediate aftermath, but then lied to the FBI about what he had done and where he had gone on January 6.   He was very briefly outside the House Chamber Door as rioters attempted to get access to the Chamber wherein members of Congress were sheltering.  All while offering his own soundtrack to add gloss to his intent, including: "They're in there counting the electoral votes we have the building surrounded we're ready to make a breach and take our Capitol back" and "I walked right through Pelosi's office I

should have shit on her chair (3 laughing emojis)."

Rahm's pride in what he did on January 6 is reflected in his words and memorialized in his videos and online posts.  None better than his words in one online post, "Home alive. History made. I walked right through Pelosi's office I should have shit on her chair (3 laughing emojis)." Participating in the worst attack on the Capitol since the War of 1812 certainly made history, but not in the way Rahm believes.  Incredibly, and without a hint of irony, in one of his online posts, Rahm called those who did not violently attack the nation's seat of democracy, "Disgusting anti-Americans."  Not only is his attempted romanticizing of what happened on January 6 factually incorrect, it betrays Rahm's sense he was embarking on a noble endeavor.  He could not be more wrong.

Rahm's activities at the Capitol, his desire to broadcast his behavior and celebrate it, his pride in his actions, and his lying to the FBI all demonstrate the need for incarceration.

### B.  Rahm's History and Characteristics

Rahm is in Criminal History Category I, but not because this is his first criminal conviction. To the contrary, he has a prolific and varied criminal record. Rahm's criminal history began with a 1977 arrest and 1978 conviction for possession of a controlled substance and manufacture/deliver or possess with intent to manufacture/deliver a controlled substance, for which he received two years' probation.  PSR ¶ 59.

In 1981, Rahm was sentenced to one year probation for possessing an instrument of crime in Philadelphia for forcing his way into a home, threatening the victim with a pair of nun chucks and striking the victim once. PSR ¶ 60.

In 1982, Rahm was convicted of possession of marijuana after a driving while intoxicated

investigation found him in possession of the substance.  PSR ¶ 61.

In 1987, Rahm was sentenced to three years' probation in Arizona for solicitation to sell marijuana. PSR ¶ 62.

In 1992, Rahm was convicted in District Court for the Eastern District of Pennsylvania of conspiracy to smuggle marijuana and was sentenced to five years' probation. PSR ¶ 63.

During his interview with the FBI in February 2021, Rahm claimed he was arrested in Arizona for marijuana smuggling in the 1980's but was freed after bribing a judge by paying him $25,000.  Rahm also detailed previously living a lavish lifestyle in the 1980's from being a drug dealer, oftentimes smuggling large quantities drugs into the U.S. from Mexico.

Also, despite his prior federal felony conviction from 1992, which he acknowledged to the FBI during his interview in February 2021, Rahm had photographs on his telephone that were taken on March 22, 2020 of him handling a firearm, as depicted below:





As a felon, Rahm is federally prohibited from possessing a firearm.  *See* 18 U.S.C. § 922(g)(1). He had deleted the photographs, but the FBI agents recovered them from his phone. In a text message sent on March 23, 2020, Rahm advised a friend checking in on him at the start of the world-wide pandemic that he was "Locked and Loaded My Friend."

While he has now accepted responsibility by proceeding through a stipulated trial, Rahm's earlier recorded statements about the riot were the opposite: devoid of remorse and filled with pride.  He claimed he "made history" for what he did on January 6 and made light of his tromping through the Capitol by bragging that he should have "shit on [Speaker Pelosi's] chair."  The objective appeared to be to depict the Capitol attack as victimless and justified.  Neither is true.

Considering his protracted criminal history, which did not result in any criminal history points due to the passage of time, and his multiple sentences of probation, which have not had a deterrent effect, the government requests a significant period of incarceration.

### C.   The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds, and all that it involved, was an attack on the rule of law. "The violence and destruction of property at the U.S. Capitol on January 6 showed a blatant and appalling disregard for our institutions of government and the orderly administration of the democratic process."[4] As with the nature and circumstances of the offense, this factor supports a sentence of incarceration. Rahm's criminal conduct, which includes corruptly obstructing an official proceeding and celebrating the breach by declaring "history made"

---

[4] Federal Bureau of Investigation Director Christopher Wray, Statement before the House Oversight and Reform Committee (June 15, 2021) (hereinafter "FBI Director Wray's Statement"), available                                                                                              at https://oversight.house.gov/sites/democrats.oversight.house.gov/files/Wray%20Testimony.pdf

represents disrespect for the law. When Rahm entered the Capitol grounds and the Capitol itself, it was abundantly clear to him that lawmakers and their staffs, and the police officers who tried to protect them, were under siege.  Yet, he mused about fighting through police.

    **D.**    **The Need for the Sentence to Afford Adequate Deterrence**

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

### *General Deterrence*

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C. § 3553(a)(2)(B). The need to deter others is especially strong in cases involving domestic terrorism, which the breach of the Capitol certainly was.[5] Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. "Future would-be rioters must be deterred." (statement of Judge Nichols at sentencing, *United States v. Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37).

The demands of general deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol.

### *Specific Deterrence*

There is also a need for specific deterrence here.  Rahm has attempted to romanticize and justify his actions, rather than offer contrition.  Without some indication that Rahm has renounced, learned from, or even regrets his conduct on January 6, there is a greater possibility that he will do

---

[5] *See* 18 U.S.C. § 2331(5) (defining "'domestic terrorism'").

something similar again.  His prior criminal sentences to probation have not deterred his criminal conduct.  Perhaps a sentence of incarceration will.

### E.      The Importance of the Guidelines

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007). As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007); 28 U.S.C. § 994(m). In so doing, the Commission "has the capacity courts lack to 'base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise,'" and "to formulate and constantly refine national sentencing standards." *Kimbrough*, 552 U.S. at 108. Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101.

### F.      Unwarranted Sentencing Disparities

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct".  So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007). In short, "the Sentencing Guidelines are themselves an anti-

disparity formula." *United States v. Blagojevich*, 854 F.3d 918, 921 (7th Cir. 2017); *accord United States v. Sanchez*, 989 F.3d 523, 540 (7th Cir. 2021). Consequently, a sentence within the Guidelines range will ordinarily not result in an unwarranted disparity. *See United States v. Smocks*, D.D.C. 21-cr-198 (TSC), Sent. Hrg. Tr. at 49 ("as far as disparity goes, … I am being asked to give a sentence well within the guideline range, and I intend to give a sentence within the guideline range.") (statement of Judge Chutkan).

Moreover, Section 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a). The goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095. "As the qualifier 'unwarranted' reflects, this provision

leaves plenty of room for differences in sentences when warranted under the circumstances." *United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013).[6]

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the sentences in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.  Indeed, these crimes defy statutorily appropriate comparisons to other obstructive related conduct in other cases. To try to mechanically compare other Section 1512 defendants prior to January 6, 2021, would be a disservice to the magnitude of what the riot entailed and signified.

The Court may compare Rahm's conduct to that of Richard Michetti, who saw rioters fighting police officers outside the Capitol and saw tear gas deployed yet entered the Capitol anyway because he had to "stop the vote it's fraud this is our country."  Michetti pleaded guilty to a single count of violating Section 1512(c)(2).  *United States v. Richard Michetti,* No. 21-cr-232-1 (CRC). Similarly to Rahm, Michetti texted, "we stormed the building and they held us back with spray and teargas and paintballs" and encouraged other rioters to fight with police.

Unlike Rahm, Michetti had no prior criminal history and was credited with taking anger management classes after his arrest.  The government recommended 18 months incarceration in

---

[6] The Guidelines ranges in Capitol siege cases may be more likely to understate the severity of the offense conduct. *See United States v. Knutson*, D.D.C. 22-cr-31 (FYP), Aug. 26, 2022 Sent. Hrg. Tr. at 24-25 ("If anything, the guideline range underrepresents the seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.") (statement of Judge Pan).

Case 1:21-cr-00150-TFH   Document 63   Filed 01/11/23   Page 32 of 37


that case and Judge Cooper sentenced Michetti to nine months' incarceration and two years' supervised release.

## VII. RESTITUTION

Under 18 U.S.C. § 3556, a sentencing court must determine whether and how to impose restitution in a federal criminal case. Because a federal court possesses no "inherent authority to order restitution," _United States v. Fair_, 699 F.3d 508, 512 (D.C. Cir. 2012), it can impose restitution only when authorized by statute, _United States v. Papagno_, 639 F.3d 1093, 1096 (D.C. Cir. 2011). Two general restitution statutes provide such authority. First, the Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." _Papagno_, 639 F.3d at 1096. Second, the Mandatory Victims Restitution Act ("MVRA"), Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA. _Papagno_, 639 F.3d at 1096. The applicable procedures for restitution orders issued and enforced under these two statutes is found in 18 U.S.C. § 3664. See 18 U.S.C. § 3556 (directing that sentencing court "shall" impose restitution under the MVRA, "may" impose restitution under the VWPA, and "shall" use the procedures set out in Section 3664).

The VWPA and MVRA share certain features. Both require that restitution "be tied to the loss caused by the offense of conviction." _Hughey v. United States_, 495 U.S. 411, 418 (1990) (interpreting the VWPA); _see United States v. Clark_, 747 F.3d 890, 897 (D.C. Cir. 2014) (restitution under the MVRA limited to the "offense of conviction" under Hughey).[7] Both require

---

[7] While both statutes generally limit restitution to losses resulting from conduct that is the basis of

32

identification of a victim, defined in both statutes as "a person directly and proximately harmed as a result of" the offense of conviction.[8] _See_ 18 U.S.C. § 3663(a)(2) (VWPA); 18 U.S.C. § 3663A(a)(2). "In view of the purpose of the MVRA and the interpretation of the VWPA's definition of 'victim,' we agree with the Government that it is 'inconceivable that ... Congress somehow meant to exclude the Government as a potential victim under the MVRA when it adopted the definition of 'victim' contained in the VWPA.'" _United States v. Ekanem_, 383 F.3d 40, 44 (2d Cir. 2004).

Both statutes identify similar covered costs, including lost property and certain expenses of recovering from bodily injury. _See_ _Papagno_, 639 F.3d at 1097-97; 18 U.S.C. §§ 3663(b), 3663A(b). Finally, under both the statutes, the government bears the burden by a preponderance of the evidence to establish the amount of loss suffered by the victim. _United States v. Bikundi_, 926 F.3d 761, 791 (D.C. Cir. 2019). The relevant inquiry is the scope of the defendant's conduct and the harm suffered by the victim as a result. _See Emor_, 850 F. Supp. 2d at 202. The use of a "reasonable estimate" or reasonable approximation is sufficient, "especially in cases in which an exact dollar amount is inherently incalculable."[9] _United States_

---

the offense of conviction, they also authorize the court to impose restitution under the terms of a plea agreement.  _See_ 18 U.S.C. § 3663(a)(3); 18 U.S.C. § 3663A(a)(3); _see also United States v. Zerba_, 983 F.3d 983, 986 (8th Cir. 2020); _United States v. Giudice_, 2020 WL 220089, at *5 (D.N.J., Jan. 15, 2020).  The defendant in this case did not enter into a plea agreement.

[8] The government or a governmental entity can be a "victim" for purposes of the VWPA and MVRA.  _See United States v. Emor_, 850 F. Supp.2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).

[9] The sentencing court should "articulate the specific factual findings underlying its restitution order in order to enable appellate review."  _Fair_, 699 F.3d at 513.  Here, the Court should find that Rahm's conduct in entering the Capitol building as part of a mob caused damage to that building.

*v. Gushlak*, 728 F.3d 184, 196 (2d Cir. 2013); *see United States v. Sheffield*, 939 F.3d 1274, 1277 (11th Cir. 2019) (estimating the restitution figure is permissible because "it is sometimes impossible to determine an exact restitution amount") (citation omitted); *United States v. James*, 564 F.3d 1237, 1246 (10th Cir. 2009) (restitution order must identify a specific dollar amount but determining that amount is "by nature an inexact science" such that "absolute precision is not required") (citation omitted); *United States v. Burdi*, 414 F.3d 216, 221 (1st Cir. 2005) (same); *see also Paroline v. United States*, 572 U.S. 434, 459 (2014) (observing in the context of the restitution provision in 18 U.S.C. § 2259 that the court's job to "assess as best it can from available evidence the significance of the individual defendant's conduct in light of the broader casual process that produced the victim's losses . . . cannot be a precise mathematical inquiry").

The statutes also differ in significant respects. As noted above, the VWPA is a discretionary restitution statute that permits, but does not require, the sentencing court to impose restitution in any case where a defendant is convicted under Title 18 or certain other offenses in Title 21 or Title 49. 18 U.S.C. § 3663(a). In deciding whether to impose restitution under the VWPA, the sentencing court must take account of the victim's losses, the defendant's financial resources, and "such other factors as the court deems appropriate." *United States v. Williams*, 353 F. Supp. 3d 14, 23-24 (D.D.C. 2019) (quoting 18 U.S.C. § 3663(a)(1)(B)(i)).

By contrast, as noted above, the MVRA applies only to certain offenses, such as a "crime of violence," § 3663A(c)(1)(A), or "Title 18 property offenses 'in which an identifiable victim . . . has suffered a physical injury or pecuniary loss,'" *Fair*, 699 F.3d at 512 (citation omitted), but it

requires imposition of full restitution without respect to a defendant's ability to pay.[10] One of the offenses for which Alford was convicted, 18 U.S.C. § 1752(a)(1), triggers mandatory restitution under the MVRA as an "offense against property" that resulted in pecuniary loss for the Architect of the Capitol, see 18 U.S.C. § 3663A(c)(1)(A)(ii).

The VWPA also provides that restitution ordered under Section 3663 "shall be issued and enforced in accordance with section 3664." 18 U.S.C. § 3663(d). Because this case involves the related criminal conduct of hundreds of defendants, the Court has discretion to: (1) hold the defendants jointly and severally liable for the full amount of restitution owed to the victim(s), see 18 U.S.C. § 3664(f)(1)(A)(requiring that, for restitution imposed under § 3663, "the court shall order restitution to each victim in the full amount of each victim's losses as determined by the court and without consideration of the economic circumstances of the defendant"); or (2) apportion restitution and hold the defendant and other defendants responsible only for each defendant's individual contribution to the victim's total losses. 18 U.S.C. § 3664(h). That latter approach is appropriate here.

More specifically, the Court should require Rahm's to pay $2,000 in restitution for his convictions on Counts One through Five. This amount fairly reflects Rahm's role in the offense and the damages resulting from his conduct. Moreover, in cases where the parties have entered into a guilty plea agreement, $2,000 has consistently been the agreed upon amount of restitution and the amount of restitution imposed by judges of this Court where the defendant was not directly

---

[10] Both statutes permit the sentencing court to decline to impose restitution where doing so will "complicat[e]" or "prolong[]" the sentencing process. See 18 U.S.C. §§ 3663(a)(1)(B)(ii), 3663A(c)(3)(B).

35

and personally involved in damaging property. Accordingly, such a restitution order avoids sentencing disparity. As of October 14, 2022, the government's estimate of damages caused by the riot at the United States Capitol, a figure based on loss estimates supplied by the Architect of the Capitol, was $2,881,360.20.

Here, as permitted under 18 U.S.C. § 3663(a)(3), Rahm should be ordered to pay $2,000 in restitution to the Architect of the Capitol, which reflects in part the role Rahm played in the riot on January 6.[11]

Rahm's restitution payment must be made to the Clerk of the Court, who will forward the payment to the Architect of the Capitol. *See* PSR ¶ 158.

**VIII. CONCLUSION**

For the reasons set forth above, the government recommends that the Court impose a sentence of imprisonment of 21 months, which is within the Guidelines range as calculated by the government and probation, three years of supervised release, restitution of $2,000 and the mandatory $170 in special assessments.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY

*By:*     */s/*_____
Douglas Collyer
N.D.N.Y Bar No. 519096
Jacqueline Schesnol
Arizona Bar No. 016742
Assistant United States Attorneys

---

[11] Unlike under the Sentencing Guidelines for which (as noted above) the government does not qualify as a victim, *see* U.S.S.G. § 3A1.2 cmt. n.1, the government or a governmental entity can be a "victim" for purposes of the VWPA. *See United States v. Emor*, 850 F. Supp.2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).

36

United States Attorney's Office Detailees
601 D Street, N.W.
Washington, DC 20530
Phone: (602) 514-7500
E-mail:
douglas.collyer@usdoj.gov
jacqueline.schesnol@usdoj.gov