**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| | : | |
| **v.** | : | **CRIMINAL NUMBER 21-150** |
| | : | |
| | : | |
| **JAMES DOUGLAS RAHM, JR.** | : | |

<u>**SENTENCING MEMORANDUM
OF DEFENDANT JAMES DOUGLAS RAHM, JR.**</u>

James Douglas Rahm, Jr. makes no excuses for his participation in the events of January 6, 2021.   He is remorseful and has accepted responsibility for his actions.   He agreed to the facts underlying the charges against him, as set forth in the Statement of Facts prepared for the stipulated trial in this case.   Following that stipulated trial, the Court found Mr. Rahm guilty of Obstruction of an Official Proceeding and Aiding and Abetting, in violation of 18 U.S.C. §1512(c)(2) and 2 (Count One); Entering and Remaining in a Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(1) (Count Two); Disorderly and Disruptive Conduct in a Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(2) (Count Three); Disorderly Conduct in a Capitol Building, in violation of 18 U.S.C. § 5104(e)(2)(D) (Count Four); and Parading, Demonstrating, or Picketing in a Capitol Building, in violation of 18 U.S.C. § 5104(e)(2)(G) (Count Five).

Along with thousands of protesters, Mr. Rahm entered the Capitol Building on January 6th.   He had no business being there.  The Court will hear from Mr. Rahm that he regrets his actions, deplores the violence and property destruction at the Capitol, and apologizes to members of Congress, congressional staff, and law enforcement for his part in the events.   But, as in every January 6th case, the government has conducted a thorough investigation into Mr.

Rahm's actions.   That investigation has established that Mr. Rahm did not arrive in D.C. prepared for confrontation, assaulted no one, broke nothing, did not use force of entry, did not enter the Senate gallery or legislator offices, and encountered neither legislators nor congressional staff.   Rather, Mr. Rahm entered the Capitol and walked around the Rotunda and Statutory Hall for 11 minutes before exiting.   Before and after entering the Capitol, Mr. Rahm posted several inflammatory social media videos and statements, all for the purpose of boasting to his followers on Facebook.   When confronted by FBI about his actions, he voluntarily admitted his conduct.

The government and PSR contend that the advisory guideline range is 15-21 months, based on a 14 base offense level, 3-level enhancement pursuant to U.S.S.G. §2J1.2(b)(2) for "substantial interference with the administration of justice," and 3-level reduction for acceptance of responsibility. Mr. Rahm objects to the application of U.S.S.G. §2J1.2(b)(2), which does not apply as a matter of law, evident from both the dictionary definition of "administration of justice" and the fact that, in denying the motions to dismiss the § 1512(c)(2) charges filed by Mr. Rahm and many other January 6th defendants, the courts in this district have held that Congress does not engage in the administration of justice.   *See, e.g.*, *United States v. Montgomery*, 578 F. Supp. 3d 54 (D.D.C. 2021).   The §2J1.2(b)(2) enhancement is also factually inapplicable in this case.

The defense respectfully requests that this Court recognize the nature and circumstances surrounding Mr. Rahm's offenses—the enormous instigating influence of Trump and the media; Mr. Rahm's lack of planning, violence, property destruction, or intrusion into congressional offices or the Senate Chamber; and his actual minimal impact on the Joint Session's

2

proceedings—and the need to avoid sentencing disparities among similarly-situated January 6th defendants to vary below the guidelines and impose a non-custodial sentence.

This Court has consistently demonstrated full comprehension and appreciation of the necessary balance in arriving at a sentence "sufficient, but not greater than necessary" to comply with the purposes of sentencing. *Kimbrough v. United States*, 552 U.S. 85, 111 (2007).   In fact, in cases with comparable facts—if not more egregious—than those in the instant matter, this Court, appreciating the statutory aggravating and mitigating variables, has sentenced January 6th defendants to probationary sentences.   For example, in *United States v. Carlton*, Crim. No. 21-247-2, this Court sentenced the defendant to 36 months' probation. In that case, the defendant, a corrections officer who pled guilty to one count of violating 40 U.S.C. § 5104(e)(2)(G), had made two separate entries into the Capitol, spending approximately 39 minutes in total inside the building, and remained on Capitol grounds at least for another 23 minutes, taking selfies and filming the chaos around him.   *See Carlton*, Crim. No. 21-257, Gov't Sent. Memo., ECF No. 47. And when interviewed by the FBI, Carlton was repeatedly untruthful.   When Carlton was first interviewed by the FBI, he denied entering the Capitol.   When he was again interviewed two days later, he admitted entering the Capitol but claimed that he was caught up in a mob and pushed in by a group of people.   He admitted that his face burned as if from pepper spray. However, he did not admit that he entered the Capitol twice, and he claimed that he left the Capitol immediately after entering. *See id.* at 19-20.[1]   In its sentencing memorandum, the government stated that Carlton had yet to express remorse for his actions on January 6th.

---

[1] *See infra* at p. 29 for a more detailed factual account.

**Mr. Rahm's Conduct v. Carlton's Conduct**

| Mr. Rahm | Carlton |
|---|---|
| No law enforcement/military connection | Corrections Officer |
| One entry into Capitol | Two separate entries into Capitol |
| Pepper sprayed outside Capitol | "entered Capitol after watching rioters climb the scaffolding, smelling tear gas, and seeing billows of smoke rise around him and from the Lower West Terrace, where rioters were clashing with law enforcement" |
| Yelled to crowd, "I think we stopped the vote." | Joined crowd in repeatedly shouting, "Let us in!", "Fight for Trump!", and "Our House!" |
| Entered Capitol around 2:43 p.m. | Entered Capitol around 2:48 p.m., and again at 3:06 p.m. |
| Spent approximately 11 minutes inside Capitol | Spent a total of approximately 39 minutes inside Capitol |
| After exiting Capitol, immediately departed grounds | After exiting Capitol, remained on Capitol grounds for at least another 23 minutes, when he posed for a photo in front of Capitol |
| Filmed video outside Capitol, stating, "We broke down the door. We're going in. My eyes hurt like shit from that pepper spray[.]"; filmed video inside Capitol: "We're in. We're taking out fucking house back. . . Time to find some brass and kick some friggin' ass." | Filmed the chaos around him and took selfies outside Capitol |
| Made Facebook posts about 1/6, including about peppery spray and taking "our country back," and posted untrue statement about entering Speaker's office and committing an act. When interviewed by FBI, stressed that posts were just to impress people of Facebook. | No apparent social media posts |
| When interviewed by FBI, at first stated he did not enter Capitol but then admitted that he had, stated a large crowd pushed him towards the doors | When first interviewed by FBI, denied entering Capitol. Two days later, admitted entering but claimed he was caught up in a mob but did not admit entering Capitol twice and claimed he left Capitol immediately after entering |
| Told FBI he asked his son to delete his Facebook account because he had "posted dumb stuff" | Admitted he "may have" deleted some texts related to 1/6 |

4

| Is sincerely remorseful for his crimes | According to government, had not expressed remorse for his crimes |
|---|---|

In *United States v. Philip James Weisbecker*, Crim. No. 21-682, the defendant videotaped protesters as they climbed scaffolding and then entered the Senate Wing Door of the Capitol just minutes after the initial breach. *See* Statement of Facts at 3, ECF No. 27.   Weisbecker proceeded into the Speaker's suite of offices, and then the Rotunda and Statutory Hall, where he remained until approximately 3:15 p.m., when he was removed by officers from the Capitol.   During his 53 minutes inside the Capitol, Weisbecker used his cellphone and Cannon camera to take photographs and videos, including of himself inside the Capitol.   *See id.* at 4.   Between January 6 and March 18, 2021, Weisbecker posted on his website and Facebook page videos and photographs of protesters climbing scaffolding and entering the Capitol.   He also posted a picture of himself standing in the Capitol, right thumb up and right pinky finger extended, with the caption, "All in the name of Freedom for it is not free. . . ."   *See id.*; Govt. Sent. Memo. at 9, ECF No. 31.   While the government sought 90 days' incarceration and 36 months' probation based on Weisbecker's entry into a sensitive area, his lack of remorse, and lack of control when confronted by law enforcement officials, *see* Govt. Sent. Memo. at 2, ECF No. 31, this Court sentenced Weisbecker to 24 months' probation, with 30 days of intermittent confinement.

### Mr. Rahm's Conduct v. Weisbecker's Conduct

| Mr. Rahm | Weisbecker |
|---|---|
| Pepper sprayed outside Capitol | Saw officers deploy tear gas into crowd |
| Yelled to crowd, "I think we stopped the vote." | |
| Entered Capitol around 2:43 p.m. | Entered Capitol around 2:22 p.m., just after initial breach |
| Spent approximately 11 minutes inside | Spent approximately 53 minutes inside |

| Capitol and exited voluntarily | Capitol, exiting only after being removed by officers |
|---|---|
| Entered only Rotunda and Statutory Hall | Entered Speaker's suite of offices before Rotunda and Statutory Hall |
| After exiting Capitol, immediately departed grounds | After exiting Capitol, remained on Capitol grounds for at least another |
| Filmed video outside Capitol, stating, "We broke down the door. We're going in. My eyes hurt like shit from that pepper spray[.]"; filmed video inside Capitol: "We're in. We're taking out fucking house back. . . Time to find some brass and kick some friggin' ass." | Filmed protesters as they climbed scaffolding; used cellphone and Cannon camera to take photos and videos inside Capitol, including of himself |
| Made Facebook posts about 1/6, including about peppery spray, taking "our country back," and entering Speaker's office. When interviewed by FBI, stressed that posts were just to impress people of Facebook. | Between January 6 and March 18, 2021, posted on his website and FB page videos and photos of protesters climbing scaffolding and entering Capitol; posted a picture of himself standing in Capitol, right thumb up and right pinky finger extended with caption, "All in the name of Freedom for it is not free . . ." |

This Court administered additional probationary sentences to other similarly situated non-violent defendants who entered the Capitol and demonstrated their obstructive intent through videos and social media posts. *See, e.g.*, *United States v. Youngers*, Crim. No. 21-640 (36 months' probation); *United States v. Jessica Bustle*, Crim. No. 21-238 (24 months' probation to include 60 days of home confinement). And this Court sentenced Robert Reeder—who entered the Capitol *twice*, for a total of more than 30 minutes and remained on Capitol grounds for over two hours; recorded numerous videos outside and inside the Capitol, of both himself and others, including an assault on two officers; and, at his change of plea hearing, sought to convey he did not know he was prohibited from entering the Capitol and appeared proud of his participation in the attack on the Capitol and had demonstrated a continued lack of remorse or contrition for the

full scope of his conduct—to just three months' incarceration.[2]

The circumstances in this case, especially when compared to that of other similarly-situated January 6th cases before this Court and other courts in this district, *see* January 6th Sentencing Chart, attached hereto as Exhibit A, demonstrate that a non-custodial sentence would be sufficient and not greater than necessary given the nature of the offense and Mr. Rahm's personal history and characteristics.  *See United States v. Booker*, 543 U.S. 220 (2005).

## I.   FACTUAL BACKGROUND

Mr. Rahm had an adventure-filled childhood, led by his father, James Rahm, Jr., who raced cars and piloted planes, often flying his family around the country.   But his father was verbally abusive to his mother, Loraine Rahm, and when Mr. Rahm was thirteen years old, his parents divorced.   Mr. Rahm and his two younger brothers, Jeff and David, then resided with their mother in Huntington Valley, Pennsylvania, during the school year, and visited their father in Ocean City, New Jersey, on the weekends and during the summer.   During this time, Mr. Rahm's father failed to provide financial support to Loraine, who was forced to work multiple jobs to provide for her sons.

In 1990, at the age of thirty-one, Mr. Rahm married Kelly Rahm, and the two had three sons together—James Rahm, III, Matthew, and Joshua. Mr. Rahm and Kelly also raised Mr. Rahm's nephew, Gary Davidson, who had been born with cerebral palsy and was severely handicapped.   Mr. Rahm was active in his children's upbringing, and fully supported the family financially.   While Kelly worked as a homemaker, Mr. Rahm was self-employed in the construction field, owning and operating several different construction businesses over the years.

---

[2] *See infra* at pp. 28-30 for a more detailed factual account of *Youngers*, *Bustle*, and *Reeder*.

In 2005, Mr. Rahm underwent surgery after his intestines ruptured. He remained hospitalized for approximately two weeks.   After his release, he experienced a severe infection and was re-hospitalized.   Then, approximately two-and-a-half years later, Mr. Rahm developed another severe infection and again was hospitalized and underwent surgery.   Mr. Rahm spent an additional one month in the hospital while the doctors brought the infection under control.

As a result of the pain medicine he received while being treated, Mr. Rahm became addicted to Percocet.   His abuse of pain killers eventually disrupted his marriage to an irreparable degree, and Mr. Rahm and Kelly divorced in 2009.   Nevertheless, Mr. Rahm overcame his addiction approximately two years later.   He maintained an amicable relationship with his ex-wife and continued to fully support both her and their children following the divorce. He maintains close relationships with his three sons and continues to have weekly contact with his nephew Gary.

Since January 6, 2021, Mr. Rahm construction business has severely suffered.   Shortly after starting his current business, Doug Built & Sons, in 2018, he had several employees, and one of his sons had planned to join him with the goal of eventually running the business himself. However, most clients no longer want to work Mr. Rahm because of the adverse media coverage of his participation in the events at the Capitol.   He no longer has employees, and without receiving jobs in the cement and masonry repair business, he has relegated his business to trash collection for various buildings in the Philadelphia area.   Mr. Rahm's son no longer has hopes of taking over the business.

Mr. Rahm makes no excuses for his conduct.   He regrets his participation on January 6th every single day.   He since shut down his Facebook account, adamant never again to get caught

up in the dangerous world of social media, where incendiary language and egotistical boasting are so common.   He has no history of political extremism or involvement in any political groups and has no intention of any such future involvement.   Yet with a felony conviction and his reputation permanently defaced, Mr. Rahm will struggle the rest of his life to pursue his career goals and continue to support his family.

## II.   THE APPLICABLE SENTENCING GUIDELINES

The PSR calculates Mr. Rahm's Guidelines range as follows.   After grouping Counts 1-3, the base offense level is set by the guideline for Count 1, the § 1512(c)(2) conviction, under U.S.S.G. §2J1.2.   That level is 14. The PSR added a three-level enhancement under U.S.S.G. §2J1.2(b)(2) because the offense "resulted in substantial interference with the administration of justice," specifically, "Congress's certification of the Electoral College vote." PSR ¶ 49.   The PSR also subtracted three levels for acceptance of responsibility pursuant to U.S.S.G. §3E1.1(a) and U.S.S.G. §3E1.1(b), reaching a total offense level of 14.   The PSR assigned Mr. Rahm a criminal history category I.   Thus, the PSR calculated Mr. Rahm's sentencing range at 15-21 months' incarceration.   *See* PSR ¶ 126.

Mr. Rahm objects to the three-level enhancement for "substantial interference with the administration of justice."   As detailed below, the enhancement does not apply as a matter of law, as Congress's counting of the Electoral College votes does not constitute the "administration of justice," and as a matter of fact, as Mr. Rahm's actions did not constitute "*substantial* interference."   But even if the Court finds the §2J1.2(b)(2) enhancement applies, it is the defense position that a variance is warranted to account for the nature and circumstances of the offense.   For these reasons and those set forth herein, the defense requests that this Court impose a non-custodial sentence.

9

### III.   THE PSR INCORRECTLY APPLIED THE U.S.S.G. §2J1.2 SPECIFIC OFFENSE CHARACTERISTIC

The PSR added three levels to Mr. Rahm's total offense level for "substantial interference with the administration of justice" under U.S.S.G. §2J1.2(b)(2).   Following that recommendation would result in legal and factual error.

Mr. Rahm has been convicted of 18 U.S.C. § 1512(c)(2), which provides that "whoever corruptly . . . obstructs, influences, or impedes any official proceeding, or attempts to do so" faces a fine or up to 20 years imprisonment.   The "official proceeding" at issue in this case is the certification of electoral votes—"the commemora[tion] and complet[ion] [of] the peaceful transfer of executive authority."   *United States v. Seefried*, Crim. No. 21-287, 2022 WL 16528415, at *2 (D.C.C. Oct. 29, 2022).[3]

U.S.S.G. § 2J1.2(b)(2) applies "[i]f the offense resulted in substantial interference with the administration of justice."   The application notes to 2J1.2 defines "substantial interference with the administration of justice" as "includ[ing] a premature or improper termination of a felony investigation; an indictment, verdict, or any judicial determination based upon perjury, false testimony, or other false evidence; or the unnecessary expenditure of substantial governmental or court resources."

The 2J1.2(b)(2) enhancement is inapplicable here because the certification of the electoral votes does not involve the administration of justice.   The "administration of justice"

---

[3]  In light of this Court's denial of Mr. Rahm's Motion to Dismiss Count One, in which Mr. Rahm argued that the certification of electoral votes does not qualify as an official proceeding, and also without waiving any arguments set forth in that Motion or to the Court's ruling, Mr. Rahm assumes for purposes of this objection to ¶49 of the PSR that the certification of the Electoral College vote was an "official proceeding."

"involves a judicial or quasi-judicial tribunal that applies the force of the state to determine legal rights."   *United States v. Seefried*, Crim. No. 21-287, 2022 WL 16528415, at *2 (D.C.C. Oct. 29, 2022) (citing Black's Law Dictionary); *see also id.* at *3 ("the 'administration of justice' involves something like a legal proceeding, such as a trial or grand jury hearing" (quoting definition of "obstructing the administration of justice" and "interfering with the administration of justice" from *Perverting the Course of Justice*, Black's Law Dictionary (11th ed. 2019)).   The plain meaning of "administration of justice," therefore, certainly does not include every "official proceeding," as the term is statutorily defined, *see* 18 U.S.C. § 1515 ("[a]s used in section[ ] 1512 . . . (1) the term "official proceeding" means:   (A) a proceeding before a judge or court of the United States . . .; (B) a proceeding before the Congress; (C) a proceeding before a Federal Government agency which is authorized by law; or (D) a proceeding involving the business of insurance whose activities affect interstate commerce before any insurance regulatory official or agency . . ."), and does not include the joint session of Congress, which is not a legal proceeding or investigatory in nature.

Every circuit that has interpreted the phrase "administration of justice" has found it refers to judicial proceedings. *See, e.g., United States v. Richardson*, 676 F.3d 491, 502-503 (5th Cir. 2012) (in defining elements of § 1503, stating, "We have defined 'due administration of justice' as 'the performance of acts required by law in the discharge of duties such as appearing as a witness and giving truthful testimony when subpoenaed.'   Thus, obstructing the due administration of justice means interfering with the procedure of a judicial hearing or trial." (citations omitted)); *United States v. Brenson*, 104 F.3d 1267, 1279-80 (11th Cir. 1997) ("due administration of justice" means "judicial procedure" and "the performance of acts required by

law in the discharge of duties such as appearing as a witness and giving thoughtful testimony when subpoenaed"); *United States v. Warlick*, 742 F.2d 113, 116 (4th Cir. 1984) (defining obstruction of the "administration of justice" as acts that "thwart the judicial process"); *United States v. Rasheed*, 663 F.2d 843, 851 (9th Cir. 1981) ("administration of justice" commences with "a specific judicial proceeding").

The Supreme Court has held the same. In *United States v. Aguilar*, the Supreme Court construed obstruction of the "due administration of justice" in 18 U.S.C. § 1503 to require a showing of a nexus between the defendant's obstructive conduct and a particular judicial or grand jury proceeding. 515 U.S. 593, 599-600 (1995).

To the extent the aforementioned cases defined "administration of justice" in the context of a statute, the definition of the term should be defined no differently in the context of the Guidelines.  *See United States v. Martinez*, 870 F.3d 870 F.3d 1163, 1166 (9th Cir. 2017) ("We interpret the Sentencing Guidelines using the ordinary tools of statutory interpretation."); *United States v. Jenkins*, 275 F.3d 283, 287 (3d Cir. 2001) ("We interpret United States Sentencing Guidelines the same way we interpret statutes, using the terms meaning in ordinary usage. (citation and internal quotation marks omitted)).   The proper inquiry into meaning, therefore, "will most often begin and end with the text and structure of the Guidelines."  *Id.*   "The language of the Sentencing Guidelines, like the language of a statute, must be given its plain and ordinary meaning."  *United States v. Fulford*, 662 F.3d 1174, 1177 (11th Cir. 2011).   Here, construction of the phrase "administration of justice" as it appears in Title 18 should not differ from the interpretation of the same phrase in the Guidelines.   The phrase "administration of justice" cannot mean one thing in the statutes and another thing in the Guidelines unless those

12

authorities specifically define it differently.   Thus, "administration of justice" as used in 2J1.2 must involve a nexus to a judicial proceeding.

The application note to 2J1.2 defining "substantial interference with the administration of justice" supports the plain reading of "administration of justice" as involving judicial or quasi-judicial proceedings.   The listed examples—"a premature or improper termination of a felony investigation; an indictment, verdict, or any judicial determination based upon perjury, false testimony, or other false evidence"—involve interference with an investigation or evidence impacting judicial proceedings.   U.S.S.G. §2J1 cmt. n. 1.   The final clause—"the unnecessary expenditure of substantial governmental or court resources"—is a vague residual clause of sorts. Clearly all interference with the unnecessary expenditure of government resources cannot constitute interference with the administration of justice; it could hardly be said, for example, that severely vandalizing a public playground, while causing thousands of dollars in governmental resources to repair, interferes with the administration of justice.   Such a general phrase must be "construed to embrace the only objects similar in nature to those objects enumerated by the proceeding specific words." *Yates v. United States*, 574 U.S. 528, 545 (2015); *see also United States v. Espy*, 145 F.3d 1369, 1370–71 (D.C. Cir. 1998) ("Where a general term follows a list of specific terms, the rule of ejusdem generis limits the general term as referring only to items of the same category.").   Thus, the "expenditure of resources" phrase should be construed to include only the expenditure of resources related to judicial proceedings.

Construing the "expenditure of resources" phrase more broadly, so as to expand the plain unambiguous meaning of "administration of justice," would be inconsistent with the guidelines' text.   And under *Stinson v. United States*, if commentary is inconsistent with a guideline, the

guideline prevails.   508 U.S. 36, 38, 40 (1993).   Relying on this principle, in *United States v. Winstead*, the District of Columbia Circuit held that because the commentary to U.S.S.G. § 4B1.1 impermissibly expanded the definitions of "controlled substance offense" and "crime of violence" to include attempt offenses, the commentary was inconsistent with the guideline and thus could not carry weight at sentencing. 890 F.3d 1082, 1090-92 (D.C. Cir. 2018).   The Third Circuit and the Seventh Circuit have specifically agreed with *Winstead*'s conclusion about disregarding commentary that conflicts with the plain text of the guidelines.   *See United States v. Nasir*, 17 F.4th 459, 471–72 (3d Cir. 2021) (relying on *Winstead* to rule that § 4B1.2(b) does not include attempt crimes); *United States v. Havis*, 927 F.3d 382 (6th Cir. 2019) (en banc) (applying *Winstead* to hold that definition of "controlled substance offenses" in § 2K2.1(a)(4) does not include attempt crimes contained only in the commentary).

This plain-text approach is important because the commentary to the guidelines, unlike the guidelines themselves, "never passes through the gauntlets of congressional review or notice and comment," and thus the commentary "has no independent legal force."   *Havis*, 927 F.3d at (citing *Stinson*, 508 U.S. at 44-46).   Because the commentary has no independent legal force, "separation-of-powers concerns advise against any interpretation of the Commentary that expands the substantive law set forth in the guidelines themselves."   *Nasir*, 982 F.3d 144, 159 (3d Cir. 2020); *accord Havis*, 927 F.3d at 386 (a court may not rely on a commentary note that inconsistently expands the scope of the corresponding guideline).   Here, the plain language of §2J1.2(b)(2) is not genuinely ambiguous. Rather, the ordinary meaning of "administration of justice" is "[t]he maintenance of right within a political community by means of the physical force of the state" and "the state's application of the sanction of force to the rule of right."

14

*Seefried*, 2022 WL 16528415, at \*2 (quoting *Administration of Justice*, Black's Law Dictionary (11th ed. 2019)).   And the ordinary meaning of the "due administration of justice" is defined as "[t]he proper functioning and integrity of a court or other tribunal and the proceedings before it in accordance with the rights guaranteed to the parties."   *Id.*

Thus, the commentary expands the clear scope of §2J1.2(b)(2).   But *Stinson* "requires that commentary interpret the guidelines, not contradict or add to them."   *Riccardi*, 989 F.3d at 493 (6th Cir. 2021) (Nalbadian, J., concurring in part and in the judgment); *accord Stinson*, 508 U.S. at 40, 43.   The commentary's incorporation of "the unnecessary expenditure of substantial governmental or court resources" is a broad expansion of "administration of justice" that conflicts with and extends well beyond the plain and unambiguous language of guideline §2J1.2(b)(2).   The Court should not defer to commentary that "strays too far from the Guideline that it claims to interpret."   *United States v. Perez*, 5 F.4th 390, 403 (3d Cir. 2021) (Bibas, J., concurring).

In analyzing the applicability of the §2J1.2(b)(2) enhancement, a district court in New Jersey found the commentary to §2J1.2 confined the "expenditure of resources" phrase to resources expended in relation to investigations or judicial proceedings.   *See United States v. Atlantic States Cast Iron Pipe Co.*, 627 F. Supp. 2d 180, 202 (D.N.J. 2009).   In *Atlantic States Cast Iron*, the court noted that "one of the circumstances warranting enhancement under Section 2J1.2(b)(2) is where the defendant's obstructive conduct, which did result in an obstruction conviction, also had but-for consequences of causing unnecessary additional expenditure of substantial government resources in an underlying investigation or prosecution that was already in progress."   *Id.*   The underlying investigation may be criminal or civil in nature, but there

must be some sort of investigation. *See id.* at 200 ("A 3–level enhancement under Section

2J1.2(b)(2) . . . does not require that defendant's obstructive conduct have occurred during a

criminal investigation.   The conduct can be committed during civil proceedings." (citing *United*

*States v. Fiore*, 381 F.3d 89 (2d Cir. 2004); *United States v. Tankersley*, 296 F.3d 620 (7th Cir.

2002); *United States v. Weissman*, 195 F.3d 96 (2d Cir. 1999)).   The court noted the "wide

range of circumstances" in which the obstruction enhancement has been applied, citing cases

which all involved the obstruction of judicial or investigative proceedings.   *See id.* at 203-04

(citing cases).

Text aside, law-of-the-case and estoppel principles foreclose application of U.S.S.G. §

2J1.2(b)(2) in this case.   Mr. Rahm, along with dozens of other January 6th defendants, filed a

motion to dismiss the § 1512(c)(2) charge, arguing primarily that that Congress's joint session to

count electoral votes does not constitute an "official proceeding" under § 1512(c)(2) because,

among other reasons, it did not involve the administration of justice.   In response, the

government, in this case and others, contended that the joint session did not need to entail the

administration of justice to constitute an "official proceeding."   *See United States v. Rahm*, U.S.'

Opp. to Def.'s Mot. to Dismiss at 10-12, ECF No. 43 (arguing "official proceeding" does not

require the "'administration of justice' gloss urged by the defendant"); *see also United States v.*

*Hale-Cusanelli*, Crim No. 21-37, ECF No. 69 at 9-13 (D.C.C. Apr. 15, 2022) (arguing an

"official proceeding" is not limited to proceedings involving the administration of justice);

*United States v. Knowlton*, 21-cr-46, ECF No. 63 at 19 n.6 (D.D.C. 2021) ("The defendants'

suggestion . . . that the Seventh Circuit pattern instruction requires proof that a defendant

'interfered with the flow of evidence or otherwise impeded a proceeding related to the administration of justice' adds a requirement not found in that instruction's text.").

Agreeing with the government, and refusing to dismiss the § 1512(c)(2) charge, courts in this district have uniformly held that the joint session of Congress does not administer justice and that the events of January 6th did not involve interference with the administration of justice. *See, e.g.*, *United States v. Montgomery*, 578 F. Supp. 3d 54, 84 (D.D.C. 2021) ("Congress's constitutionally assigned duties do not include the 'administration of justice.'") (Moss, J.); *United States v. Sandlin*, 575 F. Supp. 3d 16, 24 (D.D.C. 2021) (Friedrich, J.) ("Yet § 1503 targets 'the due administration of justice,' whereas § 1512(c)(2) targets official proceedings more broadly.   Considering that difference in subject matter, the Court will not read an 'administration of justice' requirement into 'official proceeding.' . . . [A]n 'official proceeding' need not be adjudicative."); *United States v. Fitzsimons*, Crim. No. 21-158, 2022 WL 1698063, at *6 (D.D.C. May 26, 2022) (Contreras, J.) ("It would make little textual sense to interpret 'corruptly' to limit § 1512(c)'s scope to tribunal-like proceedings involving the administration of justice when . . . Congress's definition of 'official proceeding' expressly extends the provision's coverage to proceedings that do not share these features, namely proceedings before Congress. . . Given the differences in context between 'corruptly' in § 1503 and in § 1512, the Court declines to follow the Seventh Circuit pattern instructions in defining 'corruptly' to relate solely to the administration of justice for purposes of § 1512(c).").   Judge Friedrich said it most clearly in *United States v. Reffitt*:

> First, the defendant need not have intended to obstruct, impede, or influence the "due administration of justice."   While some courts have included that element in their § 1512(c)(2) instruction, they have simply borrowed from pattern

instructions for § 1503.   *See United States v. Matthews*, 505 F.3d 698, 706 n.2
(7th Cir. 2007).
But § 1503 prohibits corruptly influencing, obstructing, or impeding "the due
administration of justice," whereas § 1512(c)(2) prohibits corruptly obstructing,
influencing, or impeding "an official proceeding."   Thus, the latter statute
requires an intent to obstruct an official proceeding, as opposed the due
administration of justice.   *See Montgomery*, —— F.Supp.3d at ——, 2021 WL
6134591, at *21.   After all, official proceedings include proceedings before
Congress, which need not relate to the administration of justice.   *See id.*; *Sandlin*,
—— F.Supp.3d at ——, 2021 WL 5865006, at *4.

Crim. No. 21-32, 2022 WL 1404247, at *6 (D.D.C. May 4, 2022) (Friedrich, J.).

Having denied Mr. Rahm's motion to dismiss, in which he argued that the joint session

was required to, but did not, administer justice in order to qualify as an "official proceeding," the

Court cannot find, under the same tools of interpretation, that "administration of justice" now

means something different under the guidelines.   Under the law- of-the-case doctrine, courts

should not "reconsider issues already decided in the absence of extraordinary circumstances[.]"

*United States v. Thomas*, 572 F.3d 945, 948 (D.C. Cir. 2009); *see United States v. Kpodi*, 888

F.3d 486, 491 (D.C. Cir. 2018) ("The law-of-the-case doctrine is a rule of practice whereby

courts generally . . . refuse to reopen what has been decided." (ellipse in original) (citation

omitted)); *United States v. Carr*, 557 F.3d 93, 101 (2d Cir. 2009) ("[W]hen a court has ruled on

an issue, that decision should generally be adhered to by that court in subsequent stages in the

same case.").

Because the administration of justice involves judicial or investigative proceedings, the

certification of the electoral votes does not involve the administration of justice.   *See Seefried*,

2022 WL 16528415, at *2.   As noted by Judge McFadden:

the certification of electoral votes is a ceremonial proceeding where members and
staff open, read, list, and announce the electoral votes.   *See* 3 U.S.C. § 15.

18

During the proceeding, "certificates and papers purporting to be certificates of the
electoral votes . . . [are] opened, presented, and acted upon in the alphabetical
order of the States." *Id.*   Then, tellers "make a list of the votes as they . . .
appear" and deliver the result to the President of the Senate after Members resolve
any objections.   *Id.* Finally, the votes are entered in the House and Senate
journals.   *See id.*

*Id.* at *2.   Importantly, Judge McFadden noted, the certification "takes place within the

deliberative branch of government—Congress—not the branches that typically exercise

judgment (the judiciary), or force (the executive)." *Id.* (citing The Federalist No. 78 (Alexander

Hamilton).   And Congress applies no "force," "sanction of force," or "possibility of

punishment." *Id.*   Thus, while the dictionary definitions and plain meaning of "administration

of justice" "evoke traditional judicial or quasi-judicial bodies that decide or maintain the legal

rights of the parties before them," Congress's certification "confirms, announces, and officially

records whom the people have chosen to be President and Vice President." *Id.* (citing 3 U.S.C.

§ 15).

It is clear "official proceeding"—as used in § 1512—is a far broader term than

"administration of justice."   And while the Sentencing Commission could have amended the

enhancements in 2J1.2 to encompass the broader concept of "official proceeding" enacted in

1512(c) by the Sarbanes-Oxley Act, it chose not to.   Indeed, the enhancements in 2J1.2, and the

definition of "substantial interference" in the application notes to 2J1.2, originated before the

"official proceeding" provision was added to § 1512 in 2002, and no changes were made to the

enhancements in 2002, as they continue to apply only to inference with the "administration of

justice."   Thus, "official proceeding" continues to be a far broader term than "administration of

justice."   And the government cannot show that the administration of justice was involved in this case.

In addition, the enhancement does not apply because, irrespective of whether the administration of justice was involved in the events of January 6, Mr. Rahm's actions did not constitute substantial interference.   The facts—as stated by the government, accepted by Mr. Rahm in the Statement of Facts for Stipulated Trial, *see* ECF No. 57, and adopted in the PSR— fail to show that Mr. Rahm substantially interfered with the administration of justice.   Indeed, the PSR does not identify which facts support the §2J1.2(b)(2) enhancement.

Critically, Mr. Rahm's actions had no substantial causal relationship with the outcome or duration of the joint session, which was suspended over 20 minutes before he entered the Capitol Building and did not recommence until hours after he exited.   Mr. Rahm entered the Capitol over 40 minutes after the initial breach.   He assaulted no one, broke nothing, did not use force of entry, did not enter the Senate gallery or legislator offices, and encountered neither legislators nor congressional staff.   When compared with other January 6th cases, *see* Exhibit A, Mr. Rahm's conduct is virtually indistinguishable from—and even less egregious than—that of dozens or perhaps hundreds of misdemeanor defendants who entered the Capitol.   There is no factual basis for calling his conduct "substantially" obstructive unless the court is prepared to conclude that every protester who entered the building committed obstruction of justice.   The only conduct separating Mr. Rahm from some of those misdemeanor defendants—although far from all—is his Facebook postings.   But those postings, while perhaps evidence of his "intent" for purposes of the 1512 felony charge, do not provide factual support of his *actual* substantial interference with any proceedings.

## IV.    THE 18 U.S.C. § 3553(A) FACTORS FAVOR A DOWNWARD VARIANCE TO A NON-CUSTODIAL SENTENCE

At sentencing, a district court must impose a sentence that is "sufficient, but not greater than necessary" in light of the factors identified in §3553(a).    *Kimbrough v. United States*, 552 U.S. 85, 111 (2007).

### A.    Nature and Circumstances of the offense and history and characteristics of the Mr. Rahm

Mr. Rahm's decision to travel to Washington D.C. on January 6, 2021, was highly influenced by media reports of a stolen election.    After the 2000 presidential election, Donald Trump and his inner circle began spreading the word that the election was "stolen" from him by Democrats and others.[4]   This was a lie and he refused to concede. False claims were made on media sources, as well as by Trump himself, that the election system had been corrupted and that the integrity of the election should be questioned.    Trump's willingness to undermine confidence in the democratic process infected millions of his supporters, who were convinced that the loser was actually the winner. Investigations have shown that before January 6th, Trump White House officials strategized about a plan to direct thousands of angry marchers to the Capitol Building.    On the planning call were Mark Meadows, the White House chief of staff; Rudy Giuliani, Trump's personal lawyer; and Representative Jim Jordan, Republican of Ohio, among others.    The "stop the steal" rally at the Ellipse to the Capitol was not accidental but a well-planned scheme urging the crowd to violence.    According to Representative Liz Cheney, Vice Chair of the House Select Committee investigating January 6th, "President Trump invested

---

[4] https://www.washingtonpost.com/politics/trump-electionvoter-trust/2020/12/20/00282aa6-407a-11eb-8db8-395dedaaa036_story.html.

millions of dollars of campaign funds purposely spreading false information, running ads he knew were false, and convincing millions of Americans that the election was corrupt and that he was the true President."[5]

Many in Trump's inner circle, including his White House Counsel, informed Trump that there was no basis for overturning the election results.   Trump ignored those voices. Yet these high-profile lawyers and advisers testified to the January 6th committee that they did not "correct the public record on the issue or speak out against Trump's false claims."[6]   A huge informational void was then able to be filled with conspiracy theorists, online extremists and Trump loyalists willing to manipulate public opinion for their own purposes.   Trump himself added fuel to the fire by declaring that he was trying to protect the democratic process.[7]

To fully and fairly evaluate Mr. Rahm's conduct on January 6th, and understand why Mr. Rahm traveled from Pennsylvania to Washington D.C., the Court must take into account the enormous influence of the false information spread by Trump, the media, and through social media.   While following such influence blindly is no excuse, the powerful impact of such prolific misinformation cannot be ignored.   Outrage, hostility, and untruths were the fuel for the fire that occurred on January 6th.   Mr. Rahm, in particular, allowed himself to be swept up in the media coverage of the 2020 election and the responses on social media by angry and mobilizing

---

[5]  https://www.npr.org/2022/06/10/1104156949/jan-6-committeehearing-transcript.

[6]  https://www.washingtonpost.com/nationalsecurity/2022/06/13/jan-6-committee-hearings-live/.

[7]  On January 4th, 2021, at 10:07 a.m., Donald Trump tweeted:   "How can you certify an election when the numbers being certified are verifiably WRONG.   You will see the real numbers tonight during my speech, but especially on JANUARY 6th…"   The American Presidency Project, UC Santa Barbara, available at https://www.presidency.ucsb.edu/documents/tweets-january-4-2021 (last visited December 28, 2022).

Trump supporters.   Mr. Rahm enjoyed the comradery he felt on Facebook, communicating with those Trump supporters, who he believed shared his frustrations and political beliefs.

When Trump summoned his supports to Washington, D.C. on the day Congress would meet to certify the Electoral College votes, Mr. Rahm listened, and, on January 5, 2021, he traveled with his son from Philadelphia to Washington, D.C. to attend the political rally and show his support.   Unable to enter the rally, Mr. Rahm listened to Trump and the other speakers from across the street.   He then rode a bike to the back of the Capitol, but shortly thereafter left the Capitol grounds to continue riding around the city.   After approximately 20 minutes, Mr. Rahm returned to the Capitol, where he followed a crowd up the steps to the East Rotunda doors. He continued to follow the crowd through the doors, facing no police resistance, and stayed in the Capitol for approximately 11 minutes, during which time he wandered around holding his flag pole, through the Rotunda and Statutory Hall.   When Mr. Rahm reached the Statutory Hall Connector outside the House of Representatives Chamber, where others were attempting to breach the chamber door, Mr. Rahm turned around and proceeded back towards the doors through which he had entered.

At no time before January 6th did Mr. Rahm believe he would go to the Capitol, let alone inside the building.   He had no plans to confront law enforcement. He came to the Capitol with only the intent to support Trump and add his voice to the protests over the perceived injustice of the election.   Indeed, he engaged in no planning for the events, nor did he come prepared with any offensive items, such as weapons, body armor, or military garb.   He wore street clothing and carried a flag.

Mr. Rahm entered the Capitol approximately 23 minutes after the initial breach, hundreds of others having preceded him in entering.   Neither outside or inside the Capitol did Mr. Rahm destroy or steal any property, or injure anyone.   The fact that Mr. Rahm brought his son with him to Washington D.C. further indicates he had no plans to enter the Capitol or otherwise break the law.   He would never have wanted to expose his son to violence or criminal charges.

Unfortunately, Mr. Rahm posted videos and statements on Facebook that seemingly evidenced malicious intent that was not bore out by his actions.   The extremity of the postings as compared with Mr. Rahm's actions demonstrate their bombastic nature.   For example, despite posting that he and other protesters had "surrounded" the building and were ready to "take [their] Capitol back," Mr. Rahm did nothing inside the Capitol besides wander around peacefully.   He also filmed a video stating, "We broke the door down," and "We're in . . . . Time to find some brass and kick some friggin' ass."   Again, Mr. Rahm had not gotten close to protesters breaking down any door, and engaged in nothing close to violence.   And Mr. Rahm's highly offensive post that he "walked right through Pelosi's office I should have shit on her chair" was, again, entirely untrue; he never entered Ms. Pelosi's office or the office of any member of Congress.

**B.**     **The Need for the Sentence Imposed**

The remorse Mr. Rahm feels, the shame he feels from the community, the business he has lost, and, now, the mark of a felony conviction, have had and will continue to have the deserved punitive effect.   A period of incarceration, however, while failing to have any greater deterrent effect, will both punish his family—financially and emotionally—and wreak further havoc on Mr. Rahm's professional career.   As noted above, Mr. Rahm continues to fully support his ex-wife, who has never worked, by paying her mortgage and all her bills.   A period of incarceration

24

would prevent Mr. Rahm from working and supporting his ex-wife, and would make it exponentially harder for Mr. Rahm to find work in the construction field upon his release.

But a non-custodial sentence of would adequately meet the ends of justice.  *See* 18 U.S.C. § 3553(a)(2).   Indeed, during his pre-trial supervision, Mr. Rahm proved that he can and will abide by rules without incident.

### C. The need to avoid unwarranted sentencing disparities between Mr. Rahm and other January 6th defendants

Imposing a 15-21 month sentence would result in unwarranted sentence disparity.   A variance is equitable to avoid unwarranted sentencing disparities between Mr. Rahm and other similarly situated defendants.   The government has acknowledged the necessity to make "meaningful distinction between offenders" to avoid unwarranted sentencing disparities in January 6th cases.[8]   The government argues that, in general, "[t]hose who engaged in felonious conduct are generally more dangerous," and "[t]hose who trespassed, but engaged in aggravating factors, merit serious consideration of institutional incarceration."[9]   In contrast, the government notes that "[t]hose who trespassed, but engaged in less serious aggravating factors deserve a sentence more in line with minor incarceration or home detention."

More specifically, the government has identified a list of non-exhaustive factors for the court to consider in assessing a defendant's conduct:   (1) when and how the defendant entered the Capitol building; (2) whether the defendant encouraged violence; (3) whether the defendant

---

[8] *See, e.g.*, *United States v. Pert*, 21-cr-139, Government's Sentencing Memorandum at 16, (D.D.C. Dec. 13, 2021).

[9] *Id.*

encouraged property destruction; (4) the defendant's reaction to acts of violence of destruction; (5) whether the defendant destroyed evidence during or after the riot; (6) the length of time and precise location(s) of the defendant inside the Capitol building; (7) the defendant's statements in person or on social media; (8) whether the defendant cooperated with, or ignored, commands from law enforcement officials; and (9) whether the defendant demonstrated sincere remorse or contrition.[10]   Additionally, whether a defendant prepared for January 6th with knowledge that violence would occur is an important factor.

Consideration of these factors with respect to January 6th defendants who engaged in similar or more egregious behavior than Mr. Rahm—most of whom pled guilty to misdemeanor offenses—and the sentences of those defendants demonstrates that Mr. Rahm exists within the group of individuals who trespassed on Capitol grounds but engaged in less serious aggravating factors, warranting a non-custodial sentence.

A.   **January 6th Defendants who were convicted of misdemeanor offenses, based on similar or more egregious conduct than that of Mr. Rahm, and who received non-custodial sentences or sentences far shorter than the recommended guidelines' range in this case**

Many January 6th defendants who were convicted of misdemeanor offenses based on similar or more egregious conduct than that of Mr. Rahm were sentenced to non-custodial sentences or sentences far shorter than the recommended guidelines' range in this case.   *See* January 6th Sentencing Chart, Exhibit A.   The following, described in more detail, are just a selection of those cases, which demonstrate that the critical sentencing factors identified by the

---

[10] *Id.* at 10.

government—i.e., the defendant's manner of entry, participation in violence, and length of time in the Capitol—lend towards a non-custodial sentence in this case:

(1) *United States v. Jenny Louise Cudd*, Crim. No. 21-68

Jenny Louise Cudd was charged by an indictment nearly identical to that charging Mr. Rahm, including the 18 U.S.C. § 1512(c)(2) charge and four misdemeanor counts.   Cudd traveled to D.C. from Texas with prior knowledge that violence would occur, having posted on social media:   "Really grateful that my boyfriend bought me this bulletproof hoody before I got here."   In a Facebook Live video on January 6 around 12:30 p.m., Cudd stated that "she was about 3 miles from the Capitol" and "intended to convene with the Proud Boys at the Capitol." She entered through the West Terrace at 2:35 p.m., remained inside for approximately 20 minutes, moved through Statuary Hall, exited the Upper House Door, and remained on Capitol grounds for another hour and twenty minutes.   In addition to a plethora of incendiary social media posts, Cudd participated in an interview with a local news station, stating, "I stood up for what it is I believed in.   And I can tell you this . . . I would do it again in a heartbeat because I did not break any laws."   Cudd pled guilty to 18 U.S.C. § 1752(a)(1), and Judge McFadden sentenced her to 2 months of probation.

(2) *United States v. Pert*, Crim. No. 21-139

Rachael Lynn Pert, a Navy veteran, was charged with the same five counts, including 18 U.S.C. §§ 1512(c)(2) and 2. Pert traveled to D.C. from Florida prepared for violence, stating in a Facebook Live video during her drive, "Got her flags, come with her flagpole, that way I can hit Antifa in the head if need be."   On January 6th, Pert entered the Capitol shortly after the initial breach and remained inside for approximately 35 minutes, when clashes with law enforcement and property destruction were widespread.   After being pushed out, she and her co-defendant stood on the steps bragging to others about their actions.   In addition, Pert's criminal history demonstrated her clear disregard for the law.   Nevertheless, she entered into an agreement with the government, pleading guilty to just one count under 18 U.S.C. § 1752(a)(1).   Judge McFadden sentenced Pert to 24 months' probation and 100 hours of community service.

(3) *United States v. Cordon*, Crim. No. 21-277

Kevin Cordon was also charged with the same five counts, including 18 U.S.C. §§ 1512(c)(2) and 2.   Cordon traveled to D.C. from California prepared for violence, wearing light body armor and carrying gas masks.   He entered the Capitol during the initial breach "mob scene" by climbing through a broken window near the Senate Wing door.   In an interview with a reporter after exiting the building, Cordon stated, "[I]t was a once in a lifetime opportunity to show that the people of this country are not gonna take this corruption lying down."   Cordon pled guilty to just one count under 18 U.S.C. § 1752(a)(1) pursuant to a plea agreement with the

government.   Judge McFadden sentenced to him to 12 months' probation and 100 hours of community service.

(4) *United States v. O'Brien*, Crim. No. 21-633

Kelly O'Brien was charged with four misdemeanor offenses and pled guilty to one count under 18 U.S.C. § 1752(a)(1).   O'Brien:   (1) posted videos to Facebook on January 6th during the protests referring to her fellow rioters as "brave patriots"; (2) was aware of the potential for violence, noting in one of her Facebook videos that she was going to stay back, yet ultimately entered the Capitol; (3) penetrated the Capitol all the way to the Speaker's office suite; (4) before entering the Speaker's office suite, and while pointing to an overhead sign identifying the Speaker's office suite, told other protesters, "Look at that sign. We have to smash this place"; (5) made statements, including "no regrets…[,]" on Facebook in the days immediately following her breach of the Capitol that demonstrated a total lack of remorse; and (6) destroyed evidence from her Facebook in an attempt to evade law enforcement detection.   O'Brien entered the Capitol at 2:23 p.m. and entered the Speaker's suit at 2:33 p.m.   After approximately 21 minutes, at 2:44 p.m., she exited the Capitol.   Judge Lamberth sentenced O'Brien to just 90 days' incarceration and 12 months of supervised release.

(5) *United States v. Sidorski*, Crim. No. 21-48

Dennis Sidorski was charged with four misdemeanor offenses and pled guilty to one count under 18 U.S.C. § 1752(a)(2).   On January 5th, on the Parler application, Sidorski wrote or endorsed statements evincing his intent to disrupt the certification of the Electoral College vote, including:   "[t]hose idiot lawmakers in the Capitol building have no idea what civil unrest is till we the people march into that Capitol building and drag him out by the hair of their heads and boot their butts back home.   That is the people's house of representatives.   They're about to get served eviction notices."   On January 6th, while law enforcement officers were making their way toward the Capitol through a mob of violent protesters, Sidorski made unwarranted physical contact with an officer by putting his hand on the officer's shoulder and arm for approximately three seconds.   Then, Sidorski entered the Capitol through the Senate Wing Door just one minute after the door was kicked open.   While inside the Capitol, Sidorski entered and remained in several locations, including the Rotunda, the Crypt, Statutory Hall, Upper House Doors, and the suite of offices of Nancy Pelosi.   Although the government sought 12 months' incarceration, Judge Jackson sentenced Sidorski to 100 days' incarceration.

(6) *United States v. Simon*, Crim. No. 21-346

Simon was charged with four misdemeanor offenses and pled guilty to one count under 18 U.S.C. § 1752(a)(2).   Simon:   (1) arrived at the Capitol prepared for violence by wearing a plated tactical vest; (2) pushed a bicycle rack against a line of officers, making physical contact with them and pushing them back; (3) mocked police officers as they attempted to defend the Capitol and loudly urged his fellow rioters to put "fear" into the officers; (4) sought out Members

of Congress while he was inside the Capitol and urged his fellow rioters to do the same; (5) stayed inside the Capitol for over one hour; (6) actively resisted police officers' efforts to clear the Rotunda; (7) celebrated the riot when interviewed by a local newspaper reporter a week afterwards; and (8) lied to the FBI twice about the extent of his participation in the events of January 6, 2021.   Despite his preparedness for violence, instigation of other rioters, targeting of members of Congress, one hour stay inside the Capitol, active resistance against police, lack of remorse, and obstruction of justice, Judge Howell sentenced Simon to just 8 months' incarceration.

(7) *United States v. Jancart*, Crim. No. 21-148

Derek Jancart was charged with four misdemeanor offenses and pled guilty to one count under 40 U.S.C. § 5104(e)(2)(D).   Jancart (1) prepared for violence by bringing a gas mask and two-way radios to Washington, D.C.; (2) was aware of the potential for violence because he responded to the Capitol only after hearing it had been "breached"; (3) laughed and cheered while the forward line of the rioters broke through the police line and posted a video to Facebook of Rau screaming "we have you surrounded" at the police officers attempting to hold the line around the Capitol; (4) used a bicycle rack to scale a wall; (5) entered Capitol through the Senate Door 5 minutes after the window immediately adjacent was smashed; (6) penetrated the Capitol all the way to the Speaker's conference room; (7) spent nearly 40 minutes inside Capitol; (8) made statements on Facebook after January 6 revealing a total lack of remorse; (9) actively spread propaganda on social media by falsely downplaying the violence on January 6; (10) likely destroyed evidence by deleting videos and message threads from his phone; and (11) made social media statements revealing he believes a revolution is coming and suggesting the possibility of future violence.   Judge Boasberg sentenced Jancart to 45 days' incarceration.

(8) *United States v. Philip James Weisbecker*, Crim. No. 682

On January 4, 3021, Weisbecker traveled from California to Washington, D.C., and on January 6, he attended the "Stop the Steal" rally before proceeding to protest at the Capitol.   *See* Statement of Facts at 3, ECF No. 27.   At approximately 2:22 p.m., he saw law enforcement officers deploy tear gas into the crowd outside the Capitol, and videotaped protesters as they climbed scaffolding.   *Id.*   Just a few minutes after the initial breach through the Senate Wing Door, Weisbecker entered, between 2:22 and 2:24 p.m. He proceeded into the Speaker's suite of offices, and then the Rotunda and Statutory Hall, where he remained until approximately 3:15 p.m.. when he was removed by officers from the Capitol.   During his 53 minutes inside the Capitol, Weisbecker used his cellphone and Cannon camera to take photographs and videos, including of himself inside the Capitol.   *See id.* at 4.   Between January 6 and March 18, 2021, Weisbecker posted on his website and Facebook page videos and photographs of protesters climbing scaffolding and entering the Capitol.   He also posted a picture of himself standing in the Capitol, right thumb up and right pinky finger extended, with the caption, "All in the name of Freedom for it is not free. . . ."   *See id.*; Govt. Sent. Memo. at 9, ECF No. 31.

Weisbecker was charged with four misdemeanor offenses and pled guilty to one count under 40 U.S.C. § 5104(e)(2)(G).   The government sought 90 days' incarceration and 36 months' probation based on Weisbecker's entry into a sensitive area, his lack of remorse, and lack of control when confronted by law enforcement officials.   *See* Govt. Sent. Memo. at 2, ECF No. 31.   On June 27, 2022, this Court sentenced Weisbecker to 24 months' probation, with 30 days of intermittent confinement.

(9) *United States v. Jessica Bustle*, Crim. No. 21-238

Jessica Bustle and her husband Joshua Bustle entered the Capitol and remained for at least 20 minutes.   *See* Statement of Facts at 3, ECF No. 25.   While in and around the Rotunda, Jessica carried signs protesting the government's efforts to vaccinate the population against COVID-19.   Both before and after the riot, Jessica posted to her Facebook account, writing about her purpose for entering the Capitol.   Before traveling to the Capitol, she posted a message that read, in part, "We don't win this thing sitting on the sidelines. Excited to stand for truth with my fellow patriots and freedom fighters in D.C. today."   During or after the riot, she posted a message that read, in part, "Pence is a traitor. We stormed the capital [sic]. An unarmed peaceful woman down the hall from us was shot in the neck by cops. It's insane here."   In another message, apparently written after the riot, she wrote "We need a Revolution! We can accept an honest and fair election but this is NOT fair and patriots don't want to see their country brought into communism and destroyed over a lie."
Jessica was charged with four misdemeanor offenses and pled guilty to one count under 40 U.S.C. § 5104(e)(2)(G).   On August 30, 2021, this Court sentenced Jessica Bustle to 24 months' probation, to include 60 days of home confinement.

(10)   *United States v. Reeder*, Crim. No. 21-166

From the steps of the Capitol, Reeder recorded a video in which he stated, "We've been getting tear gassed . . . thousands of people."   *United States v. Reeder*, Crim. No. 21-166, Statement of Facts at 3, ECF No. 19.   He then chanted, "Fight for Trump!"   *Id.*   Reeder then approached an open door of the Capitol, where a high-pitched alarm can be heard, and proceeded to walk past Capitol Police Officers, opened an interior door, and entered the Capitol.   *See id.* He took numerous photos and videos.   While in the Rotunda, with an individual outfitted in combat gear, Reeder turned the camera on himself and says, with some excitement, "tear gas inside the Capitol."   Soon after, Reeder was close enough to the Senate chamber to take a video of individuals appearing to attempt to breach the doors.   He then briefly left the Capitol, only to turn around and re-enter, thus *twice* breaching the building.   At that time, he recorded a video of himself chanting "USA!" with the crowd.   Reeder then recorded another video in the Rotunda near confrontations with officers.   He recorded an assault on two police officers and seemingly told the officer, "You need to retreat!"   One officer is seen being pushed, grabbed by his gas mask, and punched in the head, while another individual is heard yelling, "Fuck the police."   By his own account, Reeder remained in the Capitol for more than a half hour, and was in or around the Capitol for over two hours.

After leaving the Capitol, Reeder recorded a video from the Capitol grounds in which he stated: "I'm leaving now... I got tear gassed at least four times inside the Capitol . . . . I saw the lady they say got shot, I walked right past her in a pool of blood. And it's just . . . completely crazy in there." *Id.* at 4. Reeder also stated: "Just left the Capitol, I was one of the last people out. I was in there for over half an hour. I got gassed several times inside the Capitol, many times outside the Capitol. Got shot with pepper balls. It was fucking nuts. We had to do . . . ah . . . battle with the Police inside. It was crazy . . . absolutely insane." *Id.*

Reeder was charged with four misdemeanor offenses and pled guilty to one count under 40 U.S.C. § 5104(e)(2)(G). In its sentencing memorandum, the government pointed out that at Reeder's guilty plea hearing, Reeder sought to convey that he did not know he was prohibited from entering the Capitol. *See* Govt. Sent. Memo. at 2, ECF No. 26. Indeed, although Reeder pleaded guilty, he appeared to be proud of his participation in the attack on the Capitol and had demonstrated a "continued lack of remorse or contrition for the full scope of his conduct. *Id.*

On November 2, 2021, this Court sentenced Reeder to three months' incarceration.

(11)    *United States v. Carlton*, Crim. No. 21-247-2

Carlton, until recently, was a corrections officer. He pled guilty before this Court on March 29, 2022, to one count of violating 40 U.S.C. § 5104(e)(2)(G), parading, demonstrating, or picketing in the Capitol. The government sought a 3-month period of incarceration followed by 36 months of probation based on that fact that Carlton: (1) made 2 separate entries into the Capitol; (2) chose to enter the Capitol after watching rioters climb the scaffolding, smelling tear gas, and seeing billows of smoke rise around him and from the Lower West Terrace, where rioters were clashing with law enforcement; (3) initially lied to law enforcement officials about his activity on January 6, 2021; (4) admitted he "may have" deleted some texts related to January 6; (5) filmed the chaos around him rather than choosing to leave; (6) has not expressed remorse for his crimes on January 6, and (7) as a corrections officer, should have recognized the dangers that he and his fellow rioters' presence at the Capitol posed to public safety, to law enforcement officials, and to Members of Congress and their staff that day. *United States v. Carlton*, Crim. No. 21-257, Gov't Sent. Memo. at 2, ECF No. 47. In addition, Carlton joined a line of rioters to climb a bike rack onto the balustrade of the northwest stairs, which allowed rioters to gain access to the Upper Northwest Terrace of the Capitol. *See id.* at 9. Soon after, outside the Senate Wing Door, Carlton joined the crowd in shouting, "Let us in! Let us in! Let us in!," "Fight for Trump! Fight for Trump!," and "Our House! Our House!" Around 2:48 p.m., rioters pushed past the officers attempting to hold the Senate Wing Door closed, and Carlton entered the Capitol around this time. *See id.* at 12. Although the crowd quickly thinned and Carlton could have easily exited, he decided to stay and attempted to reunite with his co-defendant. He then left around 3:04 p.m. only to re-enter two minutes later, at 3:06 p.m., and moved further into the building. He walked through the Crypt, all the way to the Hall of Columns. He then retreated and exited around 3:29 p.m., having spent approximately 35 minutes in total inside the Capitol. Carlton remained on Capitol grounds until at least 3:52 p.m., when he posed for a photo with his co-defendant in front of the Capitol. Carlton also aided rioters effected by the chemical irritants by providing water bottles. *See id.* at 14-19.

31

When Carlton was first interviewed by the FBI, he denied entering the Capitol.   When he was again interviewed two days later, he admitted entering the Capitol but claimed that he was caught up in a mob and pushed in by a group of people.   He admitted that his face burned as if from pepper spray.   However, he did not admit that he entered the Capitol twice, and he claimed that he left the Capitol immediately after entering.   *See id.* at 19-20.

On August 26, 2022, this Court sentenced Carlton to 36 months' probation.

(12)   *United States v. Youngers*, Crim. No. 21-640

Darrell Alan Youngers, a Marine Corps veteran, traveled from Texas to Washington, D.C. to attend the "Stop the Steal" rally, and then proceeded to the Capitol.   Before entering the Capitol, Youngers observed, "people have just stormed the front of the Capitol building, through tear gas…people aren't supposed to be up there, but they're there."   Statement of Offense at 3, ECF No. 45.   He scaled a wall to reach the Capitol and filmed a confrontation between rioters and police.   Youngers entered the Capitol through the Senate Wing Doors at 2:19 p.m., ten minutes after the initial breach, when an alarm was audible. Youngers stated, "We are inside the Capitol Building.   It has been overrun . . . . The Capitol Building has literally been broken in to…this is what a revolution motherfucking looks like."   *Id.* at 3-4.   Youngers attempted to open one of Rotunda doors, encouraged entering rioters, and swatted at a police officer.   *See* Govt. Sent. Memo. at 2, ECF No. 55.   He then moved to the Rotunda, where he said, "Two stories. Two floors. Multiple doors. The Capitol Building's been breached."   He exited the Capitol at 2:32 p.m., having spent approximately 13 minutes inside.   *See* Statement of Facts at 4. That night at the hotel, he filmed a video denying that there was violence at the Capitol.

Youngers was charged with four misdemeanor offenses and pled guilty to one count under 40 U.S.C. § 5104(e)(2)(G).   This Court sentenced him to 36 months' probation.

(13)   *United States v. Stotts*, Crim. No. 21-272

Jordan Stotts was charged with four misdemeanor offenses and pled guilty to one count under 40 U.S.C. § 5104(e)(2)(G).   Stotts (1) entered the Capitol at 2:45 p.m., having scaled the wall on the Upper West Terrace to gain access to the Capitol, and once inside he raised his fist in support of those who breached the Capitol; (2) at 3:07, made his way to the front of a crowd confronting MPD officers in the Rotunda and stood face-to-face with and shouted at the officers while they were pushing back rioters, including Stotts at least three times, out of the Rotunda; (3) admitted that he remained on Capitol grounds for a couple of hours, returning to his van at approximately 5:45 pm; (4) admitted seeing protesters throw things at officers and saw one rioter kick in window of Capitol; and (5) made post-riot statements on Facebook, in which he boasted about the "siege," claimed the fight was "far from over," and exclaimed, "I'll be back," revealing a total lack of remorse.   Judge Kelly sentenced Stotts to just 2 months' home detention and 24 months' probation.

(14)    *United States v. Abual-Ragheb*, Crim. No. 21-43

Rasha Abual-Ragheb pled guilty to 40 U.S.C. § 5104(e)(2)(G)—Count Four of the Information filed against her.   Abual-Ragheb, although inside the Capitol for just 2.5 minutes, posed proudly for a photograph, which she posted on social media later that night. She remained on the Capitol grounds for at least another 75 minutes, wandering back and forth among other rioters and occasionally verbally engaging with law enforcement members.   She used social media to spread false information about the 2020 Presidential election and repeatedly endorsed violence. In one particular post she urged others to bring firearms with them when they went to D.C. on January 6th.   And after the riot she defiantly announced on social media that she was ready to "burn" America.   Judge Nichols sentenced Abual-Ragheb to just 36 months of probation, with the first two months to be served as home detention.

(15)    *United States v. Ericson*, Crim. No. 21-506

Andrew Ericson was charged with four misdemeanor offenses and pled guilty to one count under 40 U.S.C. § 5104(e)(2)(G).   Ericson (1) penetrated the Capitol all the way to the Speaker's conference room and office space; (2) trivialized the level of his intrusion by posing with his feet on the Speaker's conference room table and taking a beer out of a mini refrigerator; (3) saw police officers overrun by the crowd of rioters; (4) recorded his presence in and around the Capitol and posted it on Snapchat while cheering on the criminal activity he was witnessing; (5) entered the Capitol at 2:24 p.m. and exited between 2:49 and 3:03 p.m., thus remaining in the Capitol for 25-39 minutes; (6) deleted his Facebook and Snapchat accounts, although it is not clear this was done in an attempt to destroy incriminating evidence; and (7) appears to have a general lack of remorse, stating only that he would not have entered the Capitol knowing what he knows now.   Judge McFadden sentenced Ericson to just 24 months' probation.

(16)    *United States v. Nelson*, Crim. No. 21-344

Brandon Nelson was charged with four misdemeanor offenses and pled guilty to one count under 40 U.S.C. § 5104(e)(2)(G).   Despite witnessing substantial evidence of a violent riot and destruction of property at the Capitol, Nelson—who spent approximately 6 years as a member of the Air National Guard and an additional 2 years as a Reservist—entered the building at the Senate Wing Door at approximately 2:16 p.m., less than 5 minutes after rioters had smashed windows on either side of the doorway to gain entry.   Approximately 15 seconds before he crossed the threshold, a rioter could be seen climbing through a broken window as other rioters cascaded through the doorway.   At 3:30 p.m., Nelson texted his mother, "I got maced." At approximately 3:40 p.m., he texted her again, "There's shit everywhere." He and codefendant Markofski remained inside and entered different parts of the building for well over an hour. After the riot, he shared texts with his codefendant that they "held the line" and did not "back[] down," and appeared to agree with Markofski that this behavior was patriotic.   At the same time, Nelson submitted to two voluntary interviews with the FBI (though he minimized his conduct in those statements), consented to a search of his apartment, alerted the FBI where

33

evidence could be found in his residence, and expressed a prompt desire to accept responsibility. Judge Bates sentenced Nelson to 24 months' probation.

(17)   *United States v. Marquez*, Crim. No. 21-136

Felipe Marquez was charged with five misdemeanor offenses and pled guilty to one count under 18 U.S.C. § 1752(a)(2).   Marquez (1) traveled from Florida to Washington, D.C., with a firearm in his car (though he apparently did not remove it from the car while in D.C.); (2) entered the Capitol as part of a mob, with alarms blaring and next to broken glass and windows; (3) once inside the Capitol building, interfered with officers trying to protect the building by repeatedly asking them for selfies and fist bumps; (4) spent about 10 minutes, with 20 other rioters, inside the private hideaway office of Senator Merkley, which suffered substantial damage, (5) while in the office, held his vape pen up to the camera showing him smoking; and (6) spent about 53 minutes inside the Capitol, and at 3:42 p.m., police officers escorted him out. Once outside, a photojournalist took a picture of Marquez giving two thumbs to the crowd, reflecting his positive review of the entire experience.   Judge Contreras sentenced Marquez to just 18 months' probation.

(18)   *United States v. Mariotto*, Crim. No. 21-94

Anthony Mariotto was charged with five misdemeanor offenses and pled guilty to one count under 40 U.S.C. § 5104(e)(2)(G).   Mariotto (1) entered the Capitol through an obviously damaged Senate Wing Door approximately 5 minutes after it was breached; (2) entered and remained in a highly sensitive area of the Capitol building, the Senate Gallery, where he took a selfie-style photograph and posted it to Facebook with the caption "I'm in [sic] And there are just a few [sic] This is our house," and deleted his Facebook account soon thereafter; (3) was present for and recorded assaults against the police inside the Capitol; (4) while walking through several hallways, chanted "Where Are the Traitors" and attempted to open multiple closed doors; (5) spent 20 minutes inside the Capitol; and (6) provided a post-arrest interview to a local news station minimizing his conduct on January 6, 2021.   Judge Walton sentenced Mariotto to 36 months' probation.

(19)   *United States v. Smith*, Crim. No. 21-290

Jeffrey Alexander Smith was charged with four misdemeanor offenses and pled guilty to one count under 40 U.S.C. § 5104(e)(2)(G).   Smith entered the Capitol after observing that fellow rioters were engaged with police officers who were deploying tear gas and flash bangs. He recorded a video when entering the Capitol through the UWT entrance while alarms were blaring.   He cheered and incited other rioters as he entered the Capitol, yelling, "We ain't going to take it," and "Let's fucking go patriots."   Immediately after successfully breaching the Rotunda doors from the inside to let in the violent mob, Smith pumped his fist in victory and directed the flood of new rioters up the stairs to the third level of the Capitol.   Smith also led the removal of barricades from the inside of the Rotunda Case doors and attempted to open those

doors to let in a mob of violent and destructive rioters.   Although 3 police officers initially prevented him from opening the doors, Smith returned to the Rotunda doors to assist a growing mass of rioters in overwhelming the officers by sandwiching them against the doors which caused the doors to open from the inside and triggering the first and only major breach point on the east side of the Capitol.   Smith then led those rioters upstairs. Far from being a follower simply caught up in the crowd, Smith— a former Army sergeant—quite literally led the charge to open the Rotunda doors from the inside to let in a violent mob clearly visible to him through the damaged door windows on the outside.   At 2:58 p.m., Smith, along with a group of other rioters, approached police officers standing guard outside an access point to the Office of the Speaker of the House.   The rioters became very vocal and abusive towards the officers. At 2:59 p.m., Smith was in the front line of these rioters and only inches from the officers.   At that time, Smith told the officers to "stand down" and warned them, "We're getting in there one way or another."   The rioters soon physically assaulted the officers, but police body worn cameras videos are not clear on whether Smith participated in this physical assault by the rioters. Smith spent a total of 34 minutes inside Capitol.   He later sent electronic messages revealing a total lack of remorse, writing that he was a "Patriot" who "stormed the capit[o]l," that there was "no way in hell I was going to drive 38 hours from San Diego and not walk right through the front of the capit[o]l building," and that his purpose was "To send a message that Americans are[n']t going to take a fraudulent election."   Smith also was not candid with law enforcement during his interview and minimized his involvement in the Capitol riot.   Judge Walton sentenced Smith to 90 days' incarceration and 2 years' probation.

(20)   *United States v. Ticas*, Crim. No. 21-601

David Ticas was charged with four misdemeanor offenses and pled guilty to one count under 40 U.S.C. § 5104(e)(2)(G).   Ticas, a former Staff Sergeant in the U.S. Marine Corps: (1) brought his 16-year-old daughter inside the Capitol, even after witnessing police officers firing nonlethal munitions against the mob; (2) scaled a metal bike rack barricade that was positioned against the retaining wall of the northwest staircase to climb up on the staircase; (3) entered the Capitol through the Senate Wing Door while filming other rioters entering through smashed out windows right next to that door; (4) moved extensively throughout the Capitol with his daughter; (5) incited his fellow rioters by shouting that the police could not scare them by setting off the non-lethal munitions; (6) mocked and harassed police officers who were guarding the Capitol, and asked them to reveal the location of lawmakers who might be hiding; (7) remained in the Capitol for 19 minutes; and (8) after leaving the Capitol, repeatedly expressed pride and satisfaction in his participation in the riot, going so far as to call himself a "domestic terrorist." Judge Bates sentenced Ticas to 14 days' incarceration and 24 months' probation.

(21)   *United States v. Lindsey*, Crim. No. 21-162-2

Terry Lindsey was charged with four misdemeanor offenses and pled guilty to one count under 40 U.S.C. § 5104(e)(2)(G); one count 40 U.S.C. § 5104(e)(2)(D); and one count under 18 U.S.C. § 1752(a)(1).   Lindsey: (1) was among a group of rioters that surrounded, taunted, and

assaulted MPD officers; (2) shoved an MPD officer during the scuffle; (3) climbed through metal scaffolding to be one of the first rioters to reach the Northwest Courtyard; (4) unlawfully entered the Capitol through the Senate Wing Door at 2:18 p.m., just 5 minutes after the initial breach; (5) proceeded toward the Crypt area of the Capitol while chanting, "Who's house? Our house!"; (6) was part of the mob that overran and made physical contact with USCP officers in the Crypt; (7) was forced out of the Capitol but remained on restricted Capitol grounds for nearly 45 minutes, during which time he claims to have used controlled substances; (8) re-entered the Capitol through a different door amidst a mass of rioters who pushed past police officers who were attempting to keep them out; (9) evaded officers who were attempting to clear the area near the Rotunda doors and then entered the Rotunda; (10) took to social media shortly after the riot to celebrate his conduct and threaten that the "next time," he would return with guns; and (11) lied to FBI agents about the extent of his criminal conduct on January 6 and repeatedly blamed law enforcement officials for his crimes by stating that he was unaware that his conduct was unlawful.   Judge Howell sentenced Lindsey to concurrent terms of 5 months' incarceration on the § 5104(e)(2) counts and a term of 36 months' probation on the § 1752(a)(1) count.

(22)    *United States v. Ortiz*, Crim. No. 22-82

Christopher Ortiz was charged with four misdemeanor offenses and pled guilty to one count under 40 U.S.C. § 5104(e)(2)(G).   Ortiz (1) unlawfully entered and exited the Capitol at 3 locations on 3 different occasions within the span of 1 hour; (2) initially chose to enter the Capitol after having witnessed unmistakable signs that the mob was engaged in a violent riot; (3) as he entered the Capitol, incited others to press deeper into the building; (4) while inside the Capitol, joined a large group of rioters in the Rotunda, and pushed some of those rioters towards officers who were trying to clear the area; (5) later that afternoon, positioned himself near the Lower West Terrace tunnel while officers were actively engaged in a physical battle with rioters, and he repeatedly shone a strobe flashlight in the direction of officers over the course of several minutes; (6) later boasted in a text message that he "literally blinded the cops as the proud boys kicked in the door"; and (7) that evening, posted on Instagram video segments that he had recorded that day, in which he, among other things, cheered on other rioters and vowed, "You are never stopping us! You criminals! You'll never stop us!"   Judge Cobb sentenced Ortiz to just 2 months' home detention and 12 months' probation.

## B.    January 6th Defendants who were convicted of felony offenses based on conduct more egregious than that of Mr. Rahm and who received sentences far less than the recommended guidelines' range in this case

As documented in Exhibit A, numerous January 6th defendants who were convicted of

felony offenses based on more egregious conduct than that of Mr. Rahm were sentenced to

sentences far shorter than the recommended guidelines' range in this case.   *See* Exhibit A.   The

following, described in more detail, are a selection of those cases, which demonstrate that the

critical sentencing factors identified by the government—i.e., the defendant's manner of entry,

participation in violence, and length of time in the Capitol—lend towards a non-custodial

sentence in this case:

(1) *United States v. Rodean*, Crim. No. 21-57

Originally charged with obstruction of an official proceeding under 18 U.S.C. §
1512(c)(2), in a Second Superseding Indictment, Nicholas Rodean was charged with 7
misdemeanors:   1 count under 18 U.S.C. § 1361; 3 counts under 18 U.S.C. § 1752 (a); and 3
counts under 40 U.S.C. § 5104(e)(2). Rodean (1) smashed two windowpanes of the Capitol
with a flagpole and a metal object, which became an entry point for many rioters thereafter; (2)
was the 15th rioter to enter the Capitol; (3) pursued U.S. Capitol Police Officer Eugene
Goodman up the stairs to the hallway outside of the Senate chamber; (4) remained in the hallway
for over 40 minutes, at one point, displaying a hatchet to an officer, and at another point, posing
for a photo while waving his "Trump is my President" flag; and (5) the next day, told a
supervisor at his job that he "did what needed to be done."   While the government sought 57
months' incarceration, Judge McFadden sentenced Rodean to just 5 years' probation including
240 days' of location monitoring.

(2)  *United States v. Michetti*, Crim. No. 21-232

Richard Michetti was charged with the same five offenses as Mr. Rahm but pled guilty to
just one count of obstruction of an official proceeding under 18 U.S.C. § 1512(c)(2).   CCTV
shows Michetti entering the Upper West Terrace door of the Capitol at 2:35 p.m., within 2
minutes of the initial breach of that entrance.   He confronted officers while in the hallway,
yelling "we pay you."   MPD officers used tear gas to push Michetti and other rioters out of that
hallway.   Michetti then returned to the Rotunda, where he shouted at MPD officers "you are
starting a civil war."   He briefly left the Rotunda but returned to and tried to enter that room
again.   Only after police officers fired tear gas at him did he leave the building through the
Rotunda East doors.   He entered and remained in the Capitol for 45 minutes, during which time
he taunted and yelled obscenities at law enforcement, referring to them as "fucking animals."
At one point, Michetti briefly pinched the sleeve of one officer as the officers were trying to keep
the mob from penetrating further into the building.   While the government sought 18 months'
incarceration, Judge Cooper sentenced Michetti to 9 months' incarceration.

(3) *United States v. Blair*, Crim. No. 21-186

Charged with assaulting, resisting, or impeding certain officers using a dangerous
weapon, in violation of 18 U.S.C. § 111(a)(1) and (b); civil disorder, in violation of 18 U.S.C. §

231(a)(3); obstruction of an official proceeding, in violation of 18 U.S.C. § 1512(c)(2); and 6 misdemeanor counts in the Superseding Indictment, David Blair pled guilty to just the one civil disorder count.   On January 6th, between 5:00 p.m. and 6:00 p.m., Officer K.P., along with the MPD Civil Disobedience Unit, formed a line at the west terrace and began moving towards the west lawn to move individuals off Capitol grounds.   At 5:47 p.m., Blair, having refused to comply with police orders to "move back" away from the Capitol, positioned himself between the officers and the crowd, waving a Confederate battle flag attached to a lacrosse stick.   While walking back and forth in front of the officers, Blair yelled words such as "hell naw, quit backing up, don't be scared, we're Americans, don't be scared, let's go quit backing up, quit being scared."   When Officer K.P. pushed Blair back toward the crowd using his baton, Blair jumped back and turned to face Officer K.P. while squaring up his body. Holding the Confederate flag attached to a lacrosse stick, Blair shouted, "What's up motherfucker, what's up, what's up bitch?" Blair then thrust the stick at Officer K.P., striking him.   Several officers then restrained Blair.   While being searched incident to arrest, MPD recovered a silver knife and tape from Blair's bag.   Judge Cooper sentenced Blair to 5 months' incarceration.

(4) *United States v. Petrosh*, Crim. No. 21-347

Robert Petrosh was charged by way of Superseding Information with the felony of theft of government property, in violation of 18 U.S.C. § 641, as well as four misdemeanor counts. He pled guilty to just the § 641 charge. Petrosh (1) stole property from the Capitol—namely, two microphones from Speaker Pelosi's lectern; (2) deliberately positioned himself at the front of a standoff between rioters and U.S. Capitol Police officers inside the Crypt, and had to be warned by another rioter not to brush up against the officers; (3) celebrated as rioters broke through the police line inside the Crypt; (4) told one of the officers in the Crypt to "Give us Nancy"; (5) was at the front of a pack of rioters who pursued law enforcement down a hallway and into the Hall of Columns; (6) instead of exiting the building through the Hall of Columns after witnessing the clash between rioters and USCP officers inside the Crypt, decided to turn back around and rejoin the fray inside the building; (7) smoked a cigarette inside the Rotunda, one of the most hallowed rooms inside the Capitol; (8) ignored several red flags upon entering the Capitol building, including the sounds of Viking horns and exploding munitions, rioters shouting "f***ing traitors" on the west lawn, USCP officers clad in full riot gear stationed outside the Senate Parliamentarian door, rioters suffering the effects of tear gas, and shattered glass on the ground outside the Senate Wing door; (9) remained in the Capitol for 30 minutes; (10) minimized his participation in the breach of the police line inside the Crypt in his interviews with the FBI; (11) told the FBI during a post-plea debrief that he believed that members of Congress were "lucky that's all that happened"; and (12) to this day, does not regret storming the Capitol.   Judge McFadden sentenced Petrosh to just 10 days' incarceration and 12 months' supervised release.

(5) *United States v. Leffingwell*, Crim. No. 21-05

In a Superseding Indictment, Leffingwell was charged with three felony counts—18 U.S.C. § 111(a)(1) (2 Counts) and 18 U.S.C. § 231(a)(3) (1 Count)—and four misdemeanor

counts.   He pled guilty to just one count of 18 U.S.C. § 111(a)(1).   As Leffingwell stood at the front of the crowd of rioters behind him, he chanted not only "stop the steal!" but also "shame!" and "join us!" directed at the police officers standing in front of him.   Appearing to respond to the pleas of the line of officers, some of the crowd began to call back to the rioters behind them to "back up!"   Rather than back up, Leffingwell called out for the rioters to stand their ground, shouting "If you back up, you'll never get back in!" The line of officers began pressing on the crowd, including Leffingwell, to back them out of the threshold of the Senate Wing doors. Leffingwell chose to fight back.   He first punched Officer D.A. in the head, and then as he continued to swing, he punched Officer W.H. in the head, before eventually punching Officer D.A. once more.   After he struck the two officers, Leffingwell tried to back out of the doors and into the safety of the crowd behind him, but he was taken to the ground.   He was then escorted by Capitol Police Officers to another part of the Capitol where he was arrested.

The government requested 27 months' incarceration but Judge Jackson sentenced Leffingwell to 6 months' incarceration.

C.     **Mr. Rahm's conduct, when viewed in comparison to the aforementioned cases, warrants a non-custodial sentence**

All of the aforementioned cases, viewed in comparison to the circumstances surrounding Mr. Rahm's conduct on January 6, 2021, demonstrate that the fair and just outcome in this case is a non-custodial sentence.   By way of summary, Mr. Rahm: 1) showed no preparedness for violence upon arriving in D.C., or otherwise evidenced a prior intent to enter the Capitol building; 2) entered the Capitol over 40 minutes after the initial breach; 3) did not engage in violence against law enforcement or the destruction of property, nor did he encourage it at the time; 4) spent a fraction of the amount of time—11 minutes—in the building than other individuals; 5) while inside the Capitol, remained peaceful, taking photos and recording a video to serve as memorabilia and bragging rights; 6) left the Capitol grounds immediately after exiting the building; 7) boasted and exaggerated on social media, but did not engage the media; and 8) truly and genuinely regrets his actions on that day and, in hindsight, wishes he never followed the crowd.   Accordingly, in light of the sentences imposed on similarly-situated defendants, a non-custodial sentence is appropriate in this case.

## V.    MR. RAHM ACCEPTED THE FACTS UNDERLYING HIS COVICTIONS AND IS REMORSEFUL FOR HIS CONDUCT

James Douglas Rahm is truly remorseful for his actions.   He agreed to the facts underlying his convictions, as presented in the Statement of Facts prepared by the government for the stipulated trial in this case.   He offers this Court no excuse for what he did.

Attached hereto are character letters that shed light on the type of individual Mr. Rahm is and what he means to his friends and family.   *See* Exhibit B.   He is continually described as passionate about his family and compassionate towards others.   Nearly every letter mentions his good heart, readiness to help others, and tireless work to support his family as its sole provider. Several friends and family members also stated that they were shocked upon learning about Mr. Rahm's participation in the events of January 6th, as it appeared entirely out of character.

Those who have been under Mr. Rahm's care expressed how supportive and loving he has been.   Mr. Rahm's nephew, Gary, explained just how caring his uncle was as he grew up with cerebral palsy:   "[W]henever I needed to get to a doctor, physical therapy, something for school or my personal life, He is ALWAYS there to provide whatever I need. The quality of my life has and will continue to be better because Mr. Rahm is in it. . . . The quality of my life has been enhanced greatly, simply again just because of his presence."   One of Mr. Rahm's sons, Joshua, described his father as "amazing," a father who was always there for him and showed him how to be a better person.   Another son, Matthew, stated that his father has always been there for him, and without his father's guidance, he "would be lost."   And a friend of Mr. Rahm's son, Christopher Anil, described Mr. Rahm as "like a father to [him], from the countless amounts of help to the variety of projects and lessons he's instilled in me."

40

Mr. Rahm's mother, Loraine, also noted that her son "contributed greatly to the community, using his equipment and abilities to help the underprivileged, sick, and elderly with construction and repairs that they could not afford."   A business partner praised Mr. Rahm for "distinguish[ing] himself as someone who was responsible, reliable and trustworthy," and who handles assignments with the "utmost professionalism."

Both Mr. Rahm's ex-wife, Kelly, and his mother noted how hard Mr. Rahm has worked over the years to support his family.   Kelly emphasized that Mr. Rahm worked "day and night" to ensure a good education for their three children and to "mak[e] sure the people around him were always taken care of."   Loraine characterized her son as not only the hardest worker she knows, but as a devoted and involved father who performed dirty and difficult work involving long commutes in order to provide for his family.   Similarly, a friend, Steven A. Ostapowicz, described Mr. Rahm as "tireless, working 90 hour weeks, always without complaint."

Now, the whole family is suffering due to Mr. Rahm's actions, but Kelly states that she and her children would suffer even more without Mr. Rahm in their lives.   Indeed, numerous letters note how the media exposure destroyed Mr. Rahm's construction business, greatly affecting his earning ability and putting great financial strain on his family.   Already, Mr. Rahm's mother notes, he has "had to give up so much of what he worked so hard to obtain." This strain would exponentially increase if Mr. Rahm were to be incarcerated, fully removed from his work and family.

Mr. Rahm's family and friends are all aware that Mr. Rahm carries great shame and regret for his actions and is "entirely remorseful."   Indeed, since the filing of the Indictment, Mr. Rahm has spent endless hours reflecting on his actions and the mistakes he made.   He knows he

41

cannot take back his actions on January 6, 2021.   Yet he is determined to show his family and this Court that he is now a better person, who simply wants to continue working and providing for his family.   Mr. Rahm will do everything in his power not to disappoint the trust of this Court.

For all the reasons set forth above, the defense respectfully requests that this Court vary below the advisory guideline range and impose a non-custodial sentence.

Respectfully submitted,


/s/ Leigh M. Skipper
LEIGH M. SKIPPER
Duane Morris LLP


/s/ Anna Kessler
ANNA KESSLER
Research & Writing Attorney
Federal Community Defender Office

## <u>CERTIFICATE OF SERVICE</u>

I, Leigh M. Skipper, Esquire, hereby certify that I have served a copy of the Sentencing Memorandum of Defendant James Douglas Rahm, Jr. by electronic case filing and/or regular mail upon Douglas G. Collyer, Assistant United States Attorney, Gateway Building, 14 Durkee Street, Room 340, Plattsburgh, New York 12901.

/s/ Leigh M. Skipper
LEIGH M. SKIPPER
Duane Morris LLP

Date: <u>January 11, 2023</u>