**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | **:** | |
| | **:** | |
| **v.** | **:** | **CRIMINAL NUMBER 21-cr-150 (RJL)** |
| | **:** | |
| **JAMES DOUGLAS RAHM, JR.** | **:** | |
| | **:** | |
| **Defendant.** | **:** | |

**SUPPLEMENTAL MEMORANDUM IN SUPPORT OF
DEFENDANT'S MOTION FOR RELEASE PENDING APPEAL**

Defendant James Douglas Rahm, Jr. respectfully submits this supplemental memorandum in support of his motion for release pending appeal to provide additional pertinent information to the Court, given the recent reassignment of this case.

As discussed in Mr. Rahm's principal memorandum, a key criterion for release pending appeal is whether resolution of a substantial question in Mr. Rahm's favor would likely result in a reduced imprisonment sentence that would expire before the appeal concludes. Mem. at 5-7. With respect to the substantial question regarding the felony obstruction count, Mr. Rahm focused on sentences imposed by then-assigned Judge Thomas F. Hogan on January 6 defendants with misdemeanor convictions for conduct similar to Mr. Rahm's. *Id*. at 6. Given the reassignment of this case, Mr. Rahm supplements that discussion with a fuller description of his offense conduct and a broader accounting of sentences imposed in misdemeanor cases.

Ultimately, the conclusion is the same: release is required because, given the median disposition time of appeals in the D.C. Circuit and the delay likely to be introduced in Mr. Rahm's appeal by *Miller*, any reduced imprisonment sentence—and very possibly even Mr. Rahm's current 12-month sentence—will likely expire before the appeal concludes. Mem. at 6-7.

A.      **Mr. Rahm's conduct**

When former-President Trump summoned his supports to Washington, D.C. on the day Congress would meet to certify the Electoral College votes, Mr. Rahm listened, and, on January 5, 2021, traveled with his son from Philadelphia to Washington, D.C. to attend the political rally and show his support.  Unable to enter the rally, Mr. Rahm listened to Trump and the other speakers from across the street.  He then rode a bike to the back of the Capitol, but shortly thereafter left the Capitol grounds to continue riding around the city.  After approximately twenty minutes, Mr. Rahm returned to the Capitol, where he followed a crowd up the steps to the East Rotunda doors.  Mr. Rahm continued to follow the crowd through the doors, encountering no police resistance.  Hundreds of other protestors had preceded him in entering.

 Mr. Rahm stayed in the Capitol for approximately eleven minutes, during which time he wandered through the Rotunda and Statutory Hall holding a flagpole.  When Mr. Rahm reached the Statutory Hall Connector outside the House of Representatives Chamber, where others were attempting to breach the chamber door, Mr. Rahm turned around and proceeded back towards the doors through which he had entered.

Mr. Rahm posted videos and bombastic statements on Facebook about "taking the Capitol back."  As evidenced by his nonforcible entry of, and quick departure from, the Capitol, however, Mr. Rahm came to D.C. with only the intent to support Trump and add his voice to the protests over the perceived injustice of the election.  Mr. Rahm engaged in no planning aside from buying tickets to the rally, nor did he come prepared with any offensive items, such as weapons, body armor, or military garb.  He did not destroy or steal any property, injure anyone, use force of entry, or enter the Senate gallery or legislator offices.

At his sentencing hearing, Mr. Rahm accepted responsibility and expressed deep remorse for his actions, which Judge Hogan credited as sincere.  While noting Mr. Rahm's bombastic Facebook postings and his thirty-year-old marijuana conviction, Judge Hogan varied downward from the applicable Guidelines range due to Mr. Rahm's health and age.  Mr. Rahm has complied with all terms and conditions of release, and will of course report for service of his sentence as ordered in the event bail pending appeal is ultimately denied.

**B.    Resolution of the felony obstruction count issue in Mr. Rahm's favor would likely result in a reduced imprisonment sentence that would expire before the appeal concludes, as evidenced by imprisonment sentences imposed in comparable misdemeanor-only January 6 cases.**

As discussed in Mr. Rahm's principal memorandum, resolution of the felony obstruction count issue in Mr. Rahm's favor would likely result in a reduced imprisonment sentence that would expire before the appeal concludes.  Mem. at 5-6.[1]  Sentences imposed by other judges of this Court in misdemeanor-only January 6 cases are comparable to Judge Hogan's typical probation sentence, ranging from probation to substantially less than 12 months' imprisonment. *See* January 6 Sentencing Chart, attached hereto as Appendix A. This range includes sentences for defendants convicted of 18 U.S.C. § 1752(a)(2) based on conduct and rhetoric far more disruptive and violent than that of Mr. Rahm. *See, e.g.*, *United States v. Marquez*, No. 21-cr-136 (RC) (18 months' probation where defendant traveled to D.C. with a firearm in his car; interfered with officers' duties inside the Capitol; spent ten minutes inside office of Senator Merkley, which suffered substantial damage; remained in Capitol for 53 minutes until escorted out by police; and once outside, had picture taken giving two thumbs up to the crowd); *United States v.*

---

[1]     The same is true for the substantial-interference enhancement issue, for the reasons set forth in Mr. Rahm's principal memorandum.  Mem. at 5-7.  We focus on the felony obstruction count issue here because the additional sentencing information being provided bears on that issue.

*Sidorski*, No. 21-cr-48 (ABJ) (100 days' incarceration where defendant, on day preceding riot, wrote or endorsed statements evincing specific intent to disrupt the certification of the Electoral College vote; made physical contact with an officer; entered Capitol one minute after the Senate Wing Door was kicked open; while inside the Capitol, entered and remained in several locations, including the suite of offices of Nancy Pelosi); *United States v. Simon*, No. 21-cr-346 (BAH) (8 months' incarceration where defendant arrived at the Capitol prepared for violence by wearing a plated tactical vest; pushed a bicycle rack against a line of officers, making physical contact with them and pushing them back; mocked police officers and loudly urged his fellow rioters to put "fear" into the officers; sought out Members of Congress while he was inside the Capitol and urged his fellow rioters to do the same; stayed inside the Capitol for over one hour; actively resisted police officers' efforts to clear the Rotunda; celebrated the riot when interviewed by a local newspaper reporter a week afterwards; lied to the FBI twice about the extent of his participation in the events of January 6, 2021).

As explained in the principal memorandum, in all events, both Mr. Rahm's current and any reduced sentence would likely expire before his appeal concludes.  He therefore respectfully maintains that release pending appeal is required and should be ordered by the Court.

Respectfully Submitted,

/s/ *Anna Kessler*
ANNA KESSLER
Research & Writing Attorney

## <u>CERTIFICATE OF SERVICE</u>

I, Anna Kessler, hereby certify that I have electronically filed and served a copy of

Defendant's Supplemental Memorandum of Law in Support of Motion for Release Pending

Appeal upon Douglas Collyer, Assistant United States Attorney, and Jacqueline Schesnol,

Assistant United States Attorney via this Court's ECF filing system.

/s/ *Anna Kessler*
ANNA KESSLER
Research & Writing Attorney


DATE:  February 18, 2023

# Appendix A

# January 6th Sentencing Chart

## 18 U.S.C. § 1752 Defendants

| Defendant | Judge | Crim. No. | Statute(s) of Conviction | Sentence Imposed | Facts |
|---|---|---|---|---|---|
| Marquez, Felipe | Contreras | 21-136 | 18 U.S.C. § 1752(a)(2) | 18 months' probation, $500 restitution | Marquez (1) traveled from Florida to Washington, D.C., with a firearm in his car (though he apparently did not remove it from the car while in Washington, D.C.); (2) entered the Capitol as part of a mob, with alarms blaring and next to broken glass and windows; (3) once inside the Capitol, interfered with officers trying to protect the building by repeatedly asking them for selfies and fist bumps; (4) spent about 10 minutes, with 20 other rioters, inside the private hideaway office of Senator Merkley, which suffered substantial damage, (5) while in the office, held his vape pen up to the camera showing him smoking; and (6) spent about 53 minutes inside the Capitol, and at 3:42 p.m., police officers escorted him out. Once outside, a photojournalist took a picture of Marquez giving two thumbs to the crowd. |
| Billingsley, Steven | Hogan | 21-519 | 18 U.S.C. § 1752(a)(2) | 24 months' probation 60 hours' community service $500 restitution | Billingsley (1) recorded and posted to Facebook a series of first-person videos and audio depicting him in an array of disruptive conduct on Capitol grounds; (2) as he neared the plaza area in front of the Capitol's Rotunda Doors, he again stated, "We're gonna tear this motherfucker down."; (3) repeatedly screamed, "Push!" at other rioters who were well in front of him and confronting a line of police officers; (4) advanced up steps in front of Rotunda doors and made another video, narrating, "We're up the steps. We're pushing 'em back. We're at the top, ya'll. . . . I'm going to the fucking top. . . . We're taking the House."; (5) taunted, yelled at, and ignored directions from police officers; (6) encouraged and assisted other rioters in breaching the Capitol grounds, including by |

| | | | | | |
|---|---|---|---|---|---|
| | | | | | unhooking a metal barricade and letting himself and other rioters through; (7) engaged in violent rhetoric, including, "we do want to hurt Pelosi. I do. Yeah, I would hang her from that big– you see that tree over there? We'd put a rope and hang her. We hang her and Schumer over there, they'll all go, 'Oh, shit.'" As he said "you see that tree over there. . ." he turned the camera towards the tree; and (8) has expressed no remorse for his actions. |
| Ayres, Stephen | Bates | 21-156 | 18 U.S.C. § 1752(a)(2) | 24 months' probation 100 hours' community service $500 restitution | (1) Made statements on Facebook, prior to January 6, that members of Congress, Chief Justice John Roberts, and Vice President Michael Pence had committed treason and were now put on notice by "We The People""; (2) entered into the Capitol and posted to Facebook images of the riot; (3) remained in Capitol for 1.5 hours; and (3) agreed with another person, in a YouTube video posted after the attack, that "The purpose of today was to expose Pence as a traitor" and "the American people are not going to let this slide" – all words that incite violence |
| Baggott, Matthew | Mehta | 21-411 | 18 U.S.C. § 1752 (a)(2) | 3 months' incarceration 12 months' supervised release 60 hours' community service $500 restitution | Observed the crowd's aggression towards police officers prior to his entry into the Capitol building; on Northwest stairs, attempted to create an opening in the white tarp that covered scaffolding; present for breaking of windows that led to initial breach; entered the Capitol building as part of the first wave of rioters to breach through the Senate Wing Doors and himself engaged in violent behavior by throwing an object at the officers; remained in the Capitol building for more than 40 minutes during which time he traveled far and wide throughout the building, and grabbed at a police officer's baton as he was being expelled from the building. |
| Sidorski, Dennis | Jackson | 21-48 | 18 U.S.C. § 1752 (a)(2) | 100 days' incarceration 12 months' supervised | Sidorski (1) the day before the attack on the United States Capitol, on the Parler application, wrote or endorsed statements evincing his intent to disrupt the certification of the 2020 Electoral College vote count on January 6, 2021, including: |

| | | | | release 50 hours' community service $500 restitution | "[t]hose idiot lawmakers in the Capitol building have no idea what civil unrest is till we the people march into that Capitol building and drag him out by the hair of their heads and boot their butts back home. That is the people's house of representatives. They're about to get served eviction notices."; (2) outside of the Capitol, while law enforcement officers were making their way toward the Capitol through a mob of violent rioters, made unwarranted physical contact with an officer by putting his hand on the officer's shoulder and arm for approximately 3 seconds; (3) approx. 1 minute after the Senate Wing Door was kicked open by the mob, chose to enter the Capitol through that door; (4) while inside the Capitol, entered and remained in several locations, including the Rotunda, the Crypt, Statutory Hall, Upper House Doors, and the suite of offices of Nancy Pelosi. |
|---|---|---|---|---|---|
| Simon, Glen Mitchell | Howell | 21-346 | 18 U.S.C. § 1752(a)(2) | 8 months' incarceration 12 months' supervised release $1,000 fine $500 restitution | Simon: (1) arrived at the Capitol prepared for violence by wearing a plated tactical vest; (2) pushed a bicycle rack against a line of officers, making physical contact with them and pushing them back; (3) mocked police officers as they attempted to defend the Capitol Building and loudly urged his fellow rioters to put "fear" into the officers; (4) sought out Members of Congress while he was inside the Capitol and urged his fellow rioters to do the same; (5) stayed inside the Capitol for over one hour; (6) actively resisted police officers' efforts to clear the Rotunda; (7) celebrated the riot when interviewed by a local newspaper reporter a week afterwards; (8) lied to the FBI twice about the extent of his participation in the events of January 6, 2021. |
| Pert, Rachael Lynn | McFadden | 21-139 | 18 U.S.C. § 1752(a)(1) | 2 months' probation | Pert, a Navy veteran, traveled to D.C. from Florida prepared for violence, stating in a Facebook Live video during her drive, "Got her flags, come with her flagpole, that way I can hit Antifa in the head if need be." On January 6, Pert entered the Capitol shortly after the initial breach and remained inside for |

| | | | | | approximately 35 minutes, when clashes with law enforcement and property destruction were widespread. After being pushed out, she and her co-defendant stood on the steps bragging to others about their actions. |
|---|---|---|---|---|---|
| Cudd, Jenny Louise | McFadden | 21-68-1 | 18 U.S.C. § 1752(a)(1) | 2 months' probation | Traveled to D.C. from Texas with prior knowledge that violence would occur, having posted on social media: "Really grateful that my boyfriend bought me this bulletproof hoody before I got here."<br>In a Facebook Live video on January 6 around 12:30 p.m., Cudd stated that "she was about 3 miles from the Capitol" and "intended to convene with the Proud Boys at the Capitol."<br>Entered through the West Terrace at 2:35 p.m., remained inside for approximately 20 minutes, moved through Statuary Hall, exited the Upper House Door, and remained on Capitol grounds for another hour and twenty minutes.<br>In addition to a plethora of incendiary social media posts, Cudd participated in an interview with a local news station, stating, "I stood up for what it is I believed in. And I can tell you this . . . I would do it again in a heartbeat because I did not break any laws." |
| Cordon, Kevin | McFadden | 21-277 | 18 U.S.C. § 1752(a)(1) | 12 months' probation and 100 hours of community service | Traveled to D.C. from California prepared for violence, wearing light body armor and carrying gas masks.<br>Entered the Capitol during the initial breach "mob scene" by climbing through a broken window near the Senate Wing door.<br>In an interview with a reporter after exiting the building, Cordon stated, "[I]t was a once in a lifetime opportunity to show that the people of this country are not gonna take this corruption lying down." |
| Nalley, Verden | Friedrich | 21-116 | 18 U.S.C. § 1752(a)(1) | 24 months' probation 60 hours' community service | Nalley (1) followed crowds into the Capitol building knowing that it was a restricted building; (2) entered the Capitol building around 2:19 pm, approx. 6 minutes after the first breach of the building, through the Senate wing doors; (3) stayed inside the building walking around for 30 to 40 minutes taking photos and |

| | | | | $500 restitution | documenting his experience; (3) his social media posts after January 6 revealed a lack of remorse for his behavior; and (4) actively spread false information on social media by downplaying the violence on January 6 and threatening to "be back with guns in two weeks if [the election results were] not fixed." |
|---|---|---|---|---|---|
| Lentz, Nicholes | | 22-53 | 18 U.S.C. § 1752(a)(1) | 1 month home detention 36 months' probation 100 hours' community service $500 restitution | Lentz (1) as a former police officer, was acutely aware of the dangers that his and other rioters' presence at the Capitol posed to law enforcement and members of Congress that day, but he nevertheless continued moving through the Capitol even after witnessing violence against law enforcement; (2) ignored his better judgment and overlooked numerous red flags in entering the Capitol, including the use of tear gas; (3) posted images and statements to social media during the riot that celebrated the siege of the building; (4) as he approached the Capitol, posted a photo of himself to social media with the caption "We the people did it."; (5) entered Capitol within minutes of initial breach through window near Senate Wing Door; (6) remained in Capitol for just under one hour; (7) in the Capitol, made his way through multiple rooms, including the Crypt and Capitol Visitor Center; (8) while in the Capitol, broadcasted live on his FB page: "America has spoken. You can not stop millions of people . . . There's no way they can hold us back." |
| Evans III, Treniss | Friedrich | 21-225 | 18 U.S.C. § 1752(a)(1) | 36 months' probation with a condition of 20 days' intermittent confinement $5,000 fine $500 restitution | (1) Evans traveled to Washington, D.C. in early January 2021 with knowledge that violent groups, including the Proud Boys, would participate in the protest and, indeed, with plans to meet up with members of the Proud Boys in Washington, D.C.; (2) Evans entered (and later exited) the Capitol building by stepping through broken windows, which had been smashed open by other rioters; (3) once inside, Evans turned back to face the broken window where other rioters were visible outside, raised a megaphone, and declared, "Bring 'em in"; (4) after entering the Capitol building, Evans walked by a line of |

| | | | | | |
|---|---|---|---|---|---|
| | | | | | U.S. Capitol Police officers who were blocking off a corridor, many of them in riot helmets with clear plastic face shields; (5) inside the Capitol, Evans entered a Congressional conference room, which he believed to be Speaker Nancy Pelosi's, and had someone record a video of him drinking a shot of whiskey; (6) since January 2021 and through the present, Evans has made statements on social media demonstrating a lack of genuine remorse and has raised money off his participation in the January 6 attack; and (7) Evans has glorified political violence on social media, including by saying in February 2022 that he "love[d]" a post threatening to "stack bodies" if members of the "deep state" did not "surrender." |
| Herendeen, Daniel | Howell | 21-278 | 18 U.S.C. § 1752(a)(1) | 14 days' incarceration 2 months' home detention 36 months' probation $500 restitution | Herendeen (1) expected to meet violence at the Capitol before he even left Michigan and told a confidential source, "If I die, I die saving the nation;" (2) consistent with that expectation, planned to take a gun and other tactical gear, but instead took black-tinted goggles, a flak jacket, tactical vest, a canister of bear spray, and a face covering depicting an American flag with him to Washington, D.C.; (3) at the Capitol, wore the goggles, flak jacket, and tactical vest and carried the bear spray inside a black military-style backpack; (4) entered the Capitol through the Senate Wing Door approximately 7 minutes after the initial breach of the Capitol at that location; (5) took photos and videos of himself and other rioters inside the Crypt of the Capitol and posted them on Facebook; and (6) attempted to profit from his participation in the riot by offering to sell photos of himself in the Capitol for further distribution. |
| Grace, Jeremey | Moss | 21-492 | 18 U.S.C. § 1752(a)(1) | 21 days' incarceration 12 months' supervised release | Grace: (1) when approaching the Capitol on January 6, was only a few feet behind other front-line rioters who toppled and pushed through barricades and broke through the police lines; (2) was among the very first wave of rioters who unlawfully entered the Capitol, entering at approximately 2:23 p.m., just 3 minutes after the VP and members of Congress began |

| | | | | 60 hours' community service $500 restitution | evacuating; (3) pressed forward into the Rotunda, despite witnessing flash bangs, tear gas, and other rioters destroying and appearing to steal federal property, including one who appeared to steal a Congressional lectern; (4) escaped the building by climbing through a broken window; (5) responded to the surrounding violence and destruction by proudly taking (and sharing with others) selfie-style photos and videos outside and inside the Capitol, where he gleefully chanted "Our House, Our House," "Just made it into the Capitol here, Oh yeah, oh yeah," and "Freedom"; (6) later destroyed evidence by deleting from his cell phone the incriminating selfie-style photos and videos; (7) later, on two separate occasions, falsely claimed to agents of the FBI that he stayed outside the Capitol and falsely denied that his father and he were the two men depicted in the photographs agents presented to him; and (8) months later tried to profit financially from his participation in the January 6 riot, attending in-person sales events with his father, as they hawked clothing and other paraphernalia with phrases such as "Our House" and "Back the Blue" emblazoned on them. |
|---|---|---|---|---|---|
| Schornak, Robert | Howell | 21-278 | 18 U.S.C. § 1752(a)(1) | 28 days' intermittent incarceration (2 14-day intervals) 2 months' home detention 36 months' probation $500 restitution | (1) he expected to meet violence at the Capitol before he even left Michigan and told a confidential source, "If I die, I die saving the nation;" (2) consistent with that expectation, he planned to take a gun and other tactical gear, but instead took black-tinted goggles, a flak jacket, tactical vest, a canister of bear spray, and a face covering depicting an American flag with him to Washington, D.C.; (3) at the U.S. Capitol Building on January 6, 2021, he wore the goggles, flak jacket, and tactical vest and carried the bear spray inside a black military-style backpack; (4) he entered the Capitol Building through the Senate Wing Door approximately seven minutes after the initial breach of the Capitol at that location; (5) he took photos and videos of himself and other rioters inside the Crypt of the Capitol Building and posted them on Facebook; and (6) |

| | | | | | attempted to profit from his participation in the riot by offering to sell photos of himself in the Capitol for further distribution Entered the capitol at 2:20P and exited at 2:36P. |
|---|---|---|---|---|---|
| Howell, Annie | Hogan | 21-217 | 18 U.S.C. § 1752(a)(1) | 60 days' intermittent incarceration, to be served in 10-day installments, as a condition of probation 36 months' probation 60 hours' community service $500 restitution | Traveled to DC from Pennsylvania; prior to traveling, on January 3, 2021, engaged in Facebook messenger conversation with other individuals she was traveling with, discussing plans for bail, the acquisition of tear gas, and meeting with the Proud Boys; left the rally and returned to hotel, but subsequently left to walk to Capitol once she learned others were attempting to breach defensive perimeters; outside Capitol, participated in various chants including "whose house, our house"; walked through clouds of tear gas; witnesses rioters clashing with officers in their attempt to breach the Lower West Terrace Tunnel entrance; took videos of attempted breach; at 4:50 pm, entered Capitol through a window near LWT Tunnel; at 4:53, sent FB message to group stating she was inside Capitol; took video inside Capitol and sent it to same group at 4:56; when someone advised her to leave, she replied, ""No... No... They just killex (sic) two fucking women... American women... No... I WATCHED THEM DIE... NO FUCKING WAY."; after leaving Capitol, posted messages on social media regarding her involvement in the riot |
| Ashlock, Ryan | Kelly | 21-160 | 18 U.S.C. § 1752(a)(1), (b)(1)(A) | 70 days' incarceration 12 months' supervised release 100 hours' community service $500 restitution | (1) Prepared for the offense, including anticipation of violence, coordination with other Proud Boys, and outfitting with tactical equipment; (2) directly physically contributed to the riot, including ripping up a fence and pulling on a barrier that police were attempting to secure; and (3) made post-offense statements advocating further political violence. |

| O'Brien, Kelly | Lamberth | 21-633 | 18 U.S.C. § 1752(a)(1) | 90 days' incarceration 12 months' supervised release $1,000 fine $500 restitution | (1) posted videos to Facebook during the siege of the U.S. Capitol calling her fellow rioters as "brave patriots"; (2) was aware of the potential for violence, noting in one of her Facebook videos that she was going to stay back, yet ultimately continued closer towards the Capitol building and entered the Capitol; (3) penetrated the U.S. Capitol all the way to the Speaker's office suite; (4) before entering the Speaker's office suite, and while pointing to an overhead sign identifying the Speaker's office suite, told other rioters "Look at that sign. We have to smash this place"; (5) made statements, including "no regrets…[,]" on Facebook in the days immediately following her breach of the Capitol that demonstrated a total lack of remorse; (6) destroyed evidence from her Facebook in an attempt to evade law enforcement detection.<br>Entered the capital at 2:23P and entered the Speaker's suit at 2:33P; she exited the capital at 2:44P. |

**40 U.S.C. § 5104 Defendants**

| Defendant | Judge | Crim. No. | Statute(s) of Conviction | Sentence Imposed | Facts |
|---|---|---|---|---|---|
| Weisbecker, Philip James | Hogan | 21-682 | 40 U.S.C. § 5104(e)(2)(G) | 24 months' probation, with 30 days of intermittent confinement | Traveled from CA to Washington, D.C., and attended the "Stop the Steal" rally before proceeding to protest at the Capitol. At approximately 2:22 p.m., he saw law enforcement officers deploy tear gas into the crowd outside the Capitol, and videotaped protesters as they climbed scaffolding. Just a few minutes after the initial breach through the Senate Wing Door, Weisbecker entered, between 2:22 and 2:24 p.m. He proceeded into the Speaker's suite of offices, and then the Rotunda and Statutory Hall, where he remained until approximately 3:15 p.m.. when he was removed by officers from the |

| | | | | | |
|---|---|---|---|---|---|
| | | | | | Capitol.  During his 53 minutes inside the Capitol, Weisbecker used his cellphone and Cannon camera to take photographs and videos, including of himself inside the Capitol. Between January 6 and March 18, 2021, Weisbecker posted on his website and Facebook page videos and photographs of protesters climbing scaffolding and entering the Capitol.  He also posted a picture of himself standing in the Capitol, right thumb up and right pinky finger extended, with the caption, "All in the name of Freedom for it is not free. . ." |
| Youngers | Hogan | 21-640 | 40 U.S.C. § 5104(e)(2)(G) | 36 months' probation | Youngers, a Marine Corps veteran, traveled from Texas to Washington, D.C. to attend the "Stop the Steal" rally, and then proceeded to the Capitol.  Before entering the Capitol, Youngers observed, "people have just stormed the front of the Capitol building, through tear gas…people aren't supposed to be up there, but they're there." He scaled a wall to reach the Capitol and filmed a confrontation between rioters and police. Youngers entered the Capitol through the Senate Wing Doors at 2:19 p.m., ten minutes after the initial breach, when an alarm was audible. Youngers stated, "We are inside the Capitol Building.  It has been overrun . . . . The Capitol Building has literally been broken in to…this is what a revolution motherfucking looks like." Youngers attempted to open one of Rotunda doors, encouraged entering rioters, and swatted at a police officer. He then moved to the Rotunda, where he said, "Two stories. Two floors. Multiple doors. The Capitol Building's been breached."  He exited the Capitol at 2:32 p.m., having spent approximately 13 minutes inside.  That night at the hotel, he filmed a video denying that there was violence at the Capitol. |

| Bustle, Jessica | Hogan | 21-238 | 40 U.S.C. § 5104(e)(2)(G) | 24 months' probation to include 60 days of home confinement | Bustle and her husband Joshua entered the Capitol and remained for at least 20 minutes. While in and around the Rotunda, Jessica carried signs protesting the government's efforts to vaccinate the population against COVID-19.  Both before and after the riot, Jessica posted to her Facebook account, writing about her purpose for entering the Capitol.  Before traveling to the Capitol, she posted a message that read, in part, "We don't win this thing sitting on the sidelines. Excited to stand for truth with my fellow patriots and freedom fighters in D.C. today."  During or after the riot, she posted a message that read, in part, "Pence is a traitor. We stormed the capital [sic]. An unarmed peaceful woman down the hall from us was shot in the neck by cops. It's insane here." In another message, apparently written after the riot, she wrote "We need a Revolution! We can accept an honest and fair election but this is NOT fair and patriots don't want to see their country brought into communism and destroyed over a lie." |
|---|---|---|---|---|---|
| Jancart, Derek | Boasberg | 21-148 | 40 U.S.C. § 5104(e)(2)(D) | 45 days' incarceration $500 restitution | Jancart (1) prepared for violence by bringing a gas mask and two-way radios to Washington, D.C.; (2) was aware of the potential for violence because he responded to the Capitol only after hearing it had been "breached"; (3) laughed and cheered while the forward line of the rioters broke through the police line and posted a video to Facebook of Rau screaming "we have you surrounded" at the police officers attempting to hold the line around the Capitol; (4) used a bicycle rack to scale a wall; (5) entered Capitol through the Senate Door 5 min. after the window immediately adjacent was smashed; (6) penetrated the Capitol all the way to the Speaker's conference room; (7) spent nearly 40 min. inside Capitol; (8) made statements on Facebook after January 6 |

| | | | | | revealing a total lack of remorse; (9) actively spread propaganda on social media by falsely downplaying the violence on January 6; (10) likely destroyed evidence by deleting videos and message threads from his phone; and (11) made social media statements revealing he believes a revolution is coming and suggesting the possibility of future violence. |
|---|---|---|---|---|---|
| Hatley, Andrew | Hogan | 21-98 | 40 U.S.C. § 5104(e)(2)(G) | 36 months' probation $500 restitution | Traveled from South Carolina to DC; witnessed rioters climbing scaffolding, banging on windows and doors, and breach through window; entered the Capitol through a smashed window in the Senate Wing, with a large group of rioters, and walked through a hallway to the Crypt of the building; took selfie of himself shortly after entering; wore gas mask; stayed in the building for about 15 minutes; entered twice- exited window, stood outside for two minutes, and then climbed back in; took another selfie in front of statute of John Calhoun |
| Reda, Kenneth | Hogan | 21-452 | 40 U.S.C. § 5104(e)(2)(G) | 2 months' home detention 36 months' probation 60 hours' community service $500 restitution | Reda (1) in December 2020, made several posts on Parler encouraging others to join him in Washington, D.C., on January 6; (2) on December 27, posted "It is time to organize PATRIOTS we need to get together and organize against this KABAL we need to overthrow it….they have thrown their last ditch effort to overthrow this election therefore this nation if we do not come together and organize we will LOSE"; (3) through text message, professed his desire to "storm the [H]ouse during the electoral college vote certification" in advance of January 6, 2021; (4) entered the Capitol despite the violence and destruction visible around him; (5) took cell phone video footage of the chaos of the mob as he advanced on Rotunda doors; (4) in Rotunda, was mere feet away from officers fighting with other rioters trying to clear people out; (6) |

| | | | | | |
|---|---|---|---|---|---|
| | | | | | in Capitol, at 3:05, filmed video in which he yelled, "Let's go to the House"; (7) inside Capitol for approximately 10 minutes; (8) following Jan. 6; continued to claim publicly that the day was largely peaceful; (9) minimized the violence and implausibly claimed in an interview, months later, that he had permission to enter the Capitol. |
| Rau, Erik | Boasberg | 21-467 | 40 U.S.C. § 5104(e)(2)(D) | 45 days' incarceration $500 restitution | Rau (1) prepared for violence by bringing Kevlar-lined gloves and a medical kit to Washington, D.C. and wore tactical pants; (2) was aware of the potential for violence because he responded to the Capitol only after Jancart heard it had been "breached" and he scaled a bicycle rack as a ladder to reach the Capitol; (3) encouraged and incited violence by screaming "we have you surrounded" to the police while the forward line of the rioters broke through the police line; (4) entered Capitol through the Senate Door 5 min. after the window immediately adjacent was smashed; (5) penetrated the U.S. Capitol all the way to the Speaker's conference room; (6) deleted evidence from his cell phone of his participation in the January 6 riot; and (7) spent nearly 40 min. inside Capitol. |
| Hemenway, Edward | Chutkan | 21-49 | 40 U.S.C. § 5104(e)(2)(G) | 45 days' incarceration 60 hours' community service $500 restitution | Hemenway (1) treated the chaos and disorder around him as an entertaining spectacle, even posing for a selfie-style photograph in a mob of people inside the Capitol with his middle finger raised; (2) remained inside the Capitol for a brief period of time – approximately 17 minutes – yet made his way into the Crypt, where police officers were being attacked; and (3) once outside, took this photograph standing on a military-style government vehicle with his arms raised in triumph. |

| Reeder, Robert | Hogan | 21-166 | 40 U.S.C. § 5104(e)(2)(G) | 3 months' incarceration $500 restitution | Reeder, after twice breaching the Capitol, remaining—by his own account—in the Capitol for more than a half hour, and being in or around the Capitol for over two hours. Reeder then walked past the Officers, opened an interior door, and proceeded into the Capitol building. From inside the Capitol, Reeder took numerous photos and videos throughout the building. While in the Capitol rotunda, with individual outfitted in combat gear, Reeder turned the camera on himself and says, with some excitement, "tear gas inside the Capitol." Soon after, Reeder was close enough to the Senate chamber to take video of individuals appearing to attempt to breach the doors. Reeder then briefly left the Capitol building, only to turn around and breach the Capitol again. At that time, Reeder recorded a video of himself chanting "USA!" with the crowd as he approached the open doors to the Capitol building. Reeder then recorded another video in which he appears to be around and within the Capitol rotunda. |
|---|---|---|---|---|---|
| Bauer, Robert | Chutkan | 21-49 | 40 U.S.C. § 5104(e)(2)(G) | 45 days' incarceration 60 hours' community service $500 restitution | Bauer (1) treated the chaos and disorder around him as an entertaining spectacle, even posing for a selfie-style photograph in a mob of people inside the Capitol with his middle finger raised; (2) remained inside the Capitol for a brief period of time –17 minutes – yet made his way into the Crypt, where police officers were being attacked; (3) took his photograph outside Capitol standing on a military-style vehicle with a U.S. Government license plate appearing elated; and (4) has not expressed true remorse for his actions, stating to the FBI, "I don't feel like I done nothing terribly wrong." |

| Vinson, Lori | Walton | 21-355 | 40 U.S.C. § 5104(e)(2)(G) | 60 months' probation $5,000 fine 120 hours' community service $500 restitution | Video recorded by another rioter shows Lori leading the way as they climb through scaffolding up to the Capitol Building. Five minutes after the entry depicted above, the Vinsons entered the U.S. Capitol through the Senate Door. The Vinsons pushed to the front of the crowd, with Lori directly at the police line. After a stand off lasting several minutes, the defendants rushed forward as officers were overwhelmed by the advancing crowd At 2:31 p.m., the Vinsons entered the "OAP Corridor" of the 1st Floor of the U.S. Capitol Building, where they were blocked from proceeding further by law enforcement. At 2:33 p.m., the Vinsons entered the Rotunda, where they used their phone to take photographs and record video for several minutes. At approximately 2:37 p.m., Lori and Thomas Vinson exited the Rotunda but remained within the Capitol Building. At 2:39 p.m., as even more rioters pushed inside the Capitol Building, the defendants simply walked back into the Rotunda. Phone location information indicates the defendants were inside the Capitol until approximately 2:50 p.m. Remained in the capitol for roughly 17 min. |
| Torrens, Eric | Howell | 21-204 | 40 U.S.C. § 5104(e)(2)(G) | 3 months' home detention 36 months' probation $500 restitution | Torrens and Griffith capitalized on the attacks that cleared their path and made their way to the stairs underneath the northwest scaffolding. Torrens continued up the northern set of stairs underneath the scaffolding to the northwest terrace, near the Senate wing of the building— a significant breach point on January 6th. Torrens's entrance is captured on the selfie-style video that his codefendant Bledsoe shared on social media. An alarm can be heard blaring in the background. Torrens |

| | | | | | |
|---|---|---|---|---|---|
| | | | | | says, "We're going in!" and co-defendant Griffith screams in excitement.<br>Once inside, Torrens and his co-defendants made their way to the Crypt. Torrens spent time in various parts of the Crypt, which can be seen in surveillance footage. Inside Capitol for approx.. 10 minutes. |
| Ryan, Jennifer | Cooper | 21-50 | 40 U.S.C. § 5104(e)(2)(G) | 2 months' incarceration $1000 fine $500 restitution | Ryan was aware that January 6 could be and did become violent. Hours before any mob formed at the Capitol, she broadcast repeated statements that the day was a "prelude" to "war." Before deciding to join others at the Capitol, she received and read a forwarded tweet reporting that rioters had breached barriers, caused destruction, and overwhelmed police. Minutes later, from her hotel, she streamed on Facebook Live that "we're gonna go down and storm the Capitol; they're down there right now and that's why we came [.]" As she left the hotel, she streamed, "I'm kinda freakin' out. Because I'm going to war."<br>As she arrived at the Capitol, she continued to promote violence. She posted a recording of herself stating that "we're all gonna be up here, we're gonna be breakin' those windows, we're gonna be havin' to deal with the tear bombs" and proclaiming, as she approached the East Rotunda door, "Life or death, it doesn't matter, here we go."<br>At 3:21 p.m., Ryan entered the Capitol through the East Rotunda door with codefendant Hyland, as she streamed herself moving past broken windows while alarms audibly sounded.<br>She left the Capitol interior after only a few minutes, but she recorded herself near the building's exterior between 3:37 and 4:22 p.m. as she encouraged others to enter, shouted "we're pushing our way in," chanted "Hang |

| | | | | | |
|---|---|---|---|---|---|
| | | | | | Mike Pence," and observed that "really, we could go in there" and "the military's not gonna come." <br> She publicly and repeatedly communicated a lack of remorse. In multiple television interviews and in subsequent social media postings that include a smiling self-portrait beside the broken Capitol window described above, and a tweet that January 6 was the "best day of my life." |
| Croy, Glenn | Howell | 21-162 | 40 U.S.C. § 5104(e)(2)(G) | 2 months' incarceration $500 restitution | Croy (1) entered the Capitol after witnessing law enforcement attempt to keep rioters at bay for over an hour, (2) supported violent, aggressive, and antagonistic actions against law enforcement through his presence in a mob overwhelming law enforcement officers and forcing them to retreat further into the Capitol, (3) disregarded the severity of his actions while he trapsed through the Capitol as if it was an amusement park, (4) after leaving the hallway by the House Wing Door, he joined a crowd of rioters in the Memorial Hallway. While there, the defendant took photos and videos of other rioters; (4) entered the Capitol a second time through Rotunda doors and once again went to Rotunda, where he was rounded up by law enforcement and escorted out after approx. 10 min. <br> Once outside, he stayed on the grounds of the Capitol close to the Capitol for approx.. 40 to 45 minutes. |
| Stotts, Jordan | Kelly | 21-272 | 40 U.S.C. § 5104(e)(2)(G) | 2 months' home detention, 24 months' probation, 60 hours' community | Stotts (1) entered the Capitol at 2:45 p.m., having scaled the wall on the Upper West Terrace to gain access to the Capitol, and once inside he raised his fist in support of those who breached the Capitol; (2) at 3:07, made his way to the front of a crowd confronting MPD officers in the Rotunda ad stood face-to-face with and shouted at the officers while they were pushing back rioters, including Stotts at least three times, out of the Capitol Rotunda; (3) |

| | | | | service, $500 restitution | admitted that he remained on Capitol grounds for a couple of hours, returning to his van at approx.. 5:45 pm; (4) admitted seeing protesters throw things at officers and saw one rioter kick in window of Capitol; (5) made post-riot statements on Facebook, in which he boasted about the "siege," claimed the fight was "far from over," and exclaimed, "I'll be back," revealing a total lack of remorse. |
|---|---|---|---|---|---|
| Camper, Boyd | Kollar-Kotelly | 21-325 | 40 U.S.C. § 5104(e)(2)(G) | 2 months' incarceration 60 hours' community service $500 restitution | Camper (1) made it to the top of the Capitol steps where he got tear gas in his eyes; (2) entered the Capitol through UWT door despite seeing violence between rioters and officers; (2) concealed video and audio evidence collected by his Go-Pro camera he brought inside the Capitol; and (3) participated in CBS News video interview while still on or near grounds indicating a complete lack of remorse and suggesting the possibility of future violence. On January 7, 2021, a clip of the interview was posted to YouTube under the CBS Evening News channel. In the video, Camper acknowledged that he was inside the Capitol, stating, "I was on the front line." He further stated, "We're going to take this damn place. If you haven't heard it's called the insurrection act and we the people are ready." |
| Rukstales, Bradley | Nichols | 21-41 | 40 U.S.C. § 5104(e)(2)(G) | 30 days' incarceration $500 restitution | Rukstales engaged in disruptive conduct inside the Capitol when he threw a chair in the direction of officers who had been forced to hastily retreat from encroaching rioters in the Capitol Visitor Center ("CVC"). After officers began arresting rioters in the CVC and a melee broke out in full view of Rukstales, with officers struggling to subdue multiple rioters who were resisting arrest, Rukstales remained in the thick of that chaos and did not leave. He was brought to the floor by an officer, did not comply with the officer's attempts to get him up |

| | | | | | |
|---|---|---|---|---|---|
| | | | | | from the floor, and needed to be dragged by two police officers behind a police line so he could be arrested. Rukstales picked up one of the chairs strewn about the base of the stairwell and hurled it in the direction of where the officers had retreated down the corridor. Ultimately, a third officer was needed to subdue Rukstales, and he and the first officer grabbed Rukstales by his clothing and dragged him several yards to the end of the corridor and behind their defensive line to be arrested. |
| Lolos, John | Mehta | 21-243 | 40 U.S.C. § 5104(e)(2)(G) | 14 days' incarceration $500 restitution | Lolos (1) entered the Capitol through a broken window, with a balaclava that partially covered his face; (2) once inside, Lolos paraded through and remained in the Capitol for approximately forty-three (43) minutes chanting at U.S. Capitol police and waving his flags triumphally, yelling, "They left! We did it!" and only left the Capitol after he was confronted by heavily armed officers; (3) continued his unruly conduct even after the riot when he was removed from a commercial passenger airplane because of repeatedly chanting, "Trump 2020!" while onboard and disturbing other passengers. |
| Scavo, Frank | Lamberth | 21-254 | 40 U.S.C. § 5104(e)(2)(G) | 2 months' incarceration $5000 fine $500 restitution | Scavo, a local political figure from Old Forge, Pa.: (1) traveled from Pa. to D.C., having helped charter buses to transport upwards of 200 local Trump supporters to the rally; (2) shortly after recording some of the assaults on officers and before he entered the building, turned the phone's camera on himself and said, "Here we go"; (3) entered within 3 min. of the violent breach of the Rotunda Doors and those assaults; (4) as he entered the building, moved past at least 2 of the officers who had just been assaulted, held up his cellphone to record video, and walked up a stairwell at a normal pace and toward the Senate Wing of the Capitol; (5) once inside the |

| | | | | | |
|---|---|---|---|---|---|
| | | | | | Capitol, recorded boastful statements on his cellphone about "storm[ing]" and "t[aking] . . . back" the Capitol; (6) stayed inside Capitol for approx.. 10 min; (7) following Jan. 6, made public statements, including a television interview, that either downplayed or made light of his conduct; he acknowledged that after hearing Vice President Pence would not certify the election in Trump's favor, he "hear[d] the first boom," and observed "people up along the railing" and "tear gas and another series of flashbangs." The news station reported that Scavo told the station he was not in the building, and in segments of a video interview that the station published, he did not admit to entering the Capitol. |
| Abual-Ragheb, Rasha | Nichols | 21-43 | 40 U.S.C. § 5104(e)(2)(G) | 36 months' probation with the first 2 months as home detention, 60 hours' community service, $500 restitution | Abual-Ragheb, although inside the Capitol for just 2.5 minute, posed proudly for a photograph, which she posted on social media later that night. She remained on the Capitol grounds for at least another 75 minutes, wandering back and forth among other rioters and occasionally verbally engaging with law enforcement members. She used social media to spread false information about the 2020 Presidential election and repeatedly endorsed violence. In one particular post she urged others to bring firearms with them when they went to D.C. on January 6. And after the riot she defiantly announced on social media that she was ready to "burn" America. |
| Peterson, Russell | Jackson | 21-309 | 40 U.S.C. § 5104(e)(2)(G) | 30 days' incarceration $500 restitution | In the days and months following the 2020 Presidential election, Peterson frequently took to Facebook to voice his view that the election was fraudulent.<br>When the group got to the Capitol grounds and realized tear gas was being deployed, Peterson's mother and wife went back to their car. Peterson, however, continued toward the Capitol building. |

| | | | | | |
|---|---|---|---|---|---|
| | | | | | Peterson first appears around the 1:08 mark of Exhibit A, standing just to the right of those who had been assaulting officers. He continued to watch as the rioters yelled at and berated the officers<br>Entered the capitol at 2:23P and left DC at 4:00P.<br>While inside the Capitol, Peterson live-streamed two videos to Facebook. During the first live-stream, Peterson filmed fellow rioters in the Crypt as they chanted "Stop the steal! Stop the steal!"<br>Law enforcement also conducted a search of Peterson's house on the day of his arrest. Investigators found the tan backpack Peterson was wearing in the photos outside the Capitol (though he appears to have taken it off before going inside). Inside the backpack, there was an axe and a knife. Since this evidence was collected over a month after January 6, it was not possible for investigators to discern whether Peterson took the axe and knife with him to Washington D.C. |
| Ericson, Andrew | McFadden | 21-506 | 40 U.S.C. § 5104(e)(2)(G) | 24 months' probation, $500 restitution | Ericson (1) penetrated the Capitol all the way to the Speaker's conference room and office space; (2) trivialized the level of his intrusion by posing with his feet on the Speaker's conference room table and taking a beer out of a mini refrigerator; (3) saw police officers overrun by the crowd of rioters; (4) recorded his presence in and around the Capitol and posted it on Snapchat while cheering on the criminal activity he was witnessing; (5) entered the Capitol at 2:24P and exited between 2:49 and 3:03P, thus remained in Capitol for 25-39 min; (6) deleted his Facebook and Snapchat1 accounts, although it is not clear this was done in an attempt to destroy incriminating evidence; and (7) appears to have a general lack of remorse, stating only |

| | | | | | |
|---|---|---|---|---|---|
| | | | | | that he would not have entered the Capitol knowing what he knows now. |
| Pham, Tam Dinh | Kelly | 21-109 | 40 U.S.C. § 5104(e)(2)(G) | 45 days' incarceration $1000 fine $500 restitution | Pham (1) saw people trying to incite the police during the riot; (2) walked past knocked-down fences and other barricades to make his way inside the Capitol; (3) while entering the Capitol, amid shouts of "It's our house now," he cheered, "We're taking the house back!"; (4) spent approximately 20 minutes roaming through the Capitol; (5) penetrated the Capitol all the way to an area of offices; (6) falsely downplayed his conduct to FBI agents by claiming that he just wanted to take pictures of the artwork inside the Capitol building; and (7) as an active Houston, Texas police officer with 18 years of experience, including experience of his own responding to demonstrations, he knew full well that entering the Capitol was unlawful, and that it had a potential for serious violence. |
| Nelson, Brandon | Bates | 21-344 | 40 U.S.C. § 5104(e)(2)(G) | 24 months' probation $2500 fine 50 hours' community service $500 restitution | Despite witnessing substantial evidence of a violent riot and destruction of property at the Capitol, Nelson—who spent approximately 6 years as a member of the Air National Guard and an additional 2 years as a Reservist—entered the building at the Senate Wing Door at approx.. 2:16 p.m., less than 5 minutes after rioters had smashed windows on either side of the doorway to gain entry. Approximately 15 seconds before he crossed the threshold, a rioter could be seen climbing through a broken window as other rioters cascaded through the doorway. At 3:30 p.m., Nelson texted his mother, "I got maced." At approximately 3:40 p.m., he texted her again, "There's shit everywhere." He and codefendant Markofski remained inside and entered different parts of the building for well over an hour, an unusually long incursion compared to other Capitol-breach defendants. After the riot, he shared texts |

| | | | | | |
|---|---|---|---|---|---|
| | | | | | with his codefendant that they "held the line" and did not "back[] down," and appeared to agree with Markofski that this behavior was patriotic. At the same time, Nelson submitted to two voluntary interviews with the FBI (though he minimized his conduct in those statements), consented to a search of his apartment, alerted the FBI where evidence could be found in his residence, and expressed a prompt desire to accept responsibility. |
| Markofski, Abram | Bates | 21-344 | U.S.C. § 5104(e)(2)(G) | 24 months' probation $1000 fine 50 hours' community service $500 restitution | Markofski—a member of the Wisconsin Army National Guard—entered the building at the Senate Wing Door, less than 5 minutes after rioters had smashed windows on either side of the doorway to gain entry. He and codefendant Nelson remained inside and entered different parts of the building for well over an hour. While still inside the building, he bragged in a text message that he had "stormed the Capitol and shut it down." After the riot, Nelson texted him that they had "held the line" and did not "back[] down." Markofski agreed and expressed his belief this behavior was patriotic. At the same time, Markofski submitted to three voluntary interviews with the FBI (though he minimized his conduct in his post-arrest interview), produced video and photo evidence of his time at the Capitol and the unlock code to his cellphone, alerted the FBI to where items of evidence were located in his residence and car, and expressed a prompt desire to accept responsibility. |
| Mariotto, Anthony | Walton | 21-94 | 40 U.S.C. § 5104(e)(2)(G) | 36 months' probation $5000 fine 250 hours' community service $500 restitution | Mariotto (1) entered the Capitol through an obviously damaged Senate Wing Door approximately 5 minutes after it was breached; (2) entered and remained in a highly sensitive area of the Capitol building, the Senate Gallery, where he took a selfie-style photograph and posted it to Facebook with the caption "I'm in [sic] And there are just a few [sic] This is our house," and deleted |

| | | | | | his Facebook account soon thereafter; (3) was present for and recorded assaults against the police inside the Capitol; (4) while walking through several hallways, chanted "Where Are the Traitors" and attempted to open multiple closed doors; (5) spent 20 minutes inside the Capitol; and (6) provided a post-arrest interview to a local news station minimizing his conduct on January 6, 2021. |
|---|---|---|---|---|---|
| Register, Jeffrey | Kelly | 21-349 | 40 U.S.C. § 5104(e)(2)(G) | 75 days' incarceration $500 restitution | Register (1) actively led others within the building, by waving them forward, to a critical breach point where rioters almost directly confronted Members of Congress, with the fatal shooting of another rioter by law enforcement the consequence; (2) admitted his intent was to affect the certification proceeding and, even 7 weeks later, and having seen or heard the fatal shooting of a rioter, still wished he had been able to enter the House Chamber; (3) approached and breached the Capitol Building just 5 min after the first wave of rioters, indicating that he was among the initial crowd to surge from the lower west plaza toward the Capitol and overrun police barricades; (4) spent 30 minutes inside the building, and then more than another hour on Capitol grounds; (5) blazed a lengthy path throughout the Capitol, pushing through the Crypt, National Statuary Hall, and then near the Speaker's Lobby; (6) ignored officers' clear attempts to clear him and others from the building; (8) destroyed evidence by factory resetting his phone and then lied to the FBI during his initial interview twice denying that he entered the Capitol. |
| Smith, Jeffrey | Walton | 21-290 | 40 U.S.C. § 5104(e)(2)(G) | 90 days' incarceration 24 months' probation 200 | Smith entered the Capitol after observing that fellow rioters were engaged with police officers who were deploying tear gas and flash bangs. He recorded a video when entering the Capitol through the UWT entrance |

| | | | | | |
|---|---|---|---|---|---|
| | | | | hours' community service $500 restitution | while alarms were blaring. He cheered and incited other rioters as he entered the Capitol, yelling, "We ain't going to take it," and "Let's fucking go patriots." Immediately after successfully breaching the Rotunda doors from the inside to let in the violent mob, Smith pumped his fist in victory and directed the flood of new rioters up the stairs to the third level of the Capitol. Smith also led the removal of barricades from the inside of the Rotunda Case doors and attempted to open those doors to let in a mob of violent and destructive rioters. Although 3 police officers initially prevented him from opening the doors, Smith returned to the Rotunda doors to assist a growing mass of rioters in overwhelming the officers by sandwiching them against the doors which caused the doors to open from the inside and triggering the first and only major breach point on the east side of the Capitol. Smith then led those rioters upstairs. Far from being a follower simply caught up in the crowd, Smith— a former Army sergeant—quite literally led the charge to open the Rotunda doors from the inside to let in a violent mob clearly visible to him through the damaged door windows on the outside.<br><br>At 2:58 p.m., Smith, along with a group of other rioters, approached police officers standing guard outside an access point to the Office of the Speaker of the House. The rioters became very vocal and abusive towards the officers. At 2:59 p.m., Smith was in the front line of these rioters and only inches from the officers. At that time, Smith told the officers to "stand down" and warned them, "We're getting in there one way or another." The rioters soon physically assaulted the officers, but police body worn cameras videos are not clear on whether Smith participated in this physical assault by the rioters. |

| | | | | | |
|---|---|---|---|---|---|
| | | | | | Smith spent a total of 34 min. inside Capitol. He later sent electronic messages revealing a total lack of remorse, writing that he was a "Patriot" who "stormed the capit[o]l," that there was "no way in hell I was going to drive 38 hours from San Diego and not walk right through the front of the capit[o]l building," and that his purpose was "To send a message that Americans are[n']t going to take a fraudulent election." Smith also was  not candid with law enforcement during his interview and minimized his involvement in the Capitol riot. |
| Westover, Paul | Boasberg | 21-697 | 40 U.S.C. § 5104(e)(2)(G) | 45 days' incarceration $500 restitution | Westover (1) was well aware that law enforcement officers were trying to disperse the crowd assembled outside of the Capitol, and yet he surged towards the Capitol anyway; (2) stormed past a group of police officers, which he described as "the front line," after he witnessed another rioter forcibly remove a bike barricade; (3) penetrated the U.S. Capitol all the way to the Speaker's suite and exited through a broken window; (4) witnessed and celebrated the theft of government property by his travel companions; (5) destroyed evidence by deleting photos and videos recorded on January 6 from his Facebook account and cell phone; and (6) spent nearly 40 minutes inside of the Capitol. |
| Webler, Matthew | Friedrich | 21-741 | 40 U.S.C. § 5104(e)(2)(G) | 45 days' incarceration $500 restitution | Webler (1) while taking a video, entered the Capitol through a broken window, traveling past unmistakable signs of violence including broken glass and damaged property; (2) wore a QAnon flag on his back like a cape; (3) cheered and celebrated during the breach, singing "Happy birthday to me," while inside the Capitol, and shouted to the crowd, "Woo, 1776!" upon exiting; (4) remained in Capitol for 21 min; and (5) made statements on Facebook and to law enforcement after January 6 revealing a lack of remorse. |

| Ticas, David | Bates | 21-601 | 40 U.S.C. § 5104(e)(2)(G) | 14 days' incarceration 24 months' probation 60 hours' community service $500 restitution | Ticas, a former Staff Sergeant in the U.S. Marine Corps: (1) brought his 16-year-old daughter inside the Capitol, even after witnessing police officers firing nonlethal munitions against the mob; (2) scaled a metal bike rack barricade that was positioned against the retaining wall of the northwest staircase to climb up on the staircase; (3) entered the Capitol through the Senate Wing Door while filming other rioters entering through smashed out windows right next to that door; (4) moved extensively throughout the Capitol with his daughter at his side; (5) incited his fellow rioters by shouting that the police could not scare them by setting off the non-lethal munitions; (6) mocked and harassed police officers who were guarding the Capitol, and asked them to reveal the location of lawmakers who might be hiding from the mob inside the Capitol; (7) remained in Capitol for 19 minutes; and (8) after leaving the Capitol, repeatedly expressed pride and satisfaction in his participation in the riot, going so far as to call himself a "domestic terrorist". |
| Lindsey, Terry | Howell | 21-162-2 | 18 U.S.C. § 1752(a)(1) 40 U.S.C. § 5104(e)(2)(D) 40 U.S.C. § 5104(e)(2)(G) | 5 months' incarceration on the § 5104 counts to be served concurrently 36 months' probation on the § 1752 count, $500 restitution | Lindsey: (1) was among a group of rioters that surrounded, taunted, and assaulted MPD officers as they arrived to defend the Capitol; (2) shoved an MPD officer during the scuffle; (3) climbed through metal scaffolding to be one of the first rioters to reach the Northwest Courtyard; (4) unlawfully entered the Capitol through the Senate Wing Door at 2:18 p.m., just 5 minutes after the initial breach; (5) proceeded toward the Crypt area of the Capitol while chanting, "who's house? Our house!"; (6) was part of the mob that overran and made physical contact with USCP officers in the Crypt; (7) was forced out of the Capitol but remained on restricted Capitol Grounds for nearly 45 minutes, during which time he claims to have used controlled substances; (8) re-entered |

| | | | | | |
|---|---|---|---|---|---|
| | | | | | the Capitol through a different door amidst a mass of rioters who pushed past police officers who were attempting to keep them out; (9) evaded officers who were attempting to clear the area near the Rotunda doors and then entered the Rotunda; (10) took to social media shortly after the riot to celebrate his conduct and threaten that the "next time," he would return with guns; and (11) lied to FBI agents about the extent of his criminal conduct on January 6 and repeatedly blamed law enforcement officials for his crimes by stating that he was unaware that his conduct was unlawful. |
| Ortiz, Christopher | Cobb | 22-82 | 40 U.S.C. § 5104(e)(2)(G) | 12 months' probation, 2 months' Home Detention,100 hours' community service, $500 Restitution | Ortiz (1) unlawfully entered and exited the Capitol at 3 locations on 3 different occasions within the span of 1 hour; (2) initially chose to enter the Capitol after having witnessed unmistakable signs that the mob was engaged in a violent riot; (3) as he entered the Capitol, incited others to press deeper into the building; (4) while inside the Capitol, joined a large group of rioters in the Rotunda, and pushed some of those rioters towards officers who were trying to clear the area; (5) later that afternoon, positioned himself near the Lower West Terrace tunnel while officers were actively engaged in a physical battle with rioters, and he repeatedly shone a strobe flashlight in the direction of officers over the course of several minutes; (6) later boasted in a text message that he "literally blinded the cops as the proud boys kicked in the door"; and (7) that evening, posted on Instagram video segments that he had recorded that day, in which he, among other things, cheered on other rioters and vowed, "You are never stopping us! You criminals! You'll never stop us!" |

| Carlton, Daniel Jonathan | Hogan | 21-247-2 | 40 U.S.C. § 5104(e)(2)(G) | 36 months' supervised release $500 restitution | Carlton: (1) made 2 separate entries into the Capitol; (2) chose to enter the Capitol after watching rioters climb the scaffolding, smelling tear gas, and seeing billows of smoke rise around him and from the Lower West Terrace, where rioters were clashing with law enforcement; (3) spent approximately 20 minutes inside; (4) aided rioters effected by the chemical irritants by providing water bottles; (5) initially lied to law enforcement officials about his activity on January 6, 2021; (6) admitted he "may have" deleted some texts related to January 6; (7) filmed the chaos around him rather than choosing to leave; (8) has not expressed remorse for his crimes on January 6, and (9) as a corrections officer, should have recognized the dangers that he and his fellow rioters' presence at the Capitol posed to public safety, to law enforcement officials, and to Members of Congress and their staff that day. |
|---|---|---|---|---|---|

| Rodean, Nicholas | McFadden | 21-57 | 18 U.S.C. § 1361; 18 U.S.C. § 1752(a)(1); 18 U.S.C. § 1752(a)(2); 18 U.S.C. § 1752(a)(4); 40 U.S.C. § 5104(e)(2)(D); 40 U.S.C. § 5104(e)(2)(F); 40 U.S.C. § 5104(e)(2)(G) | 5 years' probation, including 240 days' of location monitoring | Rodean (1) smashed two windowpanes of the Capitol with a flagpole and a metal object, which became an entry point for many rioters thereafter; (2) was the 15th rioter to enter the Capitol; (3) pursued U.S. Capitol Police Officer Eugene Goodman up the stairs to the hallway outside of the Senate chamber; (4) remained in the hallway for over 40 minutes, at one point, displaying a hatchet to an officer, and at another point, posing for a photo while waving his "Trump is my President" flag; and (5) the next day, told a supervisor at his job that he "did what needed to be done." |